UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PLAINTIFFS UNDER SEAL | ) | No. |
| v. | ) | **FILED UNDER SEAL** |
| DEFENDANTS UNDER SEAL | ) | COMPLAINT AND JURY DEMAND |

Paul F. Lynch
65 Franklin Street, Suite 500
Boston, MA 02110
Telephone: 617-426-1120
Facsimile: 617-348-2147

Of Counsel:

W. Scott Simmer
Thomas J. Poulin
BLANK ROME LLP
600 New Hampshire Avenue, NW
Washington, DC 20037
Telephone: 202-772-5800
Facsimile: 202-772-5858

Stephen A. Weiss
David R. Buchanan
Scott A. George
SEEGER WEISS LLP
One William Street
New York, NY 10004
Telephone: 212-584-0700
Facsimile: 212-584-0799

*Attorneys for Relators*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* LISA A. ALEXANDER AND JAMES P. GOAN, RELATORS, and on behalf of the STATES of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MARYLAND, the Commonwealth of MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, the Commonwealth of VIRGINIA, WISCONSIN and the DISTRICT OF COLUMBIA,<br><br>*Plaintiffs,*<br><br>v.<br><br>WARNER CHILCOTT PLC, WARNER CHILCOTT CORPORATION, WARNER CHILCOTT (US) INC., and JOHN DOES #1-100, FICTITIOUS NAMES,<br><br>*Defendants.* | ) | No.<br><br>FILED UNDER SEAL<br><br><u>COMPLAINT AND JURY DEMAND</u> |

# TABLE OF CONTENTS

I. INTRODUCTION ....................2

II. JURISDICTION AND VENUE ....................3

III. PARTIES ....................4

A. Plaintiff/Relator Lisa A. Alexander ....................4

B. Plaintiff/Relator James P. Goan ....................5

C. Defendant Warner Chilcott ....................5

D. Defendants John Does #1-100 ....................7

IV. SUMMARY OF DEFENDANTS' ILLEGAL CONDUCT ....................8

A. The Purpose of the Scheme ....................8

B. The Manner and Means of Executing the Scheme ....................8

V. BACKGROUND OF THE REGULATORY FRAMEWORK ....................10

A. The Food and Drug Administration ("FDA") Regulatory System ....................10

1. The FDA Regulates What Drugs May Be Marketed and the Uses For Which They May Be Marketed. ....................10

2. FDA Regulations Prohibit Off-Label Marketing and False and Misleading Statements About a Drug's Use. ....................13

3. The Prescription Drug Marketing Act Regulates the Use of Free Drug Samples and Coupons ....................18

B. The Federal Medicaid Program, 340B Program and the Veteran's Healthcare Act of 1992 ....................19

1. The 340B Program ....................23

2. The Veterans Healthcare Act of 1992 Program ....................23

C. Warner Chilcott's Fraudulent Submission of False Claims to Medicaid and Medicare ....................25

1. Submission of False Claims to Medicaid ....................26

2. Submission of False Claims to Medicare....28

VI. WARNER-CHILCOTT'S FRAUDULENT SCHEME TO INDUCE SALES OF ITS DRUG PRODUCTS....29

A. Warner Chilcott Pressures Sales Representatives to Sell at any Cost or They Will Be Fired....29

B. Flagrant Violations of Its Own Compliance Rules....31

C. The Company Conceals Its Illegal Activity....34

D. Warner Chilcott Fires P&GP Medical Science Liaisons and Instead Has Its Sales Representatives Make Unsubstantiated Scientific Claims Concerning Its Products....36

E. Use of Clinical Studies Downloaded from the Internet as Part of Sales Details....37

F. "Buying the Business": Use of Speaker Programs as Promotional Events to Induce Prescribing of Warner Chilcott Products....38

1. Didactic Speaker Programs: Using Dr. Nostrant to Provide "Free" Medicare Billing Training in Exchange for Inducing the Prescribing of Warner Chilcott Products....40

2. Use of Med-Ed Events (or "Roundtables") to Induce Prescribing of Warner Chilcott Products....42

3. Warner Chilcott's Widespread Use of Med-Eds with No Compliance Controls in Place....47

4. Warner Chilcott's Widespread Payment of Kickbacks Through Didactic and Med-Ed Speaker Programs to Induce Prescribing of its Drug Products....52

G. Warner-Chilcott's Fraudulent Marketing Scheme Related to Drug Discount Coupons, Rebates, Loyalty Programs and Free Drug Samples....53

1. Warner Chilcott Use of Coupons as an Unlawful Waiver of Patient Co-Payments....54

2. Warner Chilcott Games the System by Using Loyalty Cards to Circumvent Cost Controls That Government Programs Use to Encourage Consumers to Use Less Expensive Products....55

2. Free Samples as Kickbacks to Physicians to Induce Prescribing of Warner Chilcott Products and Evade Best Price Reporting....57

H. Warner Chilcott HIPAA Violations and Manipulation Related to Completion of Prior Authorization Forms ....58

I. Warner Chilcott Failed to Submit Promotional Materials to DDMAC ....62

J. Using Improper Influence to Change Formulary Status of Warner Chilcott Products ....63

K. Use of Preceptorships to Influence Prescribing ....64

L. Use of Gifts and Entertainment to Induce Prescribing of Warner Chilcott Products ....65

M. Violations of States' Bans on Gifts and Meals for Doctors ....67

VII. WARNER CHILCOTT'S AGGRESSIVE MARKETING OF ACTONEL® AND ATELVIA® THROUGH OFF-LABEL PROMOTION AND THE PAYMENT OF KICKBACKS ....70

A. FDA Approvals of Actonel® and Atelvia® ....72

B. Aggressive Promotion of Actonel® Through Off-Label and Unsupported Superiority Claims ....73

1. Off-Label Actonel® Claims for the Prevention of Invasive Breast Cancer ....73

2. Unsupported, Off-Label Actonel® Superiority Claims for the Treatment of Atypical Femur Fracture ....75

3. Using Unapproved Reprints to Sell Actonel® Off Label ....78

C. Aggressive Promotion of Atelvia® Off Label and Through Widespread Kickbacks to Induce Prescribing ....85

1. Misrepresenting Safety of Atelvia® in Comparison to Actonel® ....89

2. Using Med-Ed Programs to "Buy" Atelvia® Prescriptions from Speakers and Attendees ....92

3. Unfounded Superiority Claims for Atelvia® ....93

D. Use of Actonel® Credit Cards and Coupons to Induce Prescribing of Actonel® ....95

E. Warner Chilcott Distributes Free Samples of Atelvia® to Illegally Promote Off-Label Sales and Use of the Drug by Federal Program Beneficiaries ....97

F. HIPAA Violations to Overcome Prior Authorization Limits and Encourage Off-Label Prescribing of Actonel® and Atelvia®....100

VIII. AGGRESSIVE MARKETING OF ASACOL® HD THROUGH OFF-LABEL PROMOTION AND PAYMENT OF KICKBACKS....103

A. Background on Asacol® (400 mg) and Asacol® HD....103

B. The Controlled-Release Formulations are Key to the Effectiveness of Asacol® (400 mg) and Asacol® HD....104

C. Warner Chilcott Engaged in Illegal, Off-Label Promotion to Convert All Ulcerative Colitis Patients to Asacol® HD....106

D. Warner Chilcott Illegally Promoted Asacol® HD Off Label for Once-Daily Dosing....111

E. Warner Chilcott Illegally Promoted Asacol® HD Off Label for Pediatric Use....113

F. Warner Chilcott Used Dinner and Speaker Programs as Kickbacks to Induce Physicians to Prescribe Asacol® HD....114

G. Warner Chilcott Used Patient Savings Cards to Transition Patients, Including Medicare and Medicaid Patients, to Asacol® HD....117

H. Warner Chilcott's Illegal Off-Label Promotions Were Tremendously Successful At Growing Sales of Asacol® HD....119

I. Warner Chilcott's Illegal Off-Label Promotion of Asacol® HD Exposed Patients to Increased Risk of Serious Adverse Events....120

IX. AGGRESSIVE MARKETING OF DORYX® THROUGH ILLEGAL INDUCEMENTS AND OFF-LABEL PROMOTION....123

A. Background on Approval, Launch, and Off-Label Promotion of Doryx®....123

B. Warner Chilcott Promoted Doryx® Off-Label for Indications and at Dosages Not Approved by the FDA....124

C. Warner Chilcott's Strategy to Transition the Market to Doryx® 150 mg Through Illegal Coupon and Patient Loyalty Card Campaign....125

D. Use of Unapproved Clinical Studies and Widespread Med-Ed Events to Induce Sales of Doryx® 150 mg....128

E. Manipulating Prior Authorizations to Increase Sales....130

F. Warner Chilcott Promotes Doryx® Off-Label Despite Serious Side Effects and Attempts to Conceal Adverse Events....133

1. “Spinning” Doryx®’s Photosensitivity Risk....135

2. “Spinning” Doryx® IBD Risk....135

X. AGGRESSIVE MARKETING OF ENABLEX® THROUGH OFF-LABEL PROMOTION, MISBRANDING, AND THE PAYMENT OF KICKBACKS TO INDUCE PRESCRIBING....137

A. Overview of Enablex®....137

C. Misbranding Enablex® as Superior to Competing OAB Drugs....139

D. Warner-Chilcott’s Fraudulent Marketing Scheme Related to Enablex® Patient Co-Pay Cards....141

XI. AGGRESSIVE OFF-LABEL PROMOTION AND KICKBACKS TO INDUCE PRESCRIBING OF OF LOESTRIN® 24 FE AND LO LOESTRIN®....141

A. Use of Loestrin Credit Cards to Induce Prescribing....142

B. Widespread Superiority Claims to Yaz®/Beyaz®, Misbranding Loestrin® 24 Fe and Lo Loestrin®....143

C. Widespread Superiority Claims to Ortho Tri-Cyclen®, Misbranding Loestrin® 24 Fe....144

D. Off-Label Promotion of Loestrin® 24 Fe to Treat Acne and PMDD....145

E. Use of Med-Ed events to Induce Prescribing of Loestrin® 24 Fe and Lo Loestrin®....145

XII. WARNER-CHILCOTT’S FRAUDULENT MARKETING SCHEME VIOLATED THE ANTI-KICKBACK ACT....146

XIII. WARNER-CHILCOTT’S FRAUDULENT MARKETING SCHEME VIOLATED WARNER-CHILCOTT’S OBLIGATIONS UNDER THE MEDICAID BEST PRICE STATUTE....148

XIV. WARNER CHILCOTT VIOLATED THE FALSE CLAIMS ACT BY ITS FALSE CERTIFICATIONS OF COMPLIANCE WITH LAW....149

COUNT I (Violation of Federal False Claims Act) (Former 31 U.S.C. § 3729(a)(1); Current 31 U.S.C. § 3729(a)(1)(A) (May 20, 2009))....150

COUNT II (Violation of Federal False Claims Act) (Former 31 U.S.C. § 3729(a)(2); Current 31 U.S.C. § 3729(a)(1)(B) (May 20, 2009))....150

COUNT III (Violation of Federal False Claims Act) (Former 31 U.S.C. § 3729(a)(3); Current 31 U.S.C. § 3729(a)(1)(C) (May 20, 2009))....................................151

COUNT IV (Violation Of Federal False Claims Act) (Former 31 U.S.C. § 3729(A)(7); Current 31 U.S.C. § 3729(a)(1)(G) (May 20, 2009))....................................152

COUNT V (Violation of California False Claims Act) ..........................................................152

COUNT VI (Violation of Colorado False Claims Act) ..........................................................153

COUNT VII (Violation of Connecticut False Claims Act) .....................................................154

COUNT VIII (Violation of Delaware False Claims and Report Act) .......................................156

COUNT IX (Violation of District of Columbia False Claims Act)...........................................157

COUNT X (Violation of Florida False Claims Act)...............................................................158

COUNT XI (Violation of Georgia Medicaid False Claims Act)...............................................159

COUNT XII (Violation of Hawaii False Claims Act) ............................................................161

COUNT XIII (Violation of Illinois Whistleblower Reward and Protection Act) .......................162

COUNT XIV Violation of Indiana False Claims and Whistleblower Protection Act)...............163

COUNT XV (Violation of Louisiana Medical Assistance Programs Integrity Law).................165

COUNT XVI (Violation of Maryland False Health Claims Act)..............................................166

COUNT XVII (Violation of Massachusetts False Claims Act).................................................167

COUNT XVIII (Violation of Michigan Medicaid False Claims Act).......................................168

COUNT XIX (Violation of Minnesota Medicaid False Claims Act) ........................................170

COUNT XX (Violation of Montana False Claims Act) ..........................................................171

COUNT XXI (Violation of Nevada Submission of False Claims to State or Local Government Act) .........................................................................................173

COUNT XXII (Violation of New Hampshire Medicaid False Claims Act) ..............................174

COUNT XXIII (Violation of New Jersey False Claims Act)....................................................175

COUNT XXIV (Violation of New Mexico Medicaid False Claims Act) .................................177

COUNT XXV (Violation of New York False Claims Act)......................................................178

COUNT XXVI (Violation of North Carolina False Claims Act) ....................................................179

COUNT XXVII (Violation of Oklahoma Medicaid False Claims Act) ......................................180

COUNT XXVIII (Violation of Rhode Island False Claims Act) ...............................................182

COUNT XXIX (Violation of Tennessee Medicaid False Claims Act) .......................................183

COUNT XXX (Violation of Texas Human Resources Code, Medicaid Fraud Prevention Chapter)...........................................................................................................................185

COUNT XXXI (Violation of Virginia Fraud Against Taxpayers Act) .......................................186

COUNT XXXII (Violation of Wisconsin False Claims for Medical Assistance Act) ................188

**COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS**
**UNDER 31 U.S.C. § 3729 *ET SEQ.* AND STATE LAW COUNTERPARTS**

This is an action brought on behalf of the United States of America and the *Qui Tam* States by Lisa A. Alexander and James P. Goan ("Relators"), by and through their attorneys, against Defendants Warner Chilcott plc, Warner Chilcott Corporation, and Warner Chilcott (US) Inc. (collectively, "Warner Chilcott," "Defendants," or "the Company"), pursuant to the *qui tam* provisions of the Federal Civil False Claims Act, 31 U.S.C. § 3729, *et seq.* and pursuant to the *qui tam* provisions of the following States: the California False Claims Act, CAL. GOV'T CODE § 12650 (Deering 2000), *et seq.*; the Colorado False Claims Act, COLO. REV. STAT. §25.5-4-304 (2010), *et seq.*; the Connecticut False Claims Act, 2009 CONN. PUB. ACTS NO. 09-5 (Sept. Spec. Sess.), *et seq.*; the Delaware False Claims and Reporting Act, DEL. CODE ANN. Tit. 6, § 1201 (2000), *et seq.*; the District of Columbia False Claims Act, D.C. CODE ANN. § 2-308.13 (2000), *et seq.;* the Florida False Claims Act, FLA. STAT. 68-081 (2000), *et seq.*; the Georgia False Medicaid Claims Act, GA. CODE ANN.§ 49-4-168 (2007), *et seq.*; the Hawaii False Claims Act. HAW. REV. STAT. § 661-22 (2006) *et seq.*; the Illinois Whistleblower Reward and Protection Act, 740 ILL. COMP. STAT. ANN. § 175/1 (2000), *et seq.*; the Indiana False Claims and Whistleblower Protection Act, INDIANA CODE § 5-11-5.5, (2007) *et seq.*; the Louisiana Medical Assistance Programs Integrity, LA. REV. STAT. ANN. § 46.439.1 (2006), *et seq.;* the Maryland False Health Claims Act of 2010, M.D. CODE ANN. ch. 4, § 2-601 (2010), *et seq.*; the Massachusetts False Claims Act, MASS. ANN. LAWS ch. 12, § 5(A), (2007) *et seq.*; the Michigan Medicaid False Claims Act, MICH. COMP. LAWS SERV. § 400.601, (2007) *et seq.*; the Minnesota False Claims Act, MINN. STAT. § 15C.01, *et seq.*; the Montana False Claims Act, MONT. CODE ANN. § 17-8-401 (2005), *et seq.*; the Nevada Submission of False Claims to State or Local Government Act, NEV. REV. STAT. § 357.010

(1999), *et seq.*; the New Hampshire Medicaid False Claims Act, N.H. REV. STAT. ANN. § 167:61-b (2005), *et seq.*; the New Jersey False Claims Act, N.J. STAT. ANN. § 265 (2007); the New Mexico Medicaid False Claims Act, N.M. STAT. ANN. § 27-14-1 (2007), *et seq.*; the New York False Claims Act, N.Y. CLS ST. FIN. § 190.6. (2007), *et seq.*; the Nevada Submission of False Claims to State or Local Government Act, NEV. REV. STAT. § 357.010 (1999), *et seq.*; the North Carolina False Claims Act, N.C. GEN. STAT. § 1-605, *et. seq.*; the Oklahoma Medicaid False Claims Act, OKLA. STAT. tit. 63, § 5053 (2007), *et seq.*; the Rhode Island False Claims Act, R.I. GEN. LAWS § 9-1.1-1 (2008), *et seq.*; the Tennessee Medicaid False Claims Act, TENN. CODE ANN. § 71-5-181(c) (2006), *et seq.*; the TEX. HUM. RES. CODE § 36.001 (2006), *et seq.*; the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 (2006), *et seq.*; and the Wisconsin False Claims for Medical Assistance Act, WIS. STAT. § 20.931 (2007), *et seq.*, ("State *qui tam* statutes" or "*Qui Tam* States").

## I. INTRODUCTION

1. This is an action to recover damages and civil penalties on behalf of the United States and the *Qui Tam* States arising from false and/or fraudulent records, statements, and claims made, used and caused to be made, used or presented by Defendants and/or their agents, employees, or co-conspirators under the False Claims Act and the State *qui tam* statutes.

2. Warner Chilcott has successfully engaged, and continues to engage, in a Fraudulent Marketing Scheme (also, "Scheme," discussed in more detail herein) to maximize its profits in connection with its pharmaceutical products, including Actonel®, Asacol® HD, Atelvia®, Doryx®, Enablex®, Estrace® Cream, Loestrin®, and Lo Loestrin®.

3. Warner Chilcott's scheme includes payments to healthcare professionals of substantial and blatant illegal kickbacks to induce prescribing of Warner Chilcott's drug products, either in place of competitors' products or, in many instances, in place of other Warner

Chilcott products facing imminent patent expiration. The false claims generated by these illegal kickbacks caused the United States and the *Qui Tam* States to pay millions of dollars that should not have been paid, thereby enriching the Defendants, and subjected patients to non-approved, ineffective, and unsafe uses of the Warner Chilcott drug products.

4. Defendant Warner Chilcott unlawfully promoted the Warner Chilcott drug products for numerous off-label conditions. The Defendants' unlawful, off-label promotion and conspiracy to engage in the unlawful acts described in this Complaint caused, or it was foreseeable that they would cause, false and fraudulent claims for payments to be made to the United States and the *Qui Tam* States.

5. Warner Chilcott's Scheme, *inter alia,* (a) knowingly disregarded federal law and formal guidance issued by the Food and Drug Administration ("FDA") regarding off-label promotion; (b) knowingly misrepresented the evidence concerning the efficacy and safety of the off-label uses of the Warner Chilcott drug products; (c) knowingly promoted the Warner Chilcott drug products for uses that were neither effective nor safe; (d) knowingly completed prior authorization forms and/or coached physicians and their staffs on the completion of these forms in violation of HIPAA and the Company's own Code of Ethics; (e) improperly disseminated unapproved publications to physicians; (f) paid financial inducements through "Didactic" and "Med-Ed" speaker programs to "high-decile" doctors and their staffs to induce the prescribing of the Warner Chilcott drug products; and (g) provided prescribers with samples, rebates, and patient coupons in exchange for the prescribers' agreement to write prescriptions for Warner Chilcott's products.

## II. JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1331 and 28 U.S.C. § 1345. The Court has original jurisdiction of the

State law claims pursuant to 31 U.S.C. § 3732(b) because this action is brought under State laws for the recovery of funds paid by the *Qui Tam* States, and arises from the same transaction or occurrence brought on behalf of the United States under 31 U.S.C. § 3730.

7. This Court has personal jurisdiction over the Defendants because, among other things, Defendants transact business in this District and engaged in wrongdoing in this District.

8. Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c). Defendants transact business within this District, and acts proscribed by 31 U.S.C. § 3729 occurred in this District.

9. The causes of action alleged herein are timely brought because, among other things, of efforts by the Defendants to conceal from the United States their wrongdoing in connection with the allegations made herein.

## III. PARTIES

### A. PLAINTIFF/RELATOR LISA A. ALEXANDER

10. Plaintiff/Relator Alexander ("Relator Alexander") is a resident of Marquette, Michigan. She graduated *cum laude* from Northern Michigan University with a BA in Economics. Relator Alexander was employed by Procter & Gamble Pharmaceuticals ("P&GP") as a Senior Account Manager from 2003 until 2009, when P&GP was acquired by Defendant Warner Chilcott. In October 2009, she became a Warner Chilcott employee. While employed at Warner Chilcott, she has been a Portfolio Market Manager in the Northern Michigan territory where she sells Actonel® 35 mg and 150 mg, Atelvia® 35 mg, Asacol® (400mg), Asacol® HD, Enablex® 7.5 mg and 15 mg, Estrace® Cream, Loestrin® 24 Fe, and Lo Loestrin®.

11. Relator Alexander is an original source of the kickback and off-label promotion allegations in this Complaint, and these allegations are not based upon publicly disclosed information. She has provided the government with material information prior to the filing of

this Complaint in accordance with 31 U.S.C. § 3730(b)(2), including thousands of pages of documents and numerous voice recordings.

### B. PLAINTIFF/RELATOR JAMES P. GOAN

12. Plaintiff/Relator James Goan ("Relator Goan") is a resident of West Bloomfield, Michigan. He has a BA in Biology and Physiology from Michigan State University and an MBA from the University of Detroit. Relator Goan was employed at P&GP for over twenty years, during which he held various positions: Territory Sales Representative (1986-1990); Teaching Hospital Account Manager (1991-2005); Managed Care Account Manager, Cardiac Specialist, Field Sales Representative, and finally Strategic Market Manager (2006-2009). When P&GP's pharmaceutical business was acquired by Defendant Warner Chilcott in October 2009, Relator Goan became a Warner Chilcott employee. While employed at Warner Chilcott, he has been a Dermatology and Gastroenterology Market Manager, selling Asacol® (400 mg), Asacol® HD, and Doryx® 150 mg.

13. Relator Goan is an original source of the kickback and off-label promotion allegations in this Complaint, and these allegations are not based upon publicly disclosed information. He has provided the government with material information prior to the filing of this Complaint in accordance with 31 U.S.C. § 3730(b)(2), including thousands of pages of documents and numerous voice recordings.

### C. DEFENDANT WARNER CHILCOTT

14. Defendant Warner Chilcott plc is a publicly traded, for-profit Company organized, existing, and doing business under and by virtue of the laws of Ireland, with its office and principal place of business located at 100 Enterprise Drive, Rockaway, New Jersey 07866-2129. Warner Chilcott plc is listed on the NASDAQ Stock Exchange and trades under the symbol WCRX. Through its direct and indirect subsidiaries, Warner Chilcott plc is engaged in

the discovery, development, manufacturing, and distribution of Actonel®, Asacol® (400 mg), Asacol® HD, Atelvia®, Doryx®, Enablex®, Estrace® Cream, Loestrin®, and Lo Loestrin® in the United States.

15. Warner Chilcott's revenues from the sales of its drugs are substantial, particularly from Government Programs. Based on available information from the CMS website, Medicaid sales were as follows:

| **Total Revenue and Medicaid Reimbursements for Selected Warner Chilcott Products** | | |
|---|---|---|
| **Drug** | **Total Revenue ($mm)** | **Medicaid Reimbursements ($mm)** |
| Actonel® | $1027.2 (2009 – 2010) | $7.9 (Q4 2009 – Q2 2010) |
| Asacol® (400 mg) | $829.6 (2009 – 2010) | $9.6 (Q4 2009 – Q2 2010) |
| Asacol® HD | No figure available due to recent launch | $0.5 (Q1 2010 – 2Q 2010) |
| Atelvia® | $5.3 (launched in November 2010) | No figure available due to recent launch |
| Doryx® | $759.7 (2006 – 2010) | $56.5 (2000 – 2Q 2010) |
| Enablex® | $122.3 (4Q 2009 – 2010) | $5.7 (4Q 2009 – 2Q 2010) |
| Estrace® Cream | $528.9 (2004 – 2010) | $41.8 (2000 – 2Q 2010) |
| Loestrin® 24 Fe | $980.2 (2006 – 2010) | n/a |

16. Defendant Warner Chilcott Corporation is a wholly owned, indirect subsidiary of Warner Chilcott plc and is the direct one-hundred percent shareholder of Warner Chilcott (US) Inc. Warner Chilcott Corporation is organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its office and principal place of business located at 100 Enterprise Drive, Rockaway, New Jersey, 07866-2129.

17. Defendant Warner Chilcott (US) Inc. is a wholly owned subsidiary of Warner Chilcott Corporation. Warner Chilcott (US) Inc. is organized, existing, and doing business under

and by virtue of the laws of the State of Delaware, with its office and principal place of business located at 100 Enterprise Drive, Rockaway, New Jersey 07866-2129.

18. Collectively, these entities shall be referred to herein as "Warner Chilcott" or "the Company."

19. Warner Chilcott currently focuses on the gastroenterology, women's healthcare, dermatology, and urology pharmaceutical markets in North America and Western Europe. Following its spinoff from Warner-Lambert in 1996, Warner Chilcott evolved, through a series of acquisitions and divestitures, from a small seller of undifferentiated products to a fully integrated pharmaceutical company with a broad portfolio of leading branded products. The acquisition of P&GP's global branded pharmaceutical business on October 30, 2009 transformed Warner Chilcott into a global pharmaceuticals company with significant scale and geographic reach. Today, Warner Chilcott has an expanded sales force and infrastructure through which it promotes its products throughout the United States, including in this judicial district.

**D. DEFENDANTS JOHN DOES #1-100**

20. John Does #1-100, fictitious names, are individuals, corporations, limited liability companies, or other lawful business entities through which Defendants do business in the United States and internationally, and who are unknown co-conspirators who conspired with Warner Chilcott to perpetuate the scheme as described herein. To the extent that any of the conduct or activities described in this Complaint were not performed by Defendants, but by the individuals or entities described herein as John Does #1-100, fictitious names, any reference herein to Defendants under such circumstances, and only under such circumstances, refers also to John Does #1-100 and/or other co-conspirators who conspired with Defendants to perpetrate the schemes described herein.

## IV. SUMMARY OF DEFENDANTS' ILLEGAL CONDUCT

### A. THE PURPOSE OF THE SCHEME

21. It was the plan and purpose of Warner Chilcott's Fraudulent Marketing Scheme, beginning at least as early as 2003 and continuing to the present, to reap substantial profits by engaging in a deliberate pattern of fraud and deception involving illegal off-label promotion, kickbacks, and violations of FDA laws and regulations in connection with its pharmaceutical products.

### B. THE MANNER AND MEANS OF EXECUTING THE SCHEME

22. Warner Chilcott utilized its substantial sales force to illegally promote the off-label sales and use of its drugs Actonel®, Asacol® HD, Atelvia®, Doryx®, Enablex®, Estrace® Cream, Loestrin® 24 Fe, and Lo Loestrin® in order to obtain reimbursement for non-FDA-approved indications and maximize profits through false and fraudulent statements to the public, healthcare professionals, and the FDA.

23. It was part of the Scheme that, beginning at least as early as 2003, Warner Chilcott paid illegal kickbacks to influence prescribers. These kickbacks took various forms, including fees for "Roundtable" and "Didactic" speaker programs, as well as excessive gifts to physicians and their staffs, all aimed at inducing them to prescribe Warner Chilcott's products. Warner Chilcott bankrolled these blatant kickbacks by providing its sales force with unprecedented funding of upwards of $180,000 per representative per year — that is, $15,000 per month. The kickback strategy also entailed providing prescribers with samples, rebates, and patient coupons in exchange for the prescribers' agreement to write prescriptions for Warner Chilcott's products. This quid pro quo strategy was intended to (and did) induce physicians to prescribe Actonel®, Asacol® HD, Atelvia®, Doryx®, Enablex®, Estrace Cream®, Loestrin®

24 Fe, Lo Loestrin®, and other Warner Chilcott drug products to Medicare Part D and Medicaid beneficiaries.

24. Warner Chilcott engaged in various other unlawful acts in furtherance of its Scheme, including manipulating prior authorization programs — and in the process violating HIPAA patient protections — as a means of overcoming Government Programs' limitations on reimbursement of Warner Chilcott drugs Actonel®, Atelvia®, Asacol® HD, Doryx® 150mg, Enablex®, Loestrin® 24 Fe, and Lo Loestrin®.

25. It was further part of the Scheme that Warner Chilcott concealed its unlawful conduct related to the promotion and sale of Actonel®, Asacol® HD, Atelvia®, Doryx®, Enablex®, Estrace® Cream, Loestrin® 24 Fe, and Lo Loestrin®, by directing employees to assist in covering up Warner Chilcott's wrongdoing and by falsely certifying its compliance with federal and state laws.

26. Defendant Warner Chilcott's unlawful off-label promotion of and kickbacks related to Actonel®, Asacol® HD, Atelvia®, Doryx®, Enablex®, Estrace® Cream, Loestrin® 24 Fe, and Lo Loestrin® involved the unlawful making of false records or statements and/or causing false claims to be submitted for the purpose of getting the false records or statements to obtain payment or reimbursement for false or fraudulent claims.

27. Defendants' conduct had a material effect on the Governments' decision to pay for Warner Chilcott's drug products. Had the Federal Government and *Qui Tam* States known that Warner Chilcott had induced the prescribing of its drugs through widespread kickbacks and/or off-label promotions, they would not have made such reimbursements.

28. Defendants' perpetration of the Fraudulent Marketing Scheme is ongoing.

## V. BACKGROUND OF THE REGULATORY FRAMEWORK

### A. THE FOOD AND DRUG ADMINISTRATION ("FDA") REGULATORY SYSTEM

#### 1. The FDA Regulates What Drugs May Be Marketed and the Uses For Which They May Be Marketed.

29. Under the Food, Drug and Cosmetics Act ("FDCA"), 21 U.S.C. §§ 301-97, new pharmaceutical drugs cannot be marketed in the United States unless the sponsor of the drug demonstrates to the satisfaction of the FDA that the drug is safe and effective for each of its intended uses. 21 U.S.C. § 355(a), (d). Approval of the drug by the FDA is the final step in a multi-year process of study and testing.

30. To determine whether a drug is "safe and effective," the FDA relies on information provided by that drug's manufacturer; it does not conduct any substantial analysis or studies itself. Applications for FDA approval, known as New Drug Applications ("NDAs"), must include "full reports of investigations which have been made to show whether or not such drug is safe for use and whether or not such drug is effective in use." 21 U.S.C. § 355(b)(1)(A).

31. Under the nation's food and drug laws, a drug may not be introduced into interstate commerce unless its sponsor has shown that the drug is safe and effective for the intended conditions of use. *See* 21 U.S.C. § 321. The law requires that "adequate and well-controlled investigations" be used to demonstrate a drug's safety and effectiveness. *See* 21 U.S.C. § 355(d)(7). The FDA approves a drug if there are "adequate and well-controlled clinical trials" that demonstrate a drug's safety and effectiveness for its "intended conditions" of use. *See* 21 U.S.C. § 355(d)(5). The "intended conditions" for use of a drug are listed in the drug's labeling, which is reviewed and approved by the FDA. *See* 21 U.S.C. § 355(d)(1) & (2). Indications for use that are not listed in a drug's labeling have not been approved by the FDA. *See* 37 Fed. Reg. 16,503 (1972).

32. The standards that govern the FDA safety and effectiveness requirements are contained in statutes, regulations, notices, and guidance documents. The statutory requirement that a drug's effectiveness be demonstrated by "adequate and well-controlled clinical investigations" has been interpreted to mean a clinical study with (1) clear objectives; (2) adequate design to permit a valid comparison with a control group; (3) adequate selection of study subjects; (4) adequate measures to minimize bias; and (5) well-defined and reliable methods of assessing subjects' responses to treatment. *See* 21 C.F.R. § 314.26.

33. The FDA has addressed the need for reproducibility and reliability of clinical data in the trials supporting a drug's approval. Except in certain circumstances, the FDA generally requires two pivotal, adequate and well-controlled trials to support approval. As stated by the FDA in its 1998 *Guidance to the Industry*, "it has been FDA's position that Congress generally intended to require at least two adequate and well controlled studies, each convincing on its own, to establish effectiveness." *See* U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research ("CDER"), Center for Biologics Evaluation and Research ("CBER"), *Guidance for Industry: Providing Clinical Evidence of Effectiveness for Human Drugs and Biological Products*, May 1998; *see, e.g.*, Final Decision on Benylin, 44 FR 51512, 518 (Aug. 31, 1979). FDA's position is based on the language in the statute and the legislative history of the 1962 amendments. Language in a Senate report suggested that the phrase "adequate and well-controlled investigations" was designed not only to describe the quality of the required data but also the "quantum" of required evidence. *See* S. Representative. No. 1744, Part 2, 87th Cong. 2d Sess. 6 (1962). Nevertheless, the FDA has been flexible within the limits imposed by the Congressional Scheme, broadly interpreting the statutory requirements to the extent possible where the data on a particular drug was convincing.

In some cases, the FDA has relied on pertinent information from other adequate and well-controlled studies of a drug, such as studies of involving different doses, regimens, dosage forms, stage of disease, population, and/or endpoints, in order to support a single adequate and well-controlled study demonstrating effectiveness of a new use. In these cases, although there is only one study of the exact new use, there are, in fact, multiple studies supporting the new use, and expert judgment could conclude that the studies together represent substantial evidence of effectiveness.

34. In other cases, FDA has relied on only a single, adequate and well-controlled efficacy study to support approval. These are generally limited to cases in which a single multi-center study of excellent design provided highly reliable and statistically strong evidence of an important clinical benefit, such as an effect on survival, and a confirmatory study would have been difficult to conduct on ethical grounds. In section 115(a) of the Modernization Act, Congress amended section 505(d) of the Act to make it clear that the Agency may consider “data from one adequate and well-controlled clinical investigation and confirmatory evidence” to constitute substantial evidence if FDA determines that such data and evidence are sufficient to establish effectiveness. In making this clarification, Congress confirmed FDA’s interpretation of the statutory requirements for approval and acknowledged the Agency’s position that there has been substantial progress in the science of drug development resulting in higher quality clinical trial data.

35. Cases in which the FDA has approved a drug on the basis of one clinical trial plus confirmatory evidence are rare. They include instances of large, independently conducted multi-center trials with strong empirical results, with internal consistency across multiple outcomes, such that “sponsors faced ethical boundaries” in conducting a second placebo-based trial.

Clinical trials that are not controlled, blinded, randomized, and whose endpoints are not prospectively and objectively determined and measured may be used in early stage drug development phases, but they are exceptionally unlikely to qualify as the "adequate and well-controlled" clinical trials needed to support FDA approval.

36. After a drug is approved, the FDA continues to exercise control over the product labeling. To protect patients from safety concerns, the FDA may require a label change to reflect the increased risk of various side effects or interactions, restrict a drug's indications, or, in extreme cases, force a withdrawal from the market. *See* 21 C.F.R. § 201.57(3).

### 2. FDA Regulations Prohibit Off-Label Marketing and False and Misleading Statements About a Drug's Use.

37. FDA regulations restrict how drug companies may market and promote approved drugs. *See* 21 U.S.C. §§ 331, 352; 21 C.F.R. § 314.81. Drug labels — including all marketing and promotional materials relating to the drug — may not describe intended uses for the drug that have not been approved by the FDA. 21 U.S.C. §§ 331, 352. Illegal "misbranding" can result in criminal penalties. *See* 21 U.S.C. § 333.

38. The same general requirements about the promotion of prescription drugs apply to both professional and consumer-oriented marketing. In particular, promotional materials may only make claims that are supported by "substantial" scientific evidence (according to strict scientific procedures) and they may not be false or misleading. FDA oversight helps ensure a "fair balance" in all promotional claims and materials. Federal regulations require that the risks as well as the benefits be clearly identified and given appropriate prominence. Promotional materials must be consistent with the FDA-approved product labeling. This restriction pertains to the clinical indications for which the drug has been approved as well as to the dosing regimen that is supported by the clinical trials that were undertaken to establish safety and efficacy.

39. A manufacturer like Warner Chilcott wishing to market or otherwise promote an approved drug for uses other than those listed on the approved label must resubmit the drug for a series of clinical trials similar to those required for the initial FDA approval. *See* Food and Drug Administration Modernization Act of 1997 ("FDMA"), 21 U.S.C. §§ 360aaa(b), (c); *see also* 21 C.F.R. § 314.54 (outlining the administrative procedure for filing an application for a new indication); 21 U.S.C. §§ 301 *et seq.* A supplemental NDA must be filed. Unless and until an additional indication is approved by the FDA, the unapproved use is considered to be "off-label."

40. "Off-label" refers to the use of an approved drug for any purpose, or in any manner, other than what is described in the drug's labeling. Off-label use includes treating a condition not indicated on the label, treating the indicated condition at a different dose or frequency than specified on the label, or treating a different patient population than specified on the label, e.g., treating a child when the drug is only approved to treat adults.

41. Although the FDA is responsible for ensuring that a drug is safe and effective for the specific approved indication, the FDA does not regulate the practice of medicine. Once a drug is approved for a particular use, the FDA does not prohibit physicians from prescribing the drug for uses that are different than those approved by the FDA. When considering off-label prescribing, physicians depend on the patient-specific evidence they have available to them. This includes the particular patient, the severity of his or her problems, the successfulness of prior treatment, and the risks of not treating. Whether contemplating on- or off-label use, physicians also rely on personal experience, recommendations from colleagues and academics, educational seminars, and evidence from clinical trials. Much of what physicians rely on is information (or, as the case may be, misinformation) provided by sales representatives from drug

manufacturers, manufacturer-sponsored continuing medical education ("CME") courses and speaker programs, and manufacturer -sponsored clinical trials.

42. Although physicians may prescribe drugs for off-label usage, the law prohibits drug manufacturers from marketing or promoting a drug for a use or patient group that the FDA has not approved. Specifically, a manufacturer illegally "misbrands" a drug if the drug's labeling (which includes all marketing and promotional materials relating to the drug) describes intended uses for the drug that have not been approved by the FDA. 21 U.S.C. §§ 331, 352. The statute, 21 U.S.C. § 331(d), and its implementing regulations, and 21 C.F.R. 202.1(e)(4)(i)(a), prohibit any advertising that recommends or suggests an off-label use for an approved drug, and the FDA has interpreted "advertising" to include a significant amount of speech that would not typically be considered advertising. *See* Final Guidance on Industry-Supported Scientific and Educational Activities, 62 Fed. Reg. 64,074 (Dec. 3, 1997). The FDA "interprets the term 'advertisement' to include information (other than labeling) that originates from the same source as the product and that is intended to supplement or explain the product." *Id.*

43. Any manufacturer speech explaining one of its products is an "advertisement" for the product and is subject to the prohibitions against off-label marketing in 21 C.F.R. 202.1, as well as the FDA's "fair balance" requirement, described below. *Id.*

44. Section 202.1(e)(6)(xi) provides that an advertisement may not use "literature, quotations, or references for the purpose of recommending or suggesting conditions of drug use that are not approved or permitted in the drug package labeling." *See* 21 C.F.R. 202.1(e)(6)(xi); *see also* 21 U.S.C. § 331(d) (prohibiting distribution of a drug for non-approved uses); *Id.* § 331(a) (prohibiting distribution of a misbranded drug); *Id.* § 360aaa (permitting dissemination of material on off-label uses only if the manufacturer meets certain stringent requirements).

45. The FDA regulations that fall under the general rubric of 21 C.F.R. 202.1(e)(6), *et seq*., ban advertisements that are false, lacking in fair balance, or otherwise misleading. The use of unsubstantiated comparative claims is also prohibited by law. *See* 21 U.S.C. § 352; 21 C.F.R. § 202.1(e)(6). Thus, companies such as Warner Chilcott may not promote their approved drugs through unsubstantiated comparative claims that exalt their drugs as safe as or more efficacious than competitors' drugs. Such promotion renders a drug "misbranded" and no longer eligible for reimbursement by Federal Programs, including Medicaid.

46. The regulations prohibit an advertisement that "contains a representation or suggestion that a drug is safer than it has been demonstrated to be by substantial evidence or substantial clinical experience, by selective presentation of information from published articles or other references that report no side effects or minimal side effects with the drug or otherwise selects information from any source in a way that makes a drug appear to be safer than has been demonstrated." 21 C.F.R. 202.1(e)(6)(iv).

47. The regulations require drug companies to present a "true statement" of information relating to the side effects, contraindications and effectiveness of the drug use. *See* 21 C.F.R. 202.1(e)(5), *et seq*. A Company violates this regulation if it presents "false or misleading" information about a drug's side effects or does not "fair[ly] balance" information relating to the safety and efficacy of the drug use against information about its side effects and contraindications. *Id.*

48. Section 202.1(1)-(2) broadly describes "labeling" of a drug as including any material accompanying a drug product that is supplied and disseminated by the manufacturer, packer, or distributor of the drug. 21 C.F.R. 202.1(1)-(2)

49. Section 201.56 requires labeling to be "informative and accurate and neither promotional in tone nor false and misleading in any particular," to "contain a summary of the essential scientific information needed for the safe and effective use of the drug," and prohibits "implied claims or suggestions of drug use if there is inadequate evidence of safety or a lack of substantial evidence of effectiveness." 21 C.F.R. 201.56

50. The FDA has interpreted oral communications as falling under the umbrella of "labeling."

51. Section 21 C.F.R. 99.101 *et seq*. lays out the stringent requirements that must be met by the manufacturer before it may disseminate any materials on unapproved or new uses of marketed drugs. This material must be in the form of an unabridged reprint or copy of a published, peer-reviewed article that is considered "scientifically sound" by experts qualified to evaluate the safety or effectiveness of the drug involved. *See* 21 C.F.R. 99.101(a)(2). The FDA does not consider abstracts of publications to be "scientifically sound." 21 C.F.R. 99.101(b). Unabridged reprints or copies of articles shall not be disseminated with any information that is promotional in nature. 21 C.F.R. 99.101(b)(2).

52. Furthermore, the manufacturer must not disseminate materials that are "false and misleading," such as those that only present favorable information when unfavorable publications exist, exclude mandatory information about the safety and efficacy of the drug use or present conclusions that "clearly cannot be supported by the results of the study." 21 C.F.R. 99.101(a)(4).

53. Off-label information may be disseminated only in response to an "unsolicited request from a healthcare practitioner." 21 U.S.C. § 360aaa-6. In any other circumstance, a manufacturer may disseminate information concerning off-label use only after it has submitted

an application to the FDA seeking approval of the drug for the off-label use and has provided the materials to the FDA prior to dissemination; and the materials themselves are submitted in unabridged form and are neither false nor misleading. 21 U.S.C. §§ 360aaa(b) & (c); 360aaa-1.

54. The FDA does not generally regulate the exchange of scientific information, but when such information is provided by or on behalf of a drug company regarding one of the company's products, the information may be subject to the labeling and advertising provisions of the law and regulations.

55. In sum, the off-label regulatory regime protects patients and consumers by ensuring that drug companies do not promote drugs for uses other than those found to be safe and effective by an independent, scientific government body – that is, the FDA. And the prohibition on unsubstantiated comparative claims protects patients and consumers by ensuring that the prescription and use of approved drugs is not based on misleading marketing tactics.

### 3. The Prescription Drug Marketing Act Regulates the Use of Free Drug Samples and Coupons

56. The Federal Prescription Drug Marketing Act ("PDMA") regulates drug manufacturer use of free drug samples and coupons. For example the PDMA prohibits manufacturers from trading on free samples or coupons. 21 U.S.C. §353 provides that "No person may sell, purchase, or *trade* or offer to sell, purchase, or trade any drug sample" (emphasis added). In addition, "No person may sell, purchase, or trade, offer to sell, purchase, or *trade*, or counterfeit any coupon. For purposes of this paragraph, the term 'coupon' means a form which may be redeemed, at no cost or at a reduced cost, for a drug which is prescribed in accordance with section 503(b)" (emphasis added).

57. As described in this Complaint, Warner Chilcott abused its free samples and coupon program by offering a "trade" with physicians to prescribe its drug products. Warner

Chilcott's offers to "trade" its free products and coupons in exchange for prescriptions succeeded, and violated the letter and spirit of the PDMA.

### B. THE FEDERAL MEDICAID PROGRAM, 340B PROGRAM AND THE VETERAN'S HEALTHCARE ACT OF 1992

58. In 1965, Congress enacted Title XIX of the Social Security Act to expand the nation's medical assistance program for the needy and the medically needy aged, blind, disabled, and families with dependent children. 42 U.S.C. §§ 1396-1396v. This became known as the "Medicaid Program." The Medicaid Program is funded by both Federal and State monies, collectively referred to as "Medicaid Funds," with the federal contribution computed separately for each state. 42 U.S.C. §§ 1396b; 1396d(b).

59. Each State is permitted, within certain parameters, to design its own medical assistance plan, subject to approval by the Department of Health and Human Services ("HHS"). Among other forms of medical assistance, the States are permitted to provide medical assistance from the Medicaid Funds to eligible persons for outpatient prescription drugs. 42 U.S.C. § 1396a(10) (A); 1396d(a) (12).

60. HHS is an agency of the United States and is responsible for the administration, supervision and funding of the federal Medicaid Program. The Centers for Medicare & Medicaid Services ("CMS") is the division of HHS that is directly responsible for administering the federal Medicaid Program. Prior to 2001, CMS was known as the Health Care Finance Administration, or "HCFA."

61. In 1990, Congress enacted the Medicaid Rebate Program, 42 U.S.C. § 1396r-8, as part of the Omnibus Budget Reconciliation Act of 1990 (hereinafter the "Best Price" Program). The Best Price Program is a cost-savings measure that Congress passed in response to increasing

Medicaid expenditures for prescription drugs and requires drug companies to pay rebates to states on their Medicaid purchases.

62. In 1990, Congress reviewed the prices that Medicaid was paying for prescription drugs and determined that Medicaid routinely was paying more than other large drug purchasers for prescription drugs, particularly for "single source drugs" (i.e., drugs protected by patent like Actonel®, Asacol® HD, and Atelvia®, Lo Loestrin®, and Loestrin® 24 Fe). *See* H.R. Representative. No. 101-881, at 96 (1990), *reprinted in* 1990 U.S.C.C.A.N. 2017, 2108. Congress further found that, in order to contain skyrocketing drug costs, state Medicaid programs were denying beneficiaries access to needed medications. *See* 136 Cong. Rec. S12954-01, *S12955 (Sept. 12, 1990). Congress concluded that "Medicaid, the means-tested entitlement program that purchases basic health care for the poor, should have the benefit of the same discounts on single source drugs that other large public and private purchasers enjoy." 1990 U.S.C.C.A.N. at 2108. Congress therefore decided to "establish a rebate mechanism in order to give Medicaid the benefit of the best price for which a manufacturer sells a prescription drug to any public or private purchaser." *Id.*

63. Pursuant to the Medicaid Rebate Act, participating manufacturers who want their drugs covered by Medicaid must contract with the federal government in a manner that is consistent with Congressional intent in passing the Medicaid Rebate Act. A drug manufacturer must enter into a Rebate Agreement with the Secretary of HHS in order for federal matching funds to be made available for that manufacturer's covered outpatient drugs. 42 U.S.C. § 1396r-8(a)(1). Each participating manufacturer must sign, indicating agreement and compliance with all provisions therein, including that "[t]he Rebate Agreement shall be construed in accordance

with federal common law and ambiguities shall be interpreted in the manner which best effectuates the statutory scheme."

64. The Rebate Agreement provides that the Secretary enters the agreement "on behalf of the Department of Health and Human Services and all States and the District of Columbia (except to the extent they have in force an Individual State Agreement)." Upon entering a Rebate Agreement with the Secretary, the manufacturer must pay a quarterly rebate directly to each participating State based on all of the manufacturer's drugs purchased by that State pursuant to its Medicaid plan during that quarter.

65. Drug manufacturers are required under the Medicaid Rebate Statute and Rebate Agreement to calculate and report their average manufacturer prices ("AMPs") and best prices to the Secretary on a quarterly basis. 42 U.S.C. § 1396r-8(b)(3)(A)(i); Rebate Agreement at § II(e). Any information provided by a manufacturer or wholesaler under the rebate statute is confidential and "shall not be disclosed by the Secretary... or a State agency... except as the Secretary determines to be necessary to carry out this section." 42 U.S.C. § 1396r-8(b)(3)(D); Rebate Agreement at § VII.

66. Pursuant to the Rebate Agreement definition of "AMP," "the Average Manufacturer Price for a quarter must be adjusted by the Manufacturer if cumulative discounts or other arrangements subsequently adjust the prices actually realized."

67. In addition, "Best Price" means "with respect to Single Source and Innovator Multiple Source Drugs, the lowest price at which the manufacturer sells the Covered Outpatient Drug to any purchaser in the United States in any pricing structure (including capitated payments), in the same quarter for which the AMP is computed." "Best Price" is "inclusive of cash discounts, free goods, volume discounts, and rebates. . . ." Pursuant to the Rebate

Agreement, a manufacturer is obligated to adjust the best price "if cumulative discounts, rebates, or other arrangements subsequently adjust the prices actually realized."

68. The Rebate Agreement provides that, in the absence of guidance, a manufacturer may make reasonable assumptions in calculating its Best Price, but that those assumptions must be consistent with the Rebate Statute and Agreement and must be documented in either a written or electronic record. Rebate Agreement, II(i).

69. The Rebate Agreement further provides that any ambiguities "shall be interpreted in the manner which best effectuates the statutory scheme," and that "nothing in this Agreement shall be construed to require or authorize the commission of any act contrary to law." Rebate Agreement, IX(e), (d).

70. The information provided by the manufacturer under the Rebate Agreement was to be complete and accurate. Pursuant to Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, and Section 1927(b)(3)(C)(ii) of the Social Security Act, the Secretary could impose penalties of up to $100,000 for each item of false information provided by the manufacturer.

71. States are required to report their total Medicaid drug utilization to each manufacturer and the Secretary sixty days after the end of the rebate quarter. 42 U.S.C. § 1396r-8(b)(2)(A). Using the manufacturer pricing data, CMS computes the unit rebate amount ("URA") "to which the Medicaid utilization information may be applied by States in invoicing the Manufacturer for the rebate payment due." Rebate Agreement at § I(dd). Using the Medicaid drug utilization data, manufacturers calculate and pay the States the rebates they believe are due and owing to each State.

**1. The 340B Program**

72. In 1992, Congress enacted Section 340B of the Public Health Service ("PHS") Act, known as the "340B Program," to provide drug price protection for certain PHS entities that receive federal funds. 42 U.S.C. § 256b. PHS entities include such safety net programs as black-lung clinics, state-operated AIDS-drug purchase-assistance programs, hemophilia diagnostic treatment centers, urban Indian organizations, and disproportionate-share hospitals — all as further defined in the Drug Pricing Program. 42 U.S.C. § 256b(a)(4).

73. Under the 340B Program, drug manufacturers were required to enter into an agreement with HHS with obligations nearly identical to those under the Rebate Agreement and to agree that the amount required to be paid for covered drugs (taking into account any rebate or discount) by the 340B entities would not exceed the average manufacturer price, as reported to HCFA under the Medicaid Rebate Program in the previous calendar quarter, minus a specified rebate percentage. 42 U.S.C. § 256b(a)(l). For each covered outpatient drug, the rebate percentage was to be equal to the average rebate required under the Medicaid Rebate Program during the preceding calendar quarter, divided by the average manufacturer price for the drug during such quarter. 42 U.S.C. §§ 256b(a)(2).

**2. The Veterans Healthcare Act of 1992 Program**

74. The Veterans Administration, through the Veterans Healthcare Act of 1992 (the "VHCA"), administers the purchasing of drugs through the Federal Supply Schedule ("FSS"), where prices are set through negotiations between the government and manufacturers. 48 C.F.R. § 538.270(d). One of the of the main purposes of the VHCA is to control the prices of covered drugs purchased by certain Government agencies, including the Department of Veterans Affairs ("VA"), the Department of Defense ("DoD"), Public Health Service/Indian Health Service

("PHS"), and the Coast Guard. Congress's intent was that each of these "Big 4" agencies receives special pricing discounts on pharmaceuticals in accordance with the VHCA.

75. Under the VHCA, pharmaceutical manufacturers must offer a reduced price for innovator drugs and biologics to certain agencies including the VA, DoD, and PHS in order to participate in Medicaid, Medicare Part B, and certain other federal-funded programs. Through contractual agreements with the VA implementing the requirements of the VHCA, each manufacturer must offer its products on the VA Federal Supply Schedule at prices that are equal to or lower than the Federal Ceiling Price. The Federal Ceiling Price is determined through the use of a statutory formula that provides for a 24 percent discount off of the average price to wholesalers. In addition to complying with the Federal Ceiling Price requirements, manufacturers of brand-name drugs must make all of their covered pharmaceutical products available on the Federal Supply Schedule, as required by the VHCA. The Federal Supply Schedule is a listing of goods available for sale mainly to federal government agencies.

76. Drug prices on the FSS must be equal to or better than the best price charged to the manufacturer's most-favored non-federal customers. *See generally* GAO-02-969T VA and DOD Health Care: Factors Contributing to VA AND DOD HEALTH CARE Factors Contributing to Reduced Pharmacy Costs and Continuing Challenges. To comply with the law's requirements, all manufacturers, including Warner Chilcott, must have entered into a Master Agreement (MA) and a Pharmaceutical Pricing Agreement ("PPA") with the VA, whereby they agree to offer all covered drugs to the Big 4 on their VA Federal Supply Schedule contracts at no more than their calculated Federal Ceiling Price. If a manufacturer does not comply with the pricing requirements, it is not only precluded from selling to the Big 4, but it is also prevented

from receiving payment for the purchase of covered drugs from buyers under Medicaid or any entities that receive funds under the Public Health Service Act.

77. At all relevant times hereto, Warner Chilcott sold, provided, or otherwise supplied to physicians Actonel®, Asacol® HD, Atelvia®, Doryx®, Enablex®, Estrace® Cream, Loestrin®, and Lo Loestrin® at prices lower than the prices listed in the FSS price schedule.

78. As alleged in this Complaint, Warner Chilcott has (through its Fraudulent Marketing Scheme) knowingly failed to provide its lowest prices to Medicaid, the 340B program, or the Veteran's Administration, or knowingly failed to pay rebates due, as required by law or contract. In addition, Warner Chilcott has falsely certified its compliance with its participation in the Federal Medicaid Program, 340B Program and the VHCA.

**C. WARNER CHILCOTT'S FRAUDULENT SUBMISSION OF FALSE CLAIMS TO MEDICAID AND MEDICARE**

79. Warner Chilcott manufactures, sells and promotes prescription drugs that treat a variety of medical conditions that are prescribed to patients whose drug benefits are paid by Government Programs, including Medicaid and Medicare. The prescriptions are filled in pharmacies located all over the United States, where the prescription claim is processed, or "adjudicated."

80. Warner Chilcott knows the role of pharmacies in the conduct of its business, as reflected in its March 2010 10-K:

> We promote a portfolio of branded prescription pharmaceutical products currently focused on the gastroenterology, women's healthcare, dermatology and urology segments of the North American and Western European pharmaceuticals markets. To generate demand for our products, our sales representatives make face-to-face promotional and educational presentations to physicians who are potential prescribers of our products.
>
> By informing these physicians of the attributes of our products, we generate demand for our products with physicians, who then write prescriptions for their patients, who in turn go to the pharmacy where the prescription is filled.

81. As described in this Complaint, Warner Chilcott's Fraudulent Marketing Scheme caused the submission of false claims to Government Programs, including Medicaid and Medicare.

**1. Submission of False Claims to Medicaid**

82. The pharmacies where the Warner Chilcott drugs are filled agree to provide pharmaceuticals to the patients served by the *Qui Tam* States' Medicaid programs, and the *Qui Tam* States in turn reimburse these pharmacies for the cost of the Warner Chilcott drug, plus a fixed dispensing fee meant to provide the pharmacies with a profit for providing services to Medicaid patients.

83. The pharmacies submit their Medicaid claims for reimbursement by "batching them" daily, and submitting them electronically to the *Qui Tam* States. These claims include the claims for off-label prescriptions for the Warner Chilcott drugs, as well as claims tainted by illegal kickbacks. In instances in which claims were for off-label prescriptions or tainted by illegal kickbacks, the pharmacies make false representations and false claims concerning Medicaid reimbursement directly to the *Qui* Tam States on a daily basis.

84. As part of each electronic claim, the pharmacies affix their unique Medicaid provider identification numbers, which serve as electronic stamps indicating that (as Medicaid providers) they are in compliance with all applicable federal and state laws.

85. The pharmacies are reimbursed on a monthly basis by the *Qui Tam* States for all approved claims.

86. The *Qui Tam* States are not financially responsible for paying one-hundred percent of the pharmacies' claims for reimbursement. Medicaid is a joint federal-state program that provides healthcare benefits for certain groups, primarily low-income and disabled persons. The federal government provides matching funds and ensures that the states comply with

minimum standards in the administration of the program. The federal share of states' Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on each individual state's per capita income compared to the national average. Among the states, the FMAP is at least fifty percent, and in some instances, as high as seventy-seven percent. For example, for fiscal year 2004, in Virginia, Massachusetts and Illinois, the federal share is fifty percent. S*ee Federal Medical Assistance Percentages or Federal Financial Participation in State Assistance Expenditures FMAP*, Office of the Assistance Secretary for Planning and Evaluation, http://aspe.hhs.gov/health/fmap.htm (last visited Mar. 29, 2011).

87. Through the FMAP process, State Medicaid administrators obtain the federal government's share of the pharmacies' reimbursements by submitting a quarterly Form 64 to CMS. For this reason, claims submitted to state Medicaid agencies, including those in the *Qui Tam* States, are presented to the federal government within the meaning of the FCA.

88. The federal government pays Medicaid claims through a continuing line of credit certified by the Secretary of the Treasury in favor of the state payee. 42 C.F.R. § 430.30(d)(3), (4). The federal government authorizes the state payee "to draw Federal funds as needed to pay the Federal share of disbursements." 42 C.F.R. § 430.30(d)(3). The state can draw down on those funds only to pay the Medicaid claims of healthcare providers. 42 C.F.R. § 430.30(d).

89. The funds made available to the state thus remain federal funds, in a Federal Reserve account, until they are drawn by the state and used to pay the pharmacies' claims.

90. The federal government also "approves" within the meaning of the FCA the claims submitted and paid through the Medicaid program. When a state presents its Form 64 (i.e., the quarterly report of actual expenditures) to CMS, the amounts of any fraudulent claims the state paid will be included in those reports. Based on the information in the reports, CMS

determines and approves whether the claims that the state paid with federal funds were appropriate. If CMS determines that certain claims paid by the state were improper, CMS may recoup the amount of the erroneously expended funds by reducing the amount of money provided to the state during the next quarter.

91. Because the Form 64 constitutes the United States' means for approving and paying the amount of federal funds expended by the state, these reports overstate the amount of federal funds to which the state was entitled by the amount fraudulently paid as a result of off-label prescriptions for the Warner Chilcott drugs, as well as claims tainted by illegal kickbacks. They are, therefore, false records or statements caused to be made or used to get false claims paid and approved by the United States.

92. The claims for reimbursement submitted by the pharmacies to the *Qui Tam* States, which in turn caused the *Qui Tam* States to submit these claims for reimbursement to the federal government pursuant to FMAP, constitute false claims as a result of the claims for reimbursement for off-label prescriptions and claims tainted by illegal kickbacks.

**2. Submission of False Claims to Medicare**

93. The pharmacies where the Warner Chilcott drugs are filled agree to provide pharmaceuticals to Medicare Part D Plans ("PDPs") for Medicare patients that they serve, and the PDPs in turn reimburse these pharmacies for the cost of the Warner Chilcott drugs, plus a fixed dispensing fee meant to provide the pharmacies with a profit for providing services to Medicare patients. PDPs (or MA-PDPs), are administered under contract with CMS by private entities such as Blue Cross Blue Shield plans, large commercial insurers such as Humana, and pharmacy benefit managers.

94. Every time a beneficiary fills a prescription covered under Part D, PDPs must submit a summary called the prescription drug event, or PDE record. The PDE record contains

drug cost and payment data that enable CMS to administer the Part D benefit. CMS uses the PDE record to calculate reimbursement to PDPs for the cost of the Warner Chilcott drugs, plus an amount meant to provide the PDPs with a profit for administering the PDP.

95. CMS reimbursement to PDPs pursuant to the PDE overstates the amount of federal funds to which the PDP was entitled by the amount fraudulently paid as a result of off-label prescriptions for the Warner Chilcott drugs, as well as claims tainted by illegal kickbacks. They are, therefore, false records or statements caused to be made or used to get false claims paid and approved by the United States.

96. The claims for reimbursement submitted by the pharmacies to PDPs, which in turn caused the PDPs to submit these claims for reimbursement to the federal government, constitute false claims as a result of the claims for reimbursement for off-label prescriptions and claims tainted by illegal kickbacks.

## VI. WARNER-CHILCOTT'S FRAUDULENT SCHEME TO INDUCE SALES OF ITS DRUG PRODUCTS

### A. WARNER CHILCOTT PRESSURES SALES REPRESENTATIVES TO SELL AT ANY COST OR THEY WILL BE FIRED

97. There are some 753 sales representatives working for Warner Chilcott. The sales force is divided into five divisions: Gastroenterology/Dermatology Specialty Representatives, who market Asacol® HD and Doryx®; Dermatology Specialty Representatives, who market only Doryx®; Urology Specialty Representatives, who market Enablex® and Estrace® Cream; Women's Healthcare Representatives, who market Loestrin® 24 Fe, Lo Loestrin®, and Estrace® Cream; and Primary Care Representatives. The Primary Care Representatives are further subdivided into two groups: the Main Sales Force, which previously marketed Actonel® and now markets Atelvia® and Enablex®; and the Portfolio Sales Force, composed of twenty sales representatives, who previously marketed Actonel®, Asacol® (400 mg), Asacol® HD,

Enablex®, Estrace® Cream, and Loestrin® 24 Fe, and now market Asacol® HD, Atelvia®, Enablex®, Estrace® Cream, Loestrin® 24 Fe, and Lo Loestrin®.

98. Sales representatives and managers are "force ranked" against each other as a means of determining who will receive bonuses and who will be fired. Managers are expected to "Fire! Fire! Fire!" under-performing sales representatives, and anyone in the bottom thirty percent by sales is automatically fired. As such, Warner Chilcott's culture is defined by a "[d]o whatever it takes to get the sale" mentality.

99. At the end of the second trimester of 2010, W. Carl Reichel, President of Pharmaceuticals, stated his desire that to fire ninety percent of Warner Chilcott's Primary Care Representatives because eighty-five percent of them had negative share growth for Actonel®. He has also referred to sales representatives as "soccer balls," stating: Kick them to get them moving; when they stop, kick them again; when they run out of air, go get a new soccer ball. Reichel frequently tells new hires: "You produce, or you're fired." He expresses pride when discussing the thirty percent yearly turnover rate for sales representatives, either as the result of forced resignation or termination.

100. Warner Chilcott employs a distinctive hiring bias. It hires, almost exclusively, women in their early- to mid-twenties without any prior pharmaceutical sales experience. During a Plan of Action ("POA") meeting in July of 2010, which included representatives from Michigan, Wisconsin, Illinois, and Minnesota, almost every one of the twenty-five to thirty newly hired sales representatives fit this characterization. (A Plan of Action meeting is a meeting to provide sales representatives with information on the Company's marketing strategy.) None of the new hires to the Primary Sales Force was male, and none appeared to be over the age of thirty.

101. During the past year, Warner Chilcott fired or "packaged out" the majority of the seven hundred P&GP representatives it acquired with the merger. These representatives were then replaced with the type of representative describe above. These new representatives are paid on average one half of what their predecessor P&GP representatives were paid: the average salary for a P&GP representative was approximately $90,000; for a Warner Chilcott representative, it is $45,000. As a result, Warner Chilcott's current sales force is composed of representatives with minimal pharmaceutical sales experience. Nearly seventy percent of the current representatives joined the Company within the past six months.

102. This lack of experience is key to facilitating Warner Chilcott's rogue compliance culture. There are minimal compliance functions of any kind, and those that exist are clearly intended as pro forma gestures, which managers expressly instruct sales representatives to ignore. Even in the present environment of widespread civil and criminal fines levied on other pharmaceutical companies, Warner Chilcott's compliance violations remain flagrant and pervasive throughout the organization. Sales representatives — particularly former P&GP representatives — who complain about these violations are invariably "packaged out" of the company, that is, given severance packages in exchange for their silence.

**B. FLAGRANT VIOLATIONS OF ITS OWN COMPLIANCE RULES**

103. In 2006, Warner Chilcott adopted a "Code of Business Conduct and Ethics" ("Code of Ethics"). The Code of Ethics states members of the Company's senior management will certify annually that they are "aware of and are in compliance with the Company's policies on ethical behavior." One provision of the Code of Ethics deals with its customer interactions and gifts to healthcare professionals:

> It is the Company's policy that the marketing of its products be evidence-based and aimed at enhancing the practice of medicine and appropriate patient care. Interactions with healthcare professionals and other customers must focus on (1)

> providing current, accurate, and balanced information about Company products, and (2) transmitting sound scientific and educational information. In no case shall Company employees offer or pay anything of value to a healthcare professional, or other person or entity in a position to influence prescribing, in order to induce them to purchase, prescribe, use, recommend, or dispense a Company product.

Code of Ethics at 8.

104. Beginning at least as early as 2009, the Company and its top management, including CEO Roger M. Boissonneault and President Reichel, have routinely and flagrantly violated this and other provisions of the Code of Ethics. Not only did they know of the Company's widespread illegal conduct such as kickbacks to healthcare providers, they actively advocated this conduct and were instrumental in ensuring that it was a requisite component of every sales representative's job performance.

105. Most pharmaceutical companies selling drugs in the United States voluntarily follow the Pharmaceutical Research and Manufacturers of America's *Code on Interactions with Healthcare Professionals*, more commonly known as the "PhRMA Code." The PhRMA Code, first adopted in 2002 and amended in 2008, sets forth ethical standards for relationships between healthcare professionals and pharmaceutical and biotechnology companies. The Code does not have the force of law, although the Office of Inspector General of HHS ("OIG") describes it as "useful and practical advice for reviewing and structuring these relationships." OIG's compliance guidance for pharmaceutical manufacturers states that "[a]lthough compliance with the PhRMA Code will not protect a manufacturer as a matter of law under the anti-kickback statute, it will substantially reduce the risk of fraud and abuse and help demonstrate a good faith effort to comply with the applicable federal health care program requirements."

106. The PhRMA Code places specific limitations on interactions between healthcare professionals and companies' representatives. It requires that CME programs remain

independent, that sales representatives receive compliance training and are held to its standards, and that any items provided to healthcare professionals be less than $100 and not of value outside their professional responsibilities.

107. Each year since 2005, the Company has certified to the State of California, pursuant to California Health & Safety Code § 119402, that it has adopted to a "Comprehensive Compliance Program" that complies with the PhRMA Code. While Warner Chilcott states publicly that it has agreed to comply with the PhRMA Code's restrictions on physician gifts and entertaining, it is not a PhRMA Code signatory. CEO Boissonneault announced to the Company's managers and sales representatives that because Warner Chilcott is a European Company, it is not required to follow the PhRMA Code. Boissonneault made this statement at a managers meeting, held in Puerto Rico in November 2010, which was attended by managers from every sales division as well as selected top sales representatives. President Reichel has made similar statements on numerous occasions. For example, at a meeting held in Chicago, Illinois in September 2009 at which Warner Chilcott's senior management met with the four- to five-hundred P&GP representatives that Warner Chilcott would soon be acquiring, a representative asked Reichel how Warner Chilcott was allowed to take doctors and their staffs out two to three nights per week without violating the PhRMA code. Reichel responded: We can do it because we weren't foolish enough to become a member of PhRMA. He continued: We are a European company.

108. Despite the flagrance of the Company's violations and the candidness with which its management acknowledges — and even at times, it seems, takes pride in — those violations, Warner Chilcott does attempt to maintain a façade of compliance through periodic memoranda and compliance presentations. In addition, the Company requires that all sales representatives

each year electronically sign documents certifying that they are unaware of any illegal practices at Warner Chilcott. The documents state that, if employees become aware of violations, they must immediately notify Warner Chilcott's legal department. The documents also contain a provision stating that employees make themselves legally responsible for the financial results of any judgments entered against the Company.

109. Having expressly instructed its employees to behave otherwise, Warner Chilcott is aware that these certifications are false and were only signed under its coercive pressure. The pro forma nature of all these actions is also readily understood by sales representatives, whose District Managers have expressly informed them that the purpose of these measures is to protect the Company. Sales representatives, their managers instruct them, should proceed as they had previously done.

### C. THE COMPANY CONCEALS ITS ILLEGAL ACTIVITY

110. Aware that it is engaged in widespread illegal activity, Warner Chilcott has undertaken efforts to conceal and/or destroy evidence of its ongoing illegal conduct.

111. Many representatives, including Relators, are regularly told that Warner Chilcott does not like documentation. As a result, representatives seldom receive e-mail and are encouraged to send it infrequently. If they have concerns, representatives are instructed to leave voice messages or talk via cell phone only to management. Additionally, for "legal reasons," sales representatives are expressly instructed *not* to detail any of their interactions with physicians in their call notes. E-mails and voicemail are deleted every two weeks to prevent leaving a trail, and files on representatives' computers hard drives are purged on a regular basis. On information and belief, these purges occur every two weeks.

112. Although the Company is required to report adverse events related to its drugs, the Company provides no training to sales representatives about how to report an adverse event.

In fact, sales representatives are regularly instructed that they are to deflect any adverse event concerns raised by healthcare professionals. For example, at a meeting in November 2009 in Chicago, Illinois, Nicola Crawford — then National Vice President for Gastroenterology and Dermatology and now Director of Sales — and President Reichel told Relator Goan and other gathered sales representatives to “spin” any concerns physicians have about adverse events. Indeed, representatives understood that if they did report adverse events they would be fired. Detailed examples related to Actonel®, Atelvia®, and Doryx® are discussed *infra* in the relevant sections.

113. Management has made engagement in widespread kickbacks, false claims of safety and efficacy, and violation of HIPAA patient privacy rules into core requirements of sales representatives’ employment. Any employee who reports compliance violations is “packaged out” of the Company, with a “gag” clause in the severance agreement precluding the representative from ever disclosing the pervasive violations. For example, at the end of 2010, Marcie Cowling, a Gastrointestinal/Dermatology sales representative in Kentucky, objected to her manager’s instructions that she engage in illegal off-label promotion of Asacol® HD, use Med-Ed dinners as a blatant quid pro quo to induce physicians to prescribe Asacol® HD, and violate HIPAA provisions by completing patients’ prior authorization forms. To document her objections, Cowling sent an e-mail in which she detailed her concerns to upper management, including District Manager John Lufborrow and National Vice President for Gastroenterology and Dermatology Nicola Crawford. In response, her manager called her, and following a conversation in which he intimidated and threatened Crowling, fired her. She was “packaged out” the following day.

### D. WARNER CHILCOTT FIRES P&GP MEDICAL SCIENCE LIAISONS AND INSTEAD HAS ITS SALES REPRESENTATIVES MAKE UNSUBSTANTIATED SCIENTIFIC CLAIMS CONCERNING ITS PRODUCTS

114. Warner Chilcott discourages a "scientific sell" of its drugs to physicians. Instead, as CEO Boissonneault instructed during a managers' meeting in Puerto Rico in November 2010, representatives are to "keep it simple" and "sell on relationships" to physicians and their staffs.

115. Most pharmaceutical manufacturers employ Medical Science Liaisons ("MSLs") to convey detailed medical-scientific information to inquiring healthcare professionals. MSLs act as medical liaisons between a pharmaceutical company and the medical community. Most have an advanced scientific degree such as an MD, PhD, or PharmD, allowing them to engage in sophisticated discussions with physicians regarding their employers' drug products. Frequently this means responding to physicians' requests for more information about a product, such as a drug's effectiveness for an off-label indication.

116. Before the sale of its pharmaceutical business to Warner Chilcott, P&GP employed some thirty MSLs. After the sale of P&GP to Warner Chilcott, all of these P&GP MSLs were fired. Warner Chilcott currently employs no MSLs.

117. Warner Chilcott instead relies on its sales representatives to convey any scientific information a physician might request. This is particularly surprising given that managers expressly discourage sales representatives from discussing detailed scientific information, and that those representatives are generally very inexperienced, possessing no advanced medical or scientific training and frequently not even a basic scientific knowledge of the products they are selling. As such, sales representatives are asked to regularly make unsubstantiated product claims to healthcare professionals, exaggerating the efficacy and safety of Warner Chilcott's products.

### E. USE OF CLINICAL STUDIES DOWNLOADED FROM THE INTERNET AS PART OF SALES DETAILS

118. Most pharmaceutical manufacturers have very strict rules about the use of clinical studies in the promotion of their drugs. Generally, any clinical study reprint must be approved by the company and can only be distributed to doctors under very limited circumstances. In contrast, Warner Chilcott has no such approval process and does not provide reprints for representatives to use in detailing. Instead, Warner Chilcott encourages representatives to simply go on the Internet, download, and print studies to share with physicians. District Managers frequently do the same, locating studies on the Internet and then sending them via e-mail to their sales representatives. Frequently, at their POA meetings, representatives and their manager then role play using these studies during off-label promotional details. This practice was particularly prevalent in the promotion of Actonel® and is discussed in detail in the relevant section *infra*. Warner Chilcott's upper managers were not only aware of the use of such studies for the off-label promotion of the Company's drugs, they supported it.

119. Warner Chilcott's widespread use of unapproved studies to make unsupported claims constitutes an illegal misbranding of its drugs. If Warner Chilcott wished to promote its drugs for uses in addition to those already approved by the FDA, the supporting materials must meet certain requirements and be resubmitted for review by the FDA. Food and Drug Administration Modernization Act of 1997, 21 U.S.C. § 360aaa, *et seq*. It was unlawful for Warner Chilcott to introduce into interstate commerce any drug which had not been demonstrated to be safe and effective for each of the intended uses set forth in its labeling. 21 U.S.C. § § 331(a) and (d). Warner Chilcott's off-label promotional practices were in violation of the FDCA and its implementing regulations, including those regulations amended by the FDA Modernization Act of 1997.

### F. "BUYING THE BUSINESS": USE OF SPEAKER PROGRAMS AS PROMOTIONAL EVENTS TO INDUCE PRESCRIBING OF WARNER CHILCOTT PRODUCTS

120. Warner Chilcott uses promotional speaker programs as the core tool to sell its products. The majority of these speaker programs, however, lack speakers. These non-speaker events are essentially "happy hours" for doctors and/or their staffs. Managers instruct sales representatives to invite "high-decile" physicians, that is, those with a high-volume prescribing potential; the staffs of difficult-to-see doctors; and/or staff in charge of processing prior authorizations paperwork. Additionally, nurses are sometimes invited in an attempt to get physicians to attend as well. For example, at a July 2010 POA meeting, Relator Alexander's District Manager Julie Johnson recommended that they were to use "nurses night out" to get physicians to attend Med-Eds. Each of these groups is key to Warner Chilcott's buy-the-business strategy.

121. The aim of this strategy is to convince physicians and their staffs that they "owe" sales representative for the drinks, dinners, and speakers fees that representatives provide to them. Sales representatives seek physicians' commitment to prescribe Warner Chilcott's products and are instructed by their managers to "beat doctors into the ground" if they fail to follow through. New hires are told: "Call doctors on their shit!" That is, if a doctor tells a representative he wrote (or will write) a prescription for a Warner Chilcott prescription but fails to do so, the representative is to pull out payment data from IMS Health, Inc., which shows physicians' prescribing behavior, and say: "No, you didn't! Look at your data!" Using the data in this way is a violation of Warner Chilcott's contract with IMS, which does not permit Warner Chilcott to share the data with any third party.

122. This strategy is in violation of both Warner Chilcott's own Code of Business Conduct and Ethics and FDA regulations, which prohibit pharmaceutical companies from

providing anything of value to healthcare professionals in exchange for prescriptions. Nonetheless, Warner Chilcott managers and sales representatives openly discuss using speaker fees as leverage to induce potential high-prescribing physicians to prescribe Warner Chilcott products. Moreover, they have successfully implemented that strategy, making it one of, if not the, key driver of sales for their new products.

123. While most of these programs lack any educational substance, for those that do include substance, Warner Chilcott also flagrantly violates both its own and FDA rules by directing sales representatives to arrange for off-label promotional presentations. The FDA mandates that all promotional educational presentations must be "on-label," presenting only information about FDA-approved uses contained in the product's package insert. Promotional talks must also contain "fair balance"—i.e., a discussion of the risks and benefits of the drug, including adverse effects, precautions, and warnings. Above all, promotional programs must be truthful and not misleading. All presentation slides, whether provided by the pharmaceutical company or developed by the speaker, should be designed to meet these requirements.

124. Warner Chilcott's speaker events flaunt each of these rules, openly discussing off-label information not supported by adequate clinical evidence, and doing so without reference to requisite precautions and potential adverse events. Even the façade of compliance is minimal; actual efforts at compliance are non-existent. The sales force is responsible for choosing speakers and topics, and until recently, handled negotiations with the presenting speakers.

125. Prior to the merger with Warner Chilcott and continuing until late 2010, all P&GP speaker programs were coordinated by Embryon, Inc., a communications company located in Bridgewater, New Jersey. Beginning in September 2010, Warner Chilcott transferred all the coordination of its speaker programs to *p*-Value Communications, a two-person company located

at 400 Interpace Parkway # 2c, Parsippany, NJ 07054-1120. *p*-Value's role is limited. It performs no apparent compliance function. Rather, it keeps lists of active speakers as well as past programs conducted, and pays speakers following completed programs. Beginning in early 2011, *p*-Value now handles all contract negotiations with speakers. (Previously, many representatives negotiated fees with speakers themselves.)

126. Warner Chilcott uses two different types of speaker programs, known as "Didactic" programs and "Med-Ed" events.

**1. Didactic Speaker Programs: Using Dr. Nostrant to Provide "Free" Medicare Billing Training in Exchange for Inducing the Prescribing of Warner Chilcott Products**

127. "Didactic" programs are traditional promotional speaker programs in which the Company pays a speaker to present from a Company-provided slide set. This type of program is, for the most part, not encouraged within the Company.

128. One notable Didactic speaker regularly used by Warner Chilcott's sales representatives is Dr. Timothy Nostrant, a professor of gastroenterology, pediatric gastroenterology, and internal medicine at the University of Michigan. Nostrant has been used regularly by Warner Chilcott to promote the off-label use of Asacol® HD throughout the United States. In 2010 alone, he gave seventy-two promotional programs for which he was paid $3,000, plus expenses, per program, or some $216,000 in honoraria. The primary topic of Nostrant's program, wildly popular among gastroenterologist attendees, is "How to Increase Revenue and Decrease Jail Time." The Nostrant program instructs attendees how to increase their revenue by increasing the relative value units, or "RVUs," in their Medicare and Medicaid billings.

129. The majority of Nostrant's program, usually some seventy to eighty minutes in length, has nothing to with Asacol® HD but rather instructs physicians how to increase their Medicare and Medicaid reimbursements. Only in the final five minutes of his presentation does

Nostrant discuss the use of Asacol® HD for the off-label treatment of a number of chronic intestinal disorders, including Crohn's and various other forms of irritable bowel disease. Asacol® HD is only indicated for the acute treatment of moderately active ulcerative colitis.

130. Warner Chilcott's free program on Medicare reimbursement is causing physicians to prescribe Asacol® HD rather than cheaper and more clinically appropriate medications — that is, medications approved by the FDA for the conditions for which physicians are instead prescribing Asacol® HD. The program is a clear quid pro quo, as physicians find it to be of tremendous value, resulting in greater Medicare and Medicaid reimbursements, and in the absence of Warner Chilcott's free provision, they would be necessitated to pay for it themselves. In exchange, these doctors prescribe Asacol® HD out of gratitude to the sales representative who invited them to the program. For those doctors that do not immediately begin prescribing Asacol® HD, representatives are instructed to tell physicians that they "owe" Warner Chilcott for the program, and that as a result they should prescribe Asacol® HD in lieu of lower-priced and/or on-label options.

131. At the direction of his manager, Relator Goan held a speaker program with Nostrant on February 10, 2011 at Marco's Italian, a restaurant in West Bloomfield, Michigan. Eight doctors and two staff members attended. The staff members were chosen because they were in charge of billing Medicare and processing prior authorization forms. Nostrant spoke primarily about how physicians could increase their Medicare reimbursements while avoiding jail time, as well as for approximately five minutes about Asacol® HD. Nostrant's presentation for Asacol® HD was blatantly off label, involving discussion of Asacol® HD use in all ulcerative colitis patients, including those on maintenance therapy, for which Asacol® HD is not indicated. Speaker Nostrant was paid $3,000 for this presentation. The dinner bill was $800.

132. Nostrant's programs have a proven track record of increasing off-label prescriptions of Asacol® HD, generally by ten to twenty percent per program among the attending physicians. Many of these new prescriptions are for off-label indications, and as indicated by the content of Nostrant's presentation, which signals that the attendees' patients are Medicare beneficiaries, many of these off-label prescriptions were likely reimbursed by Medicare or other Government Programs.

**2. Use of Med-Ed Events (or "Roundtables") to Induce Prescribing of Warner Chilcott Products**

133. The second, and far more prevalent, type of promotional speaker program used at Warner Chilcott is referred to as a Medical Education Event, or more commonly, a "Med-Ed event" or simply "Med-Ed." Very little education, however, actually takes place at these events. Instead, these are opportunities for Warner Chilcott sales representatives to "wine and dine" physicians and/or their staffs, and to purchase them numerous drinks and lavish dinners. On most occasions there is at most a passing mention of any Warner Chilcott drug product during the event.

134. Med-Ed events are further separated into two categories: the first is a Med-Ed with no speaker, which is essentially a dinner or happy hour with a doctor and/or his staff; the second is a Med-Ed with a "Roundtable speaker," which is a dinner with multiple doctors and/or staff. The latter events are commonly referred to as "Roundtables."

(i) Med-Ed Events Without Speakers

135. Given the inexperience of Warner Chilcott's sales force, by far the most common Med-Ed events are those without speakers. During these, the sales representative simply takes the doctor's staff out for dinner and/or a "happy hour." The name excepted, there is no

educational component to a Medical Education event without a speaker. The goal of Med-Ed events without speakers is simply to become "buddies" with the physicians and their staffs.

136. For example, on July 15, 2010, Relator Goan conducted a Med-Ed at Ruth Chris' Steakhouse in Troy, Michigan. In attendance were Drs. Hans-Juergen Stein, Omar Kadro, and Harry Wasvary, as well as the entire staff of their practice. The bill was $1,820. There was no discussion of Asacol® HD or any other Warner Chilcott product during the event.

137. "Journal Clubs," effectively a form of Med-Eds, functioned in this same manner. While the name suggests an educational purpose, there was generally no educational content to these programs. On March 23, 2010, Relator Goan hosted a journal club for gastrointestinal physicians, including Drs. Michael Piper, Mark Devore, Bradley Warren, Randall Jacobs, and six GI fellows, at Shiraz Restaurant in Bingham Farms, Michigan. There was no serious clinical discussion of Asacol® HD or any other Warner Chilcott product. Relator Goan sold Asacol® HD to individual physicians "on the side." The bill was $1,264. As described *infra*, Relator Goan held these events at the repeated instructions of his managers. He believed that he would be fired if he did not do so.

138. Since there was absolutely no educational purpose for these Med-Eds, the *only* purpose of these events is to build a relationship with the attendees, with whom the sales representative later has "the business discussion." During the business discussion, the sales representative informs the physician or staff member that he or she "owes" it to the representative and Warner Chilcott to prescribe Warner Chilcott's drug products, or in the case of a staff member, to process the prior authorization paperwork to ensure reimbursement for those products. In many instances the business discussion is not necessary, as physicians and staff take these actions on their own accord out of gratitude to the sales representative.

139. Warner Chilcott's upper management expressly informed sales representatives of the centrality of Med-Ed events to their sales strategy from the outset of the Company's acquisition of P&GP. At the transfer-of-power meeting in Chicago, Illinois in September 2009, President Reichel told attendees that Med-Ed events were Warner Chilcott's "competitive advantage." This statement was made in reference to the PhRMA Code, which prohibited adherents from engaging in similar activities. New previsions of the amended PhRMA code, which took effect in January 2009, strictly prohibit member companies from providing restaurant meals to healthcare professionals, only allowing them to provide modest meals in healthcare professionals' offices or in hospitals in conjunction with educational presentations. The many PhRMA members that market drugs competing directly with Warner Chilcott's are therefore prevented from using an analogous "wine and dine" strategy. For example, Warner Chilcott markets: Actonel® and Atelvia® against Evista® (Eli Lilly); Loestrin® 24 Fe and Lo Loestrin® against Yaz® and Beyaz® (Bayer), as well as against Ortho-Tri-Cyclen® (Johnson & Johnson); and Enablex® against Vesicare® (Atellas/GlaxoSmithKline), as well as against Detrol LA® and Toviaz® (Pfizer). Each of these competitors is a signee to the PhRMA code.

140. President Reichel indicated that Med-Eds had a history of success, further stating that the most successful sales representatives were the ones with the most Med-Eds. Reichel stated that wining and dining staff and physicians fostered personal relationships with Warner Chilcott representatives, resulting in what he called a "culture of accountability." Reichel's statement was an apparent reference to these events being a quid pro quo for prescriptions, as well as to the importance of the "business discussion."

141. Representatives are currently required to conduct two to three Med-Ed events, with or without speakers, per week. Numerous representatives have been fired for failing to

meeting this quota. Representatives who fully embrace the Warner Chilcott philosophy frequently conduct more than the minimum number of events per week, some doing four, five, or more. Managers applaud these representatives for their excessive spending. They are easily identified because they often use the entirety of their $15,000 to $20,000 budget each month. One such representative is Mark Szachowicz, a Women's Healthcare Representative for the Greater Milwaukee Area. Szachowicz is currently ranked in the top twelve percent of representatives on the Women's Healthcare Force and was recently recognized via Audix by Regional Vice President Michael Koellhoffer as a "perfect example of what success can and should look like." Representative Szachowicz — who averages four Med-Eds per week, utilizing his entire budget on a regular basis — regularly pays for Med-Eds but rarely actually attends them. Thus, no medical information is actually conveyed. Prescriptions are simply bought.

142. Warner Chilcott sales representatives frequently joke between themselves about the excessive quantities of money they spend on these events, and some representatives consider it a challenge to see who can spend the most money on a Med-Ed event. With no firm limit on spending, some events have become outlandishly expensive. For example, primary care sales representative Peter Zimmerman of Milwaukee, Wisconsin conducted a happy hour in late 2010 with a large office for which the total bill exceeded $2,000. Little to no medical information was conveyed at this event.

143. Representatives are held accountable for the return on investment of their Med-Ed events. If doctors are taken out to dinner, a representative must demand that they write prescriptions. If nurses and/or medical assistants are taken out to dinner, they are expected to complete prior authorizations. If receptionists are taken out to dinner, they are expected to help

the sales representative obtain additional access and time with physicians in that office. For example, in a March 1 – 2, 2011 Field Coaching Report, District Manager Julie Johnson criticized Relator Alexander for failing to convince physicians to write prescriptions in exchange for attendance at Med-Ed events. Manager Johnson stated: "Med-ed Activity: JAN-7, FEB-10, MAR-12 (planned). Med-eds are crucial to driving increased business results. The scoring above for med-eds is NI (needs improvement) because the med-eds you delivered have not led to increased efficancy. For example looking at your med-eds & call activity from JAN 7 thru the end of FEB you have had 2 seperate med-eds each with Drs Huffman, Said & Slajus (6med-eds total)........ yet none of them have even written one script for Atelvia."

(ii) Med-Ed Events with a Speaker

144. The typical Warner Chilcott Med-Ed with a speaker (or "Roundtable") lasts two to three hours. Roundtables are informal dinners without slide sets. "Speakers" simply share their opinions about Warner Chilcott products over dinner — and lots of wine.

145. Speakers are selected for their high market volume (decile) and high potential for prescribing Warner Chilcott products. Occasionally, lower volume (decile) physicians, or nurse practitioners and physicians assistants, are selected for their connections to higher-prescribing healthcare professionals.

146. As further evidence that Warner Chilcott cares little about the substance of what these speakers say, but rather only about inducing them to write Warner Chilcott products, speakers receive very little training other than listening to a one hour pre-recorded online compliance tutorial. Speakers are never tested to determine if they have actually understood or paid attention to the compliance program.

147. Despite the fact that Warner Chilcott's Master Speaker Services Agreement that all speakers sign states that they will only use Company-prepared slide decks and informational

materials, most Roundtable speakers do not use Warner Chilcott's prepared slides. Instead they simply talk about their own experience treating patients. Accordingly, there is no means by which Warner Chilcott can ensure that the Roundtable speakers will provide an "educational" program based on products' labeling, or that any claims they make will be based on "substantial evidence," which is a legal requirement for promotional programs.

148. In addition, Warner Chilcott sales representatives are given no compliance training about what speakers are permitted to say during a promotional speaker event. Instead, representatives are simply trained that Roundtable events are an opportunity for physicians, and potentially members of their staffs, to socialize and enjoy a good dinner, while speaking as they wish about their own experiences with Warner Chilcott's products.

149. The 2010 Roundtable speaker honoraria are as follows: primary care (family practice and internal medicine), $500; rheumatology, $600; orthopedic surgery, $700; Ob/Gyn, $700; gastrointestinal and colorectal surgery, $1500 (local) or $3000 (out of town); dermatology, $500-$1000 (depending on the speaker); physicians' assistants and nurse practitioners, $500. There is no limit to the number of Med-Ed events a healthcare professional can be reimbursed for per year. For example, some obstetrician/gynecologists are asked to speak at every Med-Ed a representative conducts each month. As such, if the physician attends twelve events at $700 per event, the speaker will receive an $8,400 honorarium for that month. Relator Goan's managers have instructed him to engage and pay speakers for as many events per month as is necessary, or appropriate, given the prescribing potential of the speaker.

### 3. Warner Chilcott's Widespread Use of Med-Eds with No Compliance Controls in Place

150. Warner Chilcott ensures that it eliminates most of the evidence of its widespread use of Med-Eds and the concomitant lack of compliance controls. For example, Warner Chilcott

does not require documentation of who attends these events: there are no sign-in sheets to record who attended. Part of the Company's Siebel computer management system allows representatives to record the names of the healthcare professionals in attendance, but there is no requirement that this information be entered, nor is there a tracking system in place for staff, families, and other attendees. This lack of tracking allows representatives to "pad" their expense reports should it be necessary for compliance purposes. That is, representatives are told by their managers that they can, for example, spend $500 on dinner and drinks for only two doctors but that the representative should also claim that five staff members attended as well in order to lessen the ostensible cost per person. Indeed, this policy is encouraged by Warner Chilcott expense accounting.

151. Recently, a message was sent from Michael Herberg, a representative on the Minnesota team who had his expense report audited due to excessive alcohol purchased. The expense report auditor informed the representative that he should order an extra meal or appetizer and claim on his expense report that more staff were in attendance. Similarly, Warner Chilcott sales representatives are instructed to "fudge" their expense reports to ensure that their bills for alcohol are not greater than their bills for food. Representative Herberg, in an attempt to share this knowledge with his team accidentally sent out a national Audix message sharing his "learnings" regarding the expense reporting system. Specifically, he shared the advice of the auditor who directed him to "fudge" his expense reports.

152. Nor is there is a post-program evaluation of Roundtable speakers to determine whether the "speaker" actually spoke accurately about Warner Chilcott's products, including whether there was any off-label promotion, whether Warner Chilcott's financial support even involved medical education or was merely a blatant attempt to curry favor.

153. For both the speakers and attendees, these events are outright kickbacks intended to induce prescribing of Warner Chilcott products. For example, there are numerous instances in which speakers were paid to present a program for their own employees. There are many speaker programs where no audience attends, or is even invited, in which case a speaker is essentially paid an honorarium for a dinner with a Warner Chilcott sales representative. In addition, unlike the PhRMA prohibition on taking spouses to dinner, this practice is common at Warner Chilcott. Finally, Warner Chilcott has at times maintained an open credit card account at several restaurants for high-decile physicians in Long Island, New York, allowing doctors to take their families to dinner whenever they please, without the presence of a sales representative.

154. Each of the Warner Chilcott representatives can spend up to $15,000 to $20,000 per month, or as much as $240,000 per year on Med-Ed programs. This is nearly nineteen times higher than the industry average for such events of some $13,000 per year. The "budget" Warner Chilcott uses is only the limit on a representative's credit card. The Company tracks spending by brand, but there is no limit. In theory, a representative could spend their entire $20,000 budget to take doctors out to dinner for a single product.

155. The number of promotional programs Warner Chilcott requires its sales force to conduct is, by comparison to other drug makers, extraordinary. Representatives are expected to hold at least twelve events each month, meaning they conduct after-hours events on at least twelve of twenty working days per month. Warner Chilcott makes it clear that all high prescribers should be Warner Chilcott speakers and has in some instances directed its sales force to sign up their top ten physicians as speakers. This means that the Company has an inordinately high number of speakers relative to the rest of the pharmaceutical industry. As such, Warner Chilcott clearly uses becoming a speaker as a tool to get doctors to write more prescriptions for

its drugs. Speaker selection is thus not a matter of physician expertise; rather, the goal is to drive sales.

156. Doctors are regularly told that to become Warner Chilcott speakers they must first become prescribers of its drugs. An example of this direction is a voicemail direct from President Reichel to the Primary Care Sales force on February 9, 2011. In this Audix message Reichel refers to key Atelvia® "Early Experience" high-decile doctors, stating, "We have to do our Med-Ed programs with the doctors who were from Early Experience. If the Early Experience doctors are not writing prescriptions, then by definition, since some of you have zeros, I don't see how you can go out there and use them as a speaker."

157. Any speakers who are too fair and balanced in their presentations or who refuse to adopt the Company's marketing line are dropped as speakers. One such speaker was Stephen B. Hanauer, Professor of Medicine and Clinical Pharmacology, University of Chicago Pritzker School of Medicine and Chief of Gastroenterology, Hepatology, and Nutrition, University of Chicago Medical Center. Hanauer is widely regarded as one of the leading irritable bowel disease ("IBD") experts in the United States. Hanauer was a national speaker for Asacol® (400 mg) for P&GP. However, after Warner Chilcott purchased P&GP, sales representatives were told by their district managers they could no longer use him to speak because he was too fair and balanced. Indeed, this was the explicit instruction Relator Goan received from his district manager.

158. There is a clear linkage between lavish dinner programs and driving sales of Warner Chilcott drugs. For example, in order to grow sales, sales representatives are to have "the business discussion" with physicians. That is, they are to remind physicians of all the "free"

meals and entertainment they have been provided. The implicit, if not explicit, message is that physicians "owe" it to the representative to prescribe the Warner Chilcott products.

159. While bribery of healthcare professionals is a primary goal of a Warner Chilcott Med-Ed event, this bribery is not limited to doctors. Warner Chilcott also strongly emphasizes the importance of influencing staff, particularly the staff that completes prior authorizations. It is Company direction to take these staff members out to fancy dinners — a Med-Ed with no speaker — in order to build a relationship that will result in staff completing prior authorization forms for Warner Chilcott products. This practice is regular and pervasive at Warner Chilcott. A clear example of this bribery can be found on a February 18, 2011 voicemail cascaded through the primary care management to all primary care sales representatives. In this voicemail message, sales representative Caroline Hammond's actions were applauded and encouraged by both District Manager Brett Hayes and VP Koellhoffer. Sales representative Hammond talked about the importance of building a relationship with the clinic staff via what amounts to bribery. She related in her message that, in exchange for doing prior authorizations, she asks her staff: "What can I do for you? Let's all go out... We have the budget that allows us to do that..." She then related that, as a result of entertaining the staff, "I am completely expecting those prior authorizations to get approved."

160. President Reichel advanced this same message of using Med-Eds as a means to influence staff to complete prior authorizations via a February 2, 2011 Audix message to the primary care sales force: "Take medical assistants that complete prior authorizations out to dinner.... I think this has to become a core competency of Warner Chilcott.... how to work with the prior auths...."

### 4. Warner Chilcott's Widespread Payment of Kickbacks Through Didactic and Med-Ed Speaker Programs to Induce Prescribing of its Drug Products

161. Warner Chilcott's payment of kickbacks to healthcare professionals through its Didactic and Med-Ed speaker programs was intended to (and did) increase sales of Warner Chilcott's drugs generally, as well as Federal Program reimbursements in particular. Warner Chilcott knew (and intended) that buying its speaker's loyalty would result in increased sales of its drug products, and in particular sales to Government health plans, including Medicare and Medicaid. The bribes did improperly and illegally influence speakers' selection of Warner Chilcott drug products for beneficiaries of Government Programs in violation of the AKA, 42 U.S.C. § 1320a-7b(b).

162. The Warner Chilcott managers and employees involved in the Fraudulent Marketing Scheme were fully aware that it was illegal and against Warner Chilcott policy to provide speakers honoraria if any purpose of doing so was to receive in exchange favorable treatment of Warner Chilcott's products for Government plan beneficiaries. The Code of Ethics, which all Warner Chilcott senior managers must sign that they have read and agree to abide by, explicitly prohibits providing an inducement to Warner Chilcott customers with the intent to influence that person to recommend or purchase a health care product that may be reimbursed by a federal healthcare program. In addition, Warner Chilcott employees are prohibited from providing anything to a customer in exchange for any implicit or explicit agreement or understanding to use, purchase, order, recommend, prescribe, or dispense any Warner Chilcott product. Nonetheless, in flagrant violation of the law and Warner Chilcott's own stated policies, these managers directed employees to engage in the practice anyway, because they understood that the Company's first priority was to promote its products, not comply with the law.

163. Warner Chilcott's payment of, or offer to pay, kickbacks and the receipt of kickbacks by its paid speakers was made knowingly and with the intent to induce Government Program payments through a pattern of corrupt and illegal conduct, in violation of the federal False Claims Act, 31 U.S.C. § 3729.

164. The Defendants thus knowingly and willfully offered, paid, and received illegal remuneration in violation of the AKA, 42 U.S.C. § 1320a-7b(h)(2). But for the illegal kickbacks, Government Programs would not have paid for the prescription claims tainted by these kickbacks.

165. As a result of these kickbacks, Government Programs have suffered and continue to suffer significant damages.

### G. WARNER-CHILCOTT'S FRAUDULENT MARKETING SCHEME RELATED TO DRUG DISCOUNT COUPONS, REBATES, LOYALTY PROGRAMS AND FREE DRUG SAMPLES

166. Warner Chilcott employs a widespread practice of providing coupons for all of its brand-name drug products. For example, in 2010 alone, Warner Chilcott supplied some $128 million in patient coupons for Doryx® 150 mg.

167. Warner Chilcott used coupons as a marketing tool to increase sales of its expensive brand-name drugs and as a tactic to circumvent Government Program cost-containment efforts such as higher co-pays on costlier drugs, which are used to encourage patients to use less-expensive products.

168. As described in this Complaint, Warner Chilcott's Scheme included the use of coupons to induce the prescribing of their brand-name drug products to Government Program beneficiaries. Warner-Chilcott's unlawful Scheme includes the provision of free drug coupons and rebates (also referred to as "customer loyalty cards" or "rebates") as inducements to increase the prescribing of their drug products paid for or reimbursed by Government Programs.

### 1. Warner Chilcott Use of Coupons as an Unlawful Waiver of Patient Co-Payments

169. "Copayment" is the portion of the cost of an item or service which the Government Program beneficiary must pay. For example, if the Medicare Part D coinsurance is twenty percent of the reasonable charge for the prescription drug, and that charge is $100, the Medicare beneficiary must pay $20 to the pharmacy and Medicare will pay $80.

170. Waiver of copayments by providers, practitioners, or suppliers is unlawful because it results in (1) false claims, (2) violations of the anti-kickback statute, and (3) excessive utilization of items and services paid for by Medicare. In certain cases, a provider, practitioner or supplier who routinely waives Medicare copayments or deductibles could also be held liable under the Medicare and Medicaid anti-kickback statute. 42 U.S.C. 1320a-7b(b). The statute makes it illegal to offer, pay, solicit or receive anything of value as an inducement to generate business payable by Medicare or Medicaid. When providers, practitioners, or suppliers forgive financial obligations for reasons other than genuine financial hardship of the particular patient, they may be unlawfully inducing that patient to purchase items or services from them.

171. Studies have shown that if patients are required to pay even a small portion of their care, they will be better healthcare consumers, and select items or services because they are medically needed, rather than simply because they are free. Ultimately, if Medicare pays more for an item or service than it should, or if it pays for unnecessary items or services, there are less Medicare funds available to pay for truly needed services.

172. One important exception to the prohibition against waiving copayments and deductibles is that providers, practitioners, or suppliers may forgive the copayment in consideration of a particular patient's financial hardship. This hardship exception, however, must

not be used routinely, as is Warner Chilcott's practice; it should be used only occasionally to address the special financial needs of a particular patient.

173. The OIG's concern about potentially abusive waivers of Medicare copayments and deductibles under the anti-kickback statute is longstanding. For example, the OIG has previously stated that providers who routinely waive Medicare copayments or deductibles for reasons unrelated to individualized, good-faith assessments of financial hardship may be held liable under the anti-kickback statute. *See, e.g.*, Special Fraud Alert, 59 Fed. Reg. 65,374 (Dec. 19, 1994). Such waivers may constitute prohibited remuneration to induce self-referrals under the anti-kickback statute and a violation of the civil monetary penalty for inducements to beneficiaries.

174. The OIG's 1994 Special Fraud Alert (*Id.*) counsels against the practice of routine waivers of copayments such as the practice employed by Warner Chilcott, which unlike nearly every other drug maker in the United States, specifically targets its coupon kickbacks at Medicare and Medicaid beneficiaries. Warner Chilcott's not-so-subtle promotion of its copayment assistance to Government Program enrollees includes the same unlawful conduct that the OIG fraud alert concludes is prohibited.

### 2. Warner Chilcott Games the System by Using Loyalty Cards to Circumvent Cost Controls That Government Programs Use to Encourage Consumers to Use Less Expensive Products

175. Industry critics note that pharmaceutical company coupons and credit cards, also referred to as "loyalty cards," are marketing tools which drug manufacturers use to promote expensive brand-name drugs. *See* Andrew Pollack, *Coupons for Patients, but Higher Bills for Insurers*, N.Y. Times, Jan. 1, 2011, available at http://www.nytimes.com/2011/01/02/business/02coupon.html. These coupons in turn lead to an overall increase in healthcare costs for Government Programs and commercial insurers by circumventing the system of higher co-

pays on costlier drugs that Government Programs use to encourage consumers to use less expensive products. The co-pay is designed to discourage overutilization and give the patient a stake in the medical care. These co-pay coupons, which subsidize the patient's co-payment, directly conflict with Government Programs' managed care tools such as formulary compliance and generic substitution, which are essential to holding down costs. As a result of Warner Chilcott's coupon promotion, patients are insulated from the cost of the prescription, increasing the total cost of providing the prescription benefit.

176. As detailed *infra*, Warner Chilcott sales representatives were directed to distribute its co-payment coupons and cards to doctors and their staffs in order to induce the prescribing of its drug products to Medicare and Medicaid beneficiaries. The doctors then prescribed Warner Chilcott drug products and they or their staffs provided patients with the coupons or loyalty cards. Patients then presented the coupons or loyalty cards at the drugstore when paying for their prescriptions and received the more expensive Warner Chilcott product.

177. The proliferation of manufacturer coupons and rebate cards has spawned its own industry. Warner Chilcott has used McKesson Corporation to administer its coupon programs for Actonel® through McKesson Corporation's Patient Relationship Solutions' LoyaltyScript program. The McKesson logo is prominently displayed on the Actonel® coupon cards. The Doryx® Patient Savings Card Program uses the reimbursement services of Therapy First Plus. Both McKesson and Therapy First Plus have extensive nationwide networks of pharmacies that agree to process claims using these coupons or cards.

178. Although most drug companies do not offer co-payment assistance for patients in Government Programs like Medicare and Medicaid — because such offers are an inducement to use a drug and in violation of anti-kickback laws — Warner Chilcott nonetheless directs its sales

representatives to promote its coupon and patient savings cards to doctors for use by Government Program beneficiaries. Indeed, Warner Chilcott managers specifically direct sales representatives to target the coupons and loyalty cards at doctors treating Medicare and Medicaid beneficiaries.

179. The coupon strategy has been successful and has caused increased costs to Government Programs for both on- and off-label prescriptions.

**2. Free Samples as Kickbacks to Physicians to Induce Prescribing of Warner Chilcott Products and Evade Best Price Reporting**

180. The Prescription Drug Marketing Act of 1987 ("PDMA") was enacted (1) to ensure that drug products purchased by consumers are safe and effective, and (2) to avoid the unacceptable risk to American consumers from counterfeit, adulterated, misbranded, subpotent, or expired drugs.

181. The PDMA regulates drug manufacturer use of free drug samples and coupons. For example, the PDMA prohibits manufacturers from trading on free samples or coupons. 21 U.S.C. §353 provides that "[n]o person may sell, purchase, or *trade* or offer to sell, purchase, or trade any drug sample" (emphasis added). In addition, "[n]o person may sell, purchase, or trade, offer to sell, purchase, or *trade*, or counterfeit any coupon. For purposes of this paragraph, the term 'coupon' means a form which may be redeemed, at no cost or at a reduced cost, for a drug which is prescribed in accordance with section 503(b)" (emphasis added).

182. As described in this Complaint, Warner Chilcott abused its free sample and coupon program by offering a "trade" with physicians to promote not just the drug provided as a free sample but other Warner Chilcott drugs as well. Warner Chilcott's offers to "trade" its free products and coupons in exchange for prescriptions succeeded, resulting in increased costs to Government Programs.

### H. WARNER CHILCOTT HIPAA VIOLATIONS AND MANIPULATION RELATED TO COMPLETION OF PRIOR AUTHORIZATION FORMS

183. Like most insurance or health benefit programs, Medicare has established lists, known as "formularies," of preferred drugs for certain indications. If a drug is listed, it will be covered when prescribed. Prescription of non-listed or non-preferred drugs may be allowed in individual cases when medically necessary. In such cases, a prescribing physician can request a "prior authorization" (also known as an "exception request" or a "coverage determination request") for a patient to receive coverage for a non-preferred drug. These are used in circumstances in which a formulary drug would for some reason result in increased risk or decreased effectiveness for a particular patient, frequently as the result of contraindicated medications the patient is already taking or prior adverse experience of the patient with the formulary-listed drug. 42 C.F.R. § 423.578. A legitimate clinical reason must exist to go off-formulary and to provide exceptional pharmaceutical coverage.

184. The doctor and his or her office make the medical assessment and submit the prior authorization when medically appropriate. While Warner Chilcott's formal training materials instruct sales representatives not to mention the existence of the prior authorization process and/or offer to complete the requisite forms, the actual practice at Warner Chilcott is quite contrary to these instructions, manipulating the prior authorization process and constituting a blatant HIPAA privacy violation. Indeed, management instructed sales representatives to actively manipulate the prior authorization process to increase the number of prescriptions written.

185. Warner Chilcott managers instructed sales representatives to drive the prior authorization process by coaching physicians and their staff in the process for completing authorizations, creating medical reasons for the authorizations, or completing the authorizations

for the doctor. Not only is this process fraudulent, it violates the privacy rights of patients under HIPAA when sales representatives review confidential patient records to concoct justifications for the prior authorizations.

186. In response to a February 11, 2011 memorandum stating that sales representatives should only mention the prior authorization process to doctors, Relators Alexander and Goan were told by their managers that "this is a corporate thing," and that as sales representatives they were expected to continue to help their doctors' offices complete prior authorizations.

187. Similarly, during the formal training and legal compliance sessions, managers regularly make clear that the training was offered only for "legal reasons," that representatives should ignore the training and instead continue to manipulate the prior authorization process to overcome any coverage limitations on the use of Warner Chilcott products. Voicemails of "success stories" in the field were forwarded from one region to another and through upper management, discussing best practices for the use of prior authorizations including "cutting out" non-cooperative doctors by working directly with the staff, coaching the staff on medical reasons that would better ensure approval, and simply completing the forms. In these voicemails and at POA meetings, Warner Chilcott's management routinely stressed the importance of prior authorizations in driving prescriptions, including the importance of working directly with the staff rather than the doctors to "make sure patients can get" the product "so long as [we] can get scripts."

188. This Warner Chilcott practice is pervasive nationwide. For example, in Texas, sales representative Holly Trevino-Blakely goes from office to office filling out prior authorization forms for Atelvia®. As of January 2011, she is the fourth-ranked Atelvia® representative in the country. Her practice is approved by her managers, including District

Manager Gilbert Gonzalez. Similarly, in the East Region, Long Island District, Joel Romero is one of the top twenty sales representatives for Atelvia® because he also completes prior authorizations for his offices. Indeed, Romero has set up a fax machine in his house so that doctors' offices can simply fax patients' information to his wife, who fills out the prior authorizations and then faxes them to the insurance companies or benefit providers. Similarly, Warner Chilcott representative Aleksandr Eygurin is the number-six Atelvia® sales representative in the nation largely as a result of his completion of prior authorizations at offices across his territory at whatever time of day those offices will provide him access.

189. Warner Chilcott's management is aware of this practice and actively patrols to keep the practice publicly discrete while internally pushing it as a "success story." For example, sales representative Brooke Stacey recorded a video with her phone of a nurse in her territory extolling the virtues of Atelvia® while showing how easy it is to complete a prior authorization. She forwarded the video to her District Manager, Gilbert Gonzalez, who then uploaded it to YouTube to more easily view it. Gonzales, however, did not understand that this video, once uploaded, was publicly viewable. The FDA was tipped off within a day and called Warner Chilcott on March 18, 2011 to insist that the YouTube video be taken down immediately. While Ms. Stacey, a recent Warner Chilcott hire, was not even reprimanded, Gonzalez was immediately terminated.

190. The practice of manually completing prior authorizations for doctor's offices is so widespread that Bill Poll, Senior Vice President of Finance, explained during a national teleconference regarding managed care that one pharmacy benefit manager, Medco, had recently instructed Warner Chilcott to stop using prior authorizations after Medco received two hundred such requests, all in the same handwriting, from Los Angeles alone.

191. Additional instances of this pervasive conduct are detailed *infra* for each drug.

192. This practice by Warner Chilcott is not only a key part of its Fraudulent Marketing Scheme, but a violation of HIPAA and the Company's own Code of Ethics. In the course of coaching staff, completing the prior authorization forms, or investigating reasons other prior authorizations were denied, sales representatives reviewed patient files and discussed patient medical histories, learning their names, addresses, social security numbers, and insurance providers.

193. Under the heading "Privacy," the Company's Code of Ethics provides that "[i]t is Company policy to comply with the applicable privacy and data protection laws, regulations and treaties in order to protect . . . from inappropriate or unauthorized use or disclosure." Accordingly, the Code of Ethics further provides that the Company's employees may not improperly acquire or use such personal information: "Colleagues may not acquire, use, or disclose individual colleague, consumer, customer or patient information in ways that are inconsistent with the Company's privacy policies or with applicable laws or regulations." The manipulation of prior authorizations directly violated HIPAA and the Code of Ethics.

194. HIPAA protects patients from having "protected health information" — which ranges from identifying information to the medical history and records — shared outside a limited group of people, most typically the treating doctors and other medical professionals, without express patient permission. *See* 45 C.F.R. §§ 160.103, 164.502. Sales representatives are not among the limited group of people granted access to this information, and proper permission was never obtained. However, as one manager responded to a question about the legality of the practice in Orlando, Florida, at the January 2011 launch meeting for Altevia®: In this company, it's the results that matter.

195. HIPAA introduced two additional bases for criminal liability that expressly prohibit the kind of "scheme", "trick," and "artifice" engaged in by Warner Chilcott's manipulation of prior authorizations:

- Under the title "false statements relating to health care matters," 18 U.S.C. § 1035(a) provides penalties including up to five years of prison for a person who "in any matter involving a health benefit program, knowingly and willfully – (1) falsifies, conceals or covers up by trick, scheme or device a material fact; (2) or makes any materially false, fictitious, or fraudulent statement or representation, or makes any materially false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry."
- Similarly, under the title "health care fraud," 18 U.S.C. § 1347 provides for penalties including up to ten years of prison for any person who "knowingly and willfully executes, or attempts to execute, a scheme or artifice – (1) to defraud any health care benefit program; or (2) to obtain by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program."

## I. WARNER CHILCOTT FAILED TO SUBMIT PROMOTIONAL MATERIALS TO DDMAC

196. DDMAC reviews prescription drug advertising and promotional information to ensure all promotional materials are truthful, balanced, and not misleading. Pharmaceutical companies must submit all promotional marketing materials to DDMAC. 21 C.F.R. 202.1. DDMAC is also responsible for reviewing complaints about possible promotional violations, and taking action against companies who do not comply with FDA regulations. Lastly, DDMAC

examines the product labeling and promotional materials of similar pharmaceutical products to compare them and ensure that regulatory restrictions are met.

197. In flagrant violation of these requirements, Warner Chilcott does not submit its marketing pieces to DDMAC. Indeed, President Reichel has told fellow employees that, until Warner Chilcott gets a DDMAC Warning Letter, it would continue its illegal promotional practices. In fact, it was his view that breaking the rules was part of competing aggressively.

### J. USING IMPROPER INFLUENCE TO CHANGE FORMULARY STATUS OF WARNER CHILCOTT PRODUCTS

198. Many healthcare organizations maintain lists of preferred drugs that can be prescribed by healthcare professionals within that organization or which are eligible for reimbursement by that organization. These lists are commonly called "formularies." The Pharmacy and Therapeutics ("P&T") Committee of an organization decides which pharmaceutical products are included on the formulary. P&T Committees typically make formulary decisions based upon assessments of safety, efficacy, tolerability, and increasingly cost-effectiveness. In some cases, organizations with P&T Committees may be acting on behalf of Medicaid, Medicare Part D, or other Government Programs. Members of P&T Committees are expected to avoid both actual and apparent conflicts of interest when making formulary decisions.

199. Defendant Warner Chilcott has engaged in promotions to influence P&T Committee members to add Warner Chilcott products to their formularies. For example, in early March 2011, during a Warner Chilcott managed care conference call with all managed care account executives, President Reichel expressed concern about Atelvia®'s current lack of managed care formulary status. Reichel asked the managed care executive in charge of Humana Medicare Part D why Atelvia® was not on formulary yet. Humana is one of the largest

Government Program contractors in the United States with over one million Medicare Advantage members, 3.5 million stand-alone Medicare Prescription Drug Plan members, and some 2.8 million TRICARE members. During the call, Reichel informed the managed care representative that James H. Bloem, Senior Vice President and Chief Financial Officer of Humana, Inc., is also on the Board of Directors for Warner Chilcott. Reichel instructed the representative to contact Bloem in order to gain his assistance in getting Atelvia® added to the Humana formulary. Reichel was thus attempting to unduly influence the status of Atelvia® on the formularies of Government Programs.

**K. USE OF PRECEPTORSHIPS TO INFLUENCE PRESCRIBING**

200. Warner Chilcott also sought to disguise its illegal payment of kickbacks to doctors through the use of "preceptorships." In a preceptorship, a Warner Chilcott sales representative pays a high-volume doctor typically $250 or $300 to permit the sales representative to follow the doctor during patient examinations for an entire day. Most Warner Chilcott representatives are expected to do one preceptorship per trimester. In theory, the purpose of a preceptorship is to provide the sales representative with insight into how the doctor decides which drugs to prescribe. In practice, since the sales representative generally does not learn anything new and rarely stays with the doctor for the entire day, preceptorships are a thinly veiled means of funneling unearned cash to doctors who Warner Chilcott expects will reciprocate by writing more prescriptions for Warner Chilcott products, including for off-label uses.

201. Each sales representative is encouraged to participate in preceptorships with "high decile" doctors not generally susceptible to Warner Chilcott's other marketing practices. Warner Chilcott's sales specialists understand that they are "graded" on the success of their preceptorships in prompting doctors to write more prescriptions of Warner Chilcott drugs, including for off-label uses.

202. The preceptorships have succeeded in expanding the market share for Warner Chilcott's drugs. In one instance, Relator Goan was directed to set up a preceptorship with Dr. Bradley Warren from the Michigan Endoscopy Center in Farmington Hills, Michigan. Dr. Warren was a large potential prescriber of Asacol® HD but was instead prescribing Asacol® (400 mg). Warner Chilcott sought to induce Dr. Warren to prescribe Asacol® HD, including for off-label uses, for more of his patients. Although Warner Chilcott paid for a full-day preceptorship, Relator Goan followed Company practice and expectations and did not stay the entire day. Following this preceptorship, Dr. Warren began to write a greater number of prescriptions for Asacol® HD, including for Medicaid and Medicare patients, and became a Med-Ed speaker for the Company.

**L. USE OF GIFTS AND ENTERTAINMENT TO INDUCE PRESCRIBING OF WARNER CHILCOTT PRODUCTS.**

203. Warner Chilcott has regularly provided non-educational gifts to healthcare professionals to induce their prescribing of Warner Chilcott products. These gifts are a violation of the Anti-Kickback Act and the PhRMA Code. For example, under the PhRMA Code, it is prohibited to providing items for healthcare professionals' use "that do not advance disease or treatment education" because these gifts "may foster misperceptions that Company interactions with healthcare professionals are not based on informing them about medical and scientific issues."

204. However, Warner Chilcott regularly provides non-educational gifts to healthcare professionals to induce their prescribing of its products. For example, Relator Goan was expected to (and consequently, did) give gifts to physicians in order to buy their business. In one instance, at the direction his manager, Relator Goan gave his top doctors' offices thirty honey-

baked hams and bottles of wine for the doctors and staff members who helped or might help switch patients from Asacol® (400 mg) to Asacol® HD.

205. In another recent example, Steve Justice, an Atelvia® representative in St. Louis, Missouri, who leads his team in spending on Med-Eds and speaker programs, was held up to his district as a role model because he had taken doctors pheasant hunting. He did so with the approval of his District Manager Brett Hayes and VP Koellhoffer. DM Hayes had Justice do a write-up e-mail about the hunt and how it allowed him to sell to two key doctors. That e-mail was then cascaded throughout the Company as a "best practice." In addition, VP Koellhoffer left a voice mail for his entire region about how Justice had "finally got it" and was "now a true Warner Chilcott representative."

206. This was a blatant violation of the PhRMA Code, which states: "Under the Code, companies may not provide entertainment or recreational activities to healthcare practitioners who are not employees of the companies in any context, including situations where those practitioners are providing a legitimate service to the companies, such as when they act as bona fide consultants on an advisory board or are trained at a speaker-training meeting."

207. In addition, Warner Chilcott representatives are encouraged to take doctors out on social events, for example, golfing. In order to avoid appearing blatantly non-compliant, representatives are instructed that they may not explicitly record that they are paying for the doctor's golf. Instead, the Warner Chilcott representative will pay for dinner and, "wink, wink," the doctor will pay for his/her own golf. In order to conceal that he/she paid doctors' greens fees, a representatives will go to the course a week before the actual meeting and purchase a voucher, which the representative record as having himself/herself. Then, during the actual event with the doctor, the representative uses the voucher to pay for the doctor's fees and pays

again for himself/herself. This practice is encouraged. Indeed, President Reichel told representatives that if Warner Chilcott wants to pay for representatives to go golfing during work hours with doctors, Warner Chilcott can do so.

**M. VIOLATIONS OF STATES' BANS ON GIFTS AND MEALS FOR DOCTORS**

208. As the New York Times reported in 2007, "doctors who have close relationships with drug makers tend to prescribe more, newer and pricier drugs" regardless of the drugs value compared to less expensive medications. Gardiner Harris, *Doctors' Ties to Drug Makers are Put on Close View*, N.Y. Times, Mar. 21, 2007, available at http://www.nytimes.com/2007/03/21/us/21drug.html?_r=2&pagewanted=1&ref=us&oref=slogin. To contain the associated costs associated with such "close relationships" between manufacturers and healthcare professionals, several states enacted regulations beyond those provided by federal law as well as relevant state and federal anti-kickback laws, discussed in greater detail *supra*. Three of these states — Massachusetts, Minnesota and Vermont — curtailed much of the "wining and dining" that manufacturers had used to influence healthcare practitioners and prohibited a variety of payments and gifts as having no purpose but to establish a "close relationship." These three states and several others, including West Virginia, the District of Columbia, Maine, and California, established reporting requirements related to marketing efforts to healthcare professionals.

209. Through its regular sales practices, Warner Chilcott has engaged in direct violations of the gift laws of Minnesota and Massachusetts by, *inter alia*, paying for dinners for healthcare practitioners, their spouses, and guests; providing tickets to entertainment and sporting events; and otherwise providing payments and gifts that have no bona fide medical explanation or reason.

210. These practices are part and parcel of Warner Chilcott's sales practices nationally, and the violation of such "gift laws" is known to, and countenanced and supported by, regional and national management who have authority over the sales teams in other states with gift laws. For example, Marc Moskowitz, the Regional Vice President for the New England region, approved of and supported the violations of the Massachusetts "gift law," described below, and had responsibility for the activities of the sales representatives in Vermont and Maine. Similarly, Nicola Crawford, National Vice President for Gastroenterology and Dermatology, approved of and supported the violations of the Minnesota "gift law" by the Gastroenterology sales representatives.

211. While these laws prohibited Warner Chilcott's practices, its Fraudulent Marketing Scheme has continued unabated in both Massachusetts and Minnesota just as it has throughout the United States. The "gift laws" of Minnesota and Massachusetts posed no impediment to Warner Chilcott's practices, and no exceptions were made for the sales representatives covering those states. Warner Chilcott merely changed its accounting and expensing practices. When the law prohibited dining out but allowed meals in doctors' office, sales representatives arranged for restaurants to mark a meals as "take-out," even though they were not. When the amounts of gifts and meals exceeded the limits set by law, district and regional managers told their sales representatives to use more "creative accounting." Such "creative accounting" most typically consisted of charging dinners and gifts against a general expense code or as room charges, as well as not allocating the expenses by physician or overstating headcount in order to dilute the per capita cost. By such means, Warner Chilcott effectively bypasses the gift laws and ensures that thousands of dollars can be spent on doctors in these states.

212. For example, Craigg Ott, the District Manager for Minnesota, instructed his team to continue using standard Warner Chilcott practices and suggested many ways to evade the gift law of Minnesota. He told sales representatives to allocate meal charges to their hotel rooms and to allocate a delivery from Starbucks to a physician's staff rather than the physician himself. When sales representative Shannon Schneider questioned such evasions of the law and wanted official approval before engaging in such practices, she was told by DM Ott that she should "only ask for forgiveness not permission." He also told her not to worry about any illegality, assuring her that she was a "little fish" and the only people who would be investigated were the "big fish."

213. Sales representatives in Minnesota who did not take their doctors out to dinner, bring gifts to their offices, or otherwise violate the gift law were disciplined and/or fired. For example, in October 2010, a gastroenterology sales representative in Minnesota, Pat Schwitz, was told she had to break the gift law or lose her job. That is, Schwitz was instructed by her District Manager, Colin Lewis, to get her doctors and offices out to dinner, especially those doctors and staff from the Mayo Clinic, which she covered. When Schwitz explained the gift law of Minnesota to her manager, her manager instructed her to "figure it out" and went on to explain that if she did not get the doctors and staff out to dinner, she would be fired. Schwitz, a legacy representative, was "packaged out" (i.e., fired) on October 20, 2010.

214. This treatment of the Minnesota sales representatives was not isolated to Schwitz. In late February and early March 2011, two more legacy representatives in Minnesota, Jason Lenz and Dean Buss, resigned from Warner Chilcott after their concerns and complaints about compliance issues, including violations of the gift law, were not heeded by management.

215. For their part, Massachusetts sales representatives were also regularly instructed to break the Massachusetts gift law. At the January POA meeting for the East Region where VP Moskovitz and District Manager Jeff Gilbert, among others, outlined the sales strategy for the upcoming quarter, Moskovitz instructed the Primary Care sales representatives from Boston, including Macristina Delatina, Sandra Morse, Monika Macko, Katherine Couture, Jeffrey Taylor, Rebecca Caputo, Gary Carlson, and Blake Lufburrow, to get their doctors out to dinner so that they were more accountable to Warner Chilcott. When these representatives responded that this was illegal, Moskovitz told them that they would lose their jobs if they did not get the doctors out to dinner and that he would hire new representatives that could figure out how to get physicians out to dinner. Moskovitz further directed sales representatives to mark meals as “take out” and not “dine in” and to overstate headcount to dilute per capita costs. Through such practices, Warner Chilcott evaded the Massachusetts gift law and continued wining and dining doctors in Massachusetts in exchange for prescriptions.

## VII. WARNER CHILCOTT’S AGGRESSIVE MARKETING OF ACTONEL® AND ATELVIA® THROUGH OFF-LABEL PROMOTION AND THE PAYMENT OF KICKBACKS

216. Actonel® is the leading branded product in the U.S. non-injectable osteoporosis market for the prevention and treatment of osteoporosis in women.

217. As a result of the P&GP acquisition in 2009, Warner Chilcott assumed P&GP’s global collaboration agreement (the “Collaboration Agreement”) with Sanofi-Aventis, pursuant to which the parties co-developed and marketed Actonel® (risedronate sodium) on a global basis, including in the United States. Until 2010, Actonel® was jointly promoted through the alliance arrangements of the Collaboration Agreement. Warner Chilcott and Sanofi-Aventis shared development, promotion, and marketing costs as well as product profits in the co-promotion territory based on contractual percentages. Under the Co-Promotion Agreement,

Warner Chilcott was the principal in transactions with customers and invoiced all sales in the United States.

218. In April 2010, Warner Chilcott announced an amendment to the Actonel® global collaboration agreement. Under the terms of the amendment, Warner Chilcott took full operational control over the promotion, marketing, and R&D decisions for Actonel® in the United States and Puerto Rico and assumed responsibility for all associated costs relating to those activities. In return, Sanofi-Aventis receives collaboration payments from Warner Chilcott as a percentage of U.S. and Puerto Rick net sales for the remainder of the term of the collaboration agreement, which expires at the end of 2014.

219. At the time of the amendment, CEO Boissonneault stated: "The amendment to the collaboration agreement will enable Warner Chilcott to assume full control over the promotion and marketing of the Actonel® brand in the United States. This will allow us improved flexibility to adjust our promotional plans in the U.S. as we prepare for the potential launch of the next generation Actonel® product."

220. Though Actonel® is currently the market leader, that position is due to the patent expiration of Merck's Fosamax®, which far outsold Actonel® during the former's branded life. 2007 US sales of Fosamax® were $1.4 billion, compared to $791 million for Actonel®. The entry of generic Fosamax® in early 2008 began to substantially erode sales of Actonel®, which dropped forty percent the following year. Actonel®'s other major competitor is Roche's Boniva®, which had 2009 US sales of approximately $500 million.

221. Warner Chilcott planned to stem this revenue decline with the introduction of Atelvia®, which was approved in October of 2010 and entered the market in the beginning of 2011. Early promotion of Atelvia® began in November 2010 via the "Early Experience

Program," aimed at high-decile physicians. The official launch by all primary care sales representatives was on January 7, 2011.

### A. FDA APPROVALS OF ACTONEL® AND ATELVIA®

222. Actonel® is approved for the following indications:

- Actonel® was approved on March 27, 1998 for the treatment of Paget's disease, which is a chronic disorder resulting in enlargement and deformation of bones. The continued breakdown and formation of bone tissue may weaken bone structure.
- On April 14, 2000, Actonel® received additional approvals for treatment and prophylaxis of postmenopausal osteoporosis; and for treatment and prophylaxis of corticosteroid-induced osteoporosis. A 5 mg tablet form was also approved at this time.
- On May 17, 2002, a new 35 mg tablet form was approved for the once-a-week treatment and prophylaxis of postmenopausal osteoporosis (previous dosage was 5mg once per day).
- On August 11, 2006, a 35 mg tablet form of Actonel® was approved for the once-a-week treatment (not prophylaxis) of osteoporosis in men.
- On April 16, 2007, a 75 mg form of Actonel® was approved for prevention and treatment of postmenopausal osteoporosis.
- On April 22, 2008 a new 150 mg form of Actonel® was approved for the once-monthly treatment of postmenopausal osteoporosis.

223. On October 8, 2010, the FDA approved Atelvia® for the treatment (not prevention) of postmenopausal osteoporosis. While the active ingredient in Atelvia® is the same

as in Actonel®, the new formulation of risedronate allows patients to take it immediately following a meal. While the registration trial studied use in patients taking Atelvia® before, during and after a meal, the FDA only approved Atelvia® to be taken after eating food. In contrast, patients are required to take Actonel® on an empty stomach and continue fasting for thirty minutes following administration.

### B. AGGRESSIVE PROMOTION OF ACTONEL® THROUGH OFF-LABEL AND UNSUPPORTED SUPERIORITY CLAIMS

224. Immediately following the P&GP acquisition, Warner Chilcott's CEO Boissonneault and President Reichel announced that they were embarking on an aggressive promotional campaign to grow Actonel® market share in the face of steep challenges posed by the introduction of generic Fosamax®, and then to replace Actonel® with Atelvia® following the latter's launch in early 2011. Off-label promotions and unsupported superiority claims were key components of their plan to do so.

#### 1. Off-Label Actonel® Claims for the Prevention of Invasive Breast Cancer

225. Shortly after the acquisition of P&GP, Warner Chilcott's management directed sales representatives to begin promoting Actonel® as effective for the prevention of invasive breast cancer, using preliminary results from an off-label study by Dr. Rowan Chlebowski. Chlebowski RT et al., *[21] Oral Bisphosphonate and Breast Cancer: Prospective Results from the Women's Health Initiative (WHI)*, presented at San Antonio Breast Cancer Symposium, Dec. 11, 2009 (abstract).

226. Sales representatives were encouraged to use the Chlebowski study to promote Actonel® as effective prevention for invasive breast cancer in comparison with Evista®. Evista® is an oral selective estrogen receptor modulator ("SERM"), which was originally approved for the treatment of osteoporosis, and on September 14, 2007, was approved by the

FDA for reducing the risk of invasive breast cancer in postmenopausal women with osteoporosis and in postmenopausal women at high risk for invasive breast cancer. Evista® is in a separate class of drugs from Actonel® and operates by an entirely different mechanism of action.

227. Nonetheless, in order to compete against Evista®, Warner Chilcott managers instructed sales representatives to tell doctors that there were promising new data indicating that Actonel® was also effective for the prevention of invasive breast cancer. Sales representatives were to be intentionally vague, not actually mentioning the name of the clinical study, thereby creating doubt in the minds of physicians using Evista® only because of its additional benefit to prevent invasive breast cancer.

228. On August 23, 2010, Relator Alexander was directed by her District Manager, Julie Johnson, who was in turn directed by VP Koellhoffer, to promote to physicians that this new data suggested a twenty-nine to thirty-one percent reduction in invasive breast cancer in patients taking bisphosphonates, including Actonel®.

229. Sales representatives were directed to freely discuss this information with any physicians using Evista®. However, representatives were instructed not to provide a copy of the full study (Rowan T. Chlebowski et al., *Oral Bisphosphonate Use and Breast Cancer Incidence in Postmenopausal Women*, 28 Journal of Clinical Oncology 3582 (2010)), nor were they to disclose any of the limitations inherent in the study's results or its negative findings. Not only was the Chlebowski study a cohort study and thus inherently limited, there were negative findings as well. For example, the study found that women taking bisphosphonates were more likely to develop a noninvasive tumor of the milk duct called "DCIS." Sales representatives were specifically instructed to avoid mention of such negative findings.

230. At the time the Chlebowski results were announced, there was considerable skepticism among experts. A number of researchers, including Dr. Andrew Seidman, an attending physician at the Breast Cancer Medicine Service at Memorial Sloan-Kettering Cancer Center, New York City, believed that more evidence was needed before any changes to practice were made. Despite the fact that the Chlebowski study showed a reduction in breast cancer recurrence, Dr. Seidman was quoted as stating he awaited the results of larger, better-powered studies to confirm whether bisphosphonates indeed conferred an anti-tumor effect as opposed to a pure bone-strengthening effect. "I think the jury is still out," he explained, "on whether there are direct anti-tumor effects for bisphosphonates that are clinically meaningful." Alice Goodman, *Bisphosphonates: A Dual Benefit in Breast Cancer?*, Pharmacy Practice News, Mar. 2010, at 10, 11.

231. Undaunted, beginning in September 2010, Warner Chilcott's management directed sales representatives to promote Actonel® for the treatment of invasive breast cancer in competition with Evista®, despite being off-label and having no adequate, double-blind, placebo-controlled clinical trials to support these claims. By doing so, Warner Chilcott convinced physicians who sought to reduce the risk of invasive breast cancer in their patients to prescribe Actonel® rather than Evista®, exposing those patients to serious risk of the very disease they sought to prevent. By causing doctors to prescribe a medication of spurious rather than demonstrated efficacy, Warner Chilcott exposed these patients to a risk of invasive breast cancer, and in some cases, potentially death.

### 2. Unsupported, Off-Label Actonel® Superiority Claims for the Treatment of Atypical Femur Fracture

232. In early 2010, Warner Chilcott set out to "spin" growing concerns that long-term use of bisphosphonates like Actonel® caused atypical femur fractures, comparing bone

suppression numbers from the Actonel® package insert with the Fosamax® package insert. The plan was to use the negative news to Warner Chilcott's advantage.

233. Although for years physicians had engaged in widespread prescribing of bisphosphonates for the long-term treatment of osteoporosis and bone loss, beginning in 2005, a growing number of reports emerged that some women taking bisphosphonates for many years suffered an unusual fracture of the femur. The reports indicated these cases involved little or no trauma; in most cases the women were simply standing or walking when the femur snapped. In some women, breaks occurred in both thighs. Many of the fractures were unusually slow to heal. Since that time, a growing body of medical evidence has suggested that bisphosphonates should not be used long-term due to the risk of atypical femur fractures. *See* Jane E. Broday, *Revisiting Bone Drugs and Femur Fractures*, N.Y. Times, Mar. 6, 2011, http://www.nytimes.com/2011/03/08/health/08brody-bone.html.

234. In June 2008, based on published case reports of atypical subtrochanteric femur fractures occurring in women with osteoporosis using bisphosphonates, the FDA announced it was requesting information from all bisphosphonate drug manufacturers regarding this potential safety issue. Then, in March 2010, the FDA announced it was working closely with outside experts, including members of the recently convened American Society of Bone and Mineral Research Subtrochanteric Femoral Fracture Task Force, to gather additional information that might provide more insight into this issue. Finally, on October 10, 2010, the FDA issued a warning that long-term use of bisphosphonates used to treat osteoporosis (including Fosamax®, Fosamax Plus D®, Actonel®, Actonel with Calcium®, Boniva®, Atelvia®, and Reclast®) were linked to two rare types of thigh fractures known as subtrochanteric and diaphyseal femur fractures. In its warning, the FDA mandated that the drug manufacturers include information

regarding the possible association between atypical thigh fractures and bisphosphonates in the "Warnings and Precautions" section of the drugs' labels.

235. In order to counteract concerns with atypical femur fractures raised by physicians, Warner Chilcott sales representatives were instructed to tell doctors: "If you prescribe generic Fosamax® (alendronate), your patients will be much more likely to suffer an atypical femur fracture than if you put them on Actonel®." For example, representatives were taught to say:

> Doctor, you have expressed concern about atypical femur factures. I have some data that will help put you at ease. Doctor, simply compare the package inserts of these two products. Actonel® has higher bone turnover; thus, it is creating healthier bone. Doctor, this means that a patient on Actonel® is *less likely* to suffer an atypical femur fracture than a patient on Fosamax®. Doctor, why not prescribe Actonel, the safest bisphosphonate for your patients?

The goal of Warner Chilcott's sales message was to instill fear into physicians and utilize this fear to increase sales of Actonel®. There is no scientific data to support these false promotional claims made by Warner Chilcott.

236. The FDA considers promotional claims to be false and misleading if they state or suggest that a drug's safety or efficacy is comparable or superior to that of another drug's without "substantial evidence" to support such statements or suggestions. Even though it was misleading and a violation of FDA regulations to make comparative claims based on the data in products' respective package inserts, from early until late 2010, Warner Chilcott representatives were instructed to, and subsequently did, promote this superiority message through a comparison of the Actonel® package insert with the Fosamax® package insert.

237. For example, beginning in mid 2010, Relator Alexander and her colleagues were instructed by their District Manager, Julie Johnson, who was in turn instructed by VP Koellhoffer, to utilize the atypical fracture warning issued by the FDA as a point of

differentiation between Actonel® and Fosamax®. Johnson instructed her sales representatives to compare the bone suppression statistics between the Actonel® and Fosamax® package inserts, in order to convey the message that patients taking Actonel® would have fewer atypical femur fractures than those taking Fosamax® or generic alendronate, despite the fact that there is no data to support this claim.

238. In an October 28, 2010 e-mail that was forwarded by District Manager Brent Kimble to VP Koellhoffer and then across the nation, DM Kimble reminded his team that, should a physician express concern about atypical femur fractures, it would be a "great opportunity to differentiate Actonel® from the competition" by comparing package inserts regarding the half-life of drugs. The supposition was that, in theory, the drug with the shorter half-life would result in less fragile bone and therefore greater efficacy. There is no data to support this theory. In his e-mail, however, Kimble stated: "Keep in mind the Actonel half life vs. Fosamax." Attached to the e-mail was an off-label, unapproved commentary intended for use in the field. *Statement by* National Osteoporosis Foundation *Regarding Use of Bisphosphonates* (National Osteoporosis Foundation, Washington, D.C.), Mar. 11, 2010. It is clear from this e-mail that utilizing atypical femur fracture as a "selling point" for Actonel® was a Warner Chilcott nationwide strategy.

**3. Using Unapproved Reprints to Sell Actonel® Off Label**

239. Beginning in early 2010, sales representatives were told to (and did) use a clinical trial, R.G.G. Russell et al., *Mechanisms of Action of Bisphosphonates: Similarities and differences and their potential influence on clinical efficacy*, 19 Osteoporosis International 733 (2008), to promote Actonel® off label. This study was referred to internally as the "Mechanism of Action Study" or "MOA Study." At the July 14, 2010 POA meeting in Chicago, primary care representatives were trained during role plays led by their managers to make two separate claims.

First, they were told to, and subsequently did, use the MOA Study to claim that Actonel® had the "lowest affinity" for the bone of any oral bisphosphonate, meaning that Actonel® had more complete vertebral and non-vertebral fracture protection.

240. During their role plays, sales representatives practiced using the following message:

> Doctor, what this means to you and your patients is that Actonel® has a less "sticky" design, compared to Fosamax® and Boniva®, which provide very little skeletal protection. Boniva® has only been proven to work at the spine, whereas Actonel® is able to "coat" the entire skeleton, thus providing your patients with total body non-vertebral fracture protection.

241. The evidence for these claims was taken from the separate package inserts for the competing bisphosphonates. As such, they were not reliable grounds for comparison, given that there is no evidence to suggest that these studies were similarly designed. Comparing results from two randomized studies may create the illusion of a reliable comparison, but in fact, comparing studies in this way generally results in the introduction of significant biases. In order to obtain a reliable comparison, randomization *within* a single study is required. This sort of study is referred to as a head-to-head study. No head-to-head study existed to support these claims.

242. Second, sales representatives were trained to, and subsequently did, use the MOA Study to claim that Actonel® had the "highest potency" of any oral bisphosphonate, saying:

> Doctor, what this means for you and your patients is that as a result of this high potency, Actonel® will be that fastest-acting bisphosphonate. With Actonel®, your patients will see vertebral and non-vertebral fracture protection in as little as six months. Boniva and Fosamax® can take *years* to work.

243. Again, the evidence for these claims was taken from the separate package inserts for each of the competing drugs. As such, they were not based on head-to-head trials or other reliable clinical evidence. The flaw of this type of comparison is described *supra* at ¶ 241.

244. Sales representatives were trained to, and subsequently did, close their off-label MOA sales calls by saying: "Doctor, as a result of the design of the Actonel® molecule, Actonel® will give you the most complete fracture protection in the quickest amount of time."

245. Warner Chilcott's widespread, national use of this unapproved study downloaded from the Internet is further demonstrated in an October 10, 2010 e-mail from representative Dana Miller, forwarded to her District Manager, Brent Kimble, then sent to VP Koellhoffer and forwarded nationally to the entire sales force. This e-mail was a recap from representative Miller of her attendance at the 41st Annual Rheumatology Symposium where she spoke with Dr. Nelson Watts. Both representative Miller and DM Kimble confirmed that "affinity and potency" (the MOA story) were being used as the primary sales message in the field with physicians. DM Kimble stated: "Dr. Watts also spoke to the need for moderate affinity and high potency which is *exactly the same message we have been conveying to our customers*" (emphasis added).

246. Shannon Schneider, a former P&GP sales representative from LaCrosse, Wisconsin, who was responsible for selling Warner Chilcott's drugs in Wisconsin and Minnesota, raised concerns for nearly a year with her District Manager Craig Ott that using unapproved studies was illegal. Ott not only refused to merit her concerns, he berated her for raising them. During a ride along with Schneider, when a physician asked to see the clinical study supporting the MOA claims, DM Ott told the doctor that Schneider would get a copy for him. When they left the doctor's office, Schneider again raised her concern that the MOA Study was unapproved and was being used to promote Actonel® off label. Again, DM Ott berated her,

at which point she raised her concerns with Ott's manager, VP Koellhoffer. Schneider was later told that using downloaded, unapproved studies had been "approved" by the Company.

247. In addition to their use of the MOA Study, beginning in July 2010 and continuing through December 2010, Warner Chilcott directed its sales representatives to make head-to-head comparisons with five studies that were not "approved" by Warner Chilcott's Medical Department. Three of these five studies were integrated into Warner Chilcott's off-label sales message and proactively shared with doctors.

248. Although the sales representatives had been using these off-label studies unofficially for two months already, on September 28-30, 2010, at a POA meeting in Chicago, Illinois, sales representatives received "official" training on using these studies as part of their sales message. The studies were sent to sales representatives in e-mails from their managers. On September 24, 2010, the e-mail for the Wisconsin team was sent by DM Johnson to "Legacy P&GP Representatives" Peter Zimmerman, John Payne, and Relator Alexander. The Adachi, REAL, and Ringe Studies were attached. While the agenda does not specifically note which studies were utilized during training, in her e-mail DM Johnson states: "For the Actonel portion, we will be practicing role plays from REAL, Adachi & if time Ringe... Once Mike [Koellhoffer] gives his blessing to the agenda, I will send it out to everyone in attendance. (There are people from other regions attending our session so Mike has to get their managers' buy-in before I can share it with the SRs)." This sales message was utilized across the entire nation. These studies were:

- Daniel T. Grima et al., *Adverse events, bone mineral density and discontinuation associated with generic alendronate among postmenopausal women previously*

*tolerant of brand alendronate: a retrospective cohort study*, 11 BMC Musculoskeletal Disorders 68 (2010);

- R.L. Silverman et al., *Effectiveness of bisphosphonates on nonvertebral and hip fractures in the first year of therapy: The risedronate and alendronate (REAL) cohort study*, 18 Osteoporosis International 25 (2007);
- Johann Ringe et al., *Differences in persistence, safety and efficacy of generic and original branded once weekly bisphosphonates in patients with postmenopausal osteoporosis: 1-year results of a retrospective patient chart review analysis*, 30 Rheumatology International 213 (2009).

249. Sales representatives were then expected to execute claims in the field based upon these reports. Sales representatives were told use the REAL Study (a cohort study) to sell Actonel® as having a proven forty-three percent lower-hip fracture rate compared with branded Fosamax®. They were further instructed to claim in their details that "we can assume it will be *much* lower than generic Fosamax®."

250. Sales representatives were told to use the Adachi Study — a retrospective cohort study from Canada with a population of 301 patients — to infer similar results in the United States, i.e., that patients taking generic alendronate experienced significantly lower BMD and a four-fold increase in gastrointestinal problems. The four-fold figure was calculated based on seventy-nine percent of patients on generic discontinued due to GI problems compared to twenty-one percent of patients on branded, meaning a 3.76 fold increase. VP Koellhoffer directed sales representatives to round this figure up by saying four times higher and to claim that the higher gastrointestinal side effects of the generic led patients to discontinue therapy as compared to branded Actonel®. In addition, representatives were instructed to, and

subsequently did, claim that with some twenty-six different forms of generic tablets on the market, some would dissolve two to ten times faster or five times slower than their branded counterparts. Slower disintegration, managers told sales representatives, would lead to increased drug exposure and toxicity, causing generic alendronate to result in significantly more gastrointestinal side effects than branded Actonel®. Alternatively, sales representatives were to claim that faster disintegration would result in the generic tablet coming into contact with food or beverage, resulting in reduced absorption and compromised fracture protection. Thus, the message was that Actonel® would provide superior fracture protection compared with generic alendronate. None of these claims was supported by reliable clinical evidence.

251. The Ringe Study was a retrospective chart review of 204 patients, and as such, highly flawed. Nonetheless, sales representatives were taught that the Ringe Study demonstrated that, as a result of the uncoated tablet and large difference in bioavailability, generic alendronate was clearly inferior to Actonel®, resulting in five times more gastrointestinal side effects. (This figure was calculated based on thirty-two patients on generic alendronate with gastrointestinal side effects divided by nine patients on branded Actonel with gastrointestinal side effects, which equals a 3.4-fold increase.) VP Koellhoffer told representatives to "round up" to four- or five-times greater gastrointestinal side effects. As was Warner Chilcott's standard promotional strategy, managers instructed representatives to "keep it simple," touting that Actonel® had forty- to fifty-percent lower BMD builds than generic alendronate, despite the lack of reliable clinical evidence for these claims.

252. A number of sales representatives raised concerns regarding this off-label superiority message in front of the entire upper management. For example, sales representative Steve Justice asked: How can we sell using these unapproved pieces and make claims about our

products? The response from DM Johnson and VP Koellhoffer was that sales representatives can talk to a doctor about anything if that doctor can Google that information or study on the Internet.

253. A later voicemail message was forwarded from a new Minnesota sales representative, Nicole Brown, to her District Manager, Craig Ott, then to VP Koellhoffer, and then to the entire region as an example of what management wanted to see in the field. According to VP Koellhoffer, "This is what excellence looks like." The message stated that the representative pulled out the Adachi study and showed the charts to the physician to make her point.

254. In yet another example of Warner Chilcott training sales representatives to use off-label reprints to sell Actonel®, on September 3, 2010 they received a study that addressed osteonecrosis of the jaw. Sook-Bin Woo et al., *Systematic Review: Bisphosphonates and Osteonecrosis of the Jaws*, 144 Annals of Internal Medicine 753 (2006). Although the osteonecrosis study was marked "Sales Training. Background Information Only," sales representatives were specifically instructed to use the study in their promotions. Management directed them to: (a) utilize information in the study to minimize physician concerns about osteonecrosis of the jaw; (b) point out that most patients that experience osteonecrosis of the jaw were cancer patients undergoing treatment and taking intravenous bisphosphonates like Reclast®; and (c) point out that in this study, there was only one reported case of osteonecrosis of the jaw with Actonel® compared to thirteen reported cases with Fosamax®. Representatives were trained to say: "Doctor, bottom line, if you are concerned about osteonecrosis of the jaw, Actonel® is clearly the *least* likely to cause this side effect in your patients." There is absolutely no head-to-head data to support this claim.

### C. AGGRESSIVE PROMOTION OF ATELVIA® OFF LABEL AND THROUGH WIDESPREAD KICKBACKS TO INDUCE PRESCRIBING

255. Warner Chilcott initially launched Atelvia® in November 2010 through an "Early Experience Program" or "EEP" to "Key Opinion Leaders." Those chosen were high-decile, i.e., high-volume, prescribers, ranked by Warner Chilcott as tier six or above. The aim of the Early Experience Program was to get these physicians to become prominent speakers once the drug was formally launched in January 2011.

256. At the "Meet the Managers" meeting in November 2010 in Puerto Rico, which was attended by all district managers, top representatives, and Managed Care Account Executives, CEO Boissonneault and President Reichel told attendees not to make the sales message "too complicated." Instead, they were simply to tell physicians that Atelvia® was superior to Actonel® and its competitors. In addition, on January 3-6, 2011, at the National Atelvia® Launch Meeting in Orlando, Florida, with nearly 400 primary care sales representatives in attendance, both CEO Boissonneault and President Reichel repeated their instruction to sales representatives to promote Atelvia® as superior to Actonel® and its competitors.

257. Sales representatives were to encourage physicians to switch *all* Actonel® patients to Atelvia®, despite the fact that Atelvia® is not indicated for the same indications as is Actonel®. Actonel® is indicated for numerous conditions for which Atelvia® is not, including the prevention of osteoporosis, the treatment of male osteoporosis, and Paget's Disease, as well as the prevention and treatment of steroid-induced osteoporosis.

258. This discrepancy in indications, however, has not prevented Warner Chilcott from actively promoting Atelvia® beyond its FDA-approved indications. For example, as of March 28, 2011, Realtor Alexander was assigned 159 Atelvia "targets" to detail. Of these 159, nineteen

physicians, or twelve percent of her targets, are in specialties that involve sales promotion outside the scope of Atelvia®'s indication, including: rheumatology, OB/GYN, pediatrics, infectious disease, nephrology, emergency medicine, endocrinology, orthopedic surgery, and general preventative medicine. Nearly all of these targets treat Medicare Part D or Medicaid patients.

259. There are two main physician specialties at the heart of this off label promotion. The first involve rheumatologists. Warner Chilcott sales representatives must call on rheumatologists and sell Atelvia® off-label for the prevention and treatment of steroid-induced osteoporosis. Relator Alexander has three rheumatologists and a rheumatologist nurse practitioner on her call panel including: Dr. Charles Huebner (560 W. Mitchell St., Suite 560, Petoskey, MI 49770), Jane Denay, N.P. (560 W. Mitchell St., Suite 560, Petoskey, MI 49770), Dr. Irene Kazmers (3280 Woods Way, Petoskey, MI 49770), and Dr. Mary Haller (500 Campus Drive, Hancock, MI 49930). Even more ironic, Dr. Charles Huebner (rheumatologist) is ranked as a tier eight physician. Dr. Huebner is the second most "important" physician in Relator Alexander's territory according to Warner Chilcott corporate direction for Atelvia®. Dr. Huebner was considered important enough to be included in the Atelvia® Early Experience Program, during which Relator Alexander's manager made pre-launch sales calls to him.

260. On December 21, 2010, Relator Alexander and DM Johnson had an early experience lunch meeting with Dr. Huebner and Nurse Practitioner Jane Denay. For over one hour, DM Johnson sold to Dr. Huebner and NP Denay, utilizing tactics such as implying superiority of Atelvia® versus Actonel® with regards to BMD builds, in addition to claims that Atelvia® has better gastrointestinal tolerability than Actonel®. This last claim is, according to the “Adverse Events” section of the Atelvia® prescribing information, a blatant lie. Most

importantly, at no point during this one-hour sales call did DM Johnson mention that Atelvia® was in fact *not* indicated for the prevention and treatment of steroid-induced osteoporosis. DM Johnson instead clearly implied that "risedronate is risedronate is risedronate".

261. On March 1, 2011, DM Johnson again accompanied Relator Alexander to a lunch meeting with Dr. Huebner and Nurse Practitioner Jane Denay. During this lunch meeting DM Johnson still did not mention the indication of Atelvia®. After the March 1, 2011 lunch meeting DM Johnson mentioned to Relator Alexander, while in the first story restroom of the Burns Building, that she really thought Dr. Huebner would come around and start writing Atelvia®, per DM Johnson, even though it isn't even indicated for use in the prevention and treatment of steroid induced osteoporosis.

262. The second physician specialty at the heart of this off-label promotion are OB/GYNs. Warner Chilcott sales representatives must call on OB/GYNs and sell Atelvia® off label for the prevention of osteoporosis. Relator Alexander currently has five OB/GYN physicians on her call panel, including: Dr. John Cook (1001 S. Hemlock St., Iron Mountain, Michigan 49801), Dr. David Miner (829 N. Center Ave., Gaylord, Michigan 49735), Dr. Daniel Verberg (2390 Mitchell Park Drive Petoskey, Michigan 49770), Dr. William Mosher (1461 West Upright Street, Charlevoix, Michigan 49720), and Dr. Joseph Sypniewski (560 West Mitchell Street, Suite 210, Petoskey, Michigan 49770). It is well known that OB/GYNs (especially if their focus in on the OB side), generally prescribe therapies for the prevention of osteoporosis.

263. On two separate one-on-one conference calls, which took place on March 14, 2011 and March 28, 2011 between Relator Alexander and DM Johnson, Relator Alexander was told to focus more time and energy on her OB/GYNs (treating for prevention of osteoporosis).

DM Johnson stated that prior authorizations are more quickly approved by commercial insurance plans. Younger patients (treated by OB/GYNs), typically have commercial insurance (and in some cases Medicaid). By focusing on the OB/GYNs, Relator Alexander was told that she would grow her Atelvia® business much faster. In addition, DM Johnson stated that this sales tactic was being utilized successfully by managers and representatives across the country.

264. Additionally, sales representatives were told not to engage in the "fair and balanced" promotion of Atelvia® and were even go so far as to suppress safety information. Indeed at the January 3-6, 2011 National Atelvia® Launch Meeting, President Reichel stood on stage and gave multiple role plays in front of the some 400 primary care representatives and their managers. In the role plays he called the GI side effect comparable to Actonel®, despite information in the Atelvia® package insert which clearly disputes this claim.

265. The message, despite a complete lack of evidence supporting it, was that Atelvia® was an "upgrade" over Actonel®. For example, in a breakout session for the Midwest Region, sales representatives were directed by District Managers Craig Ott, Julie Johnson, and Brett Hayes, and Regional Vice President Mike Koellhoffer, *not* to mention to doctors that antacids and PPIs should be taken at a different time that Atelvia®. Identical messages were given at similar breakout sessions for other regions.

266. Toward the end of the national January 3-6, 2011 Atelvia® Launch meeting, representatives were required to complete a validation role play. District managers validated sales representatives based upon a checklist of key items they needed to cover during their sales message. Representatives were not required to cover drug interactions, side effects, or any safety issues. Thus, a fair and balanced presentation was not the goal of this validation. Rather, the sales message was that Atelvia® was an "upgrade" over Actonel®.

267. By failing to accurately disclose the risks of long-term Atelvia® use, Warner Chilcott exposed patients to potentially serious harm. The effect of long-term bisphosphonate use is unknown. Among the possible health concerns are the building of unusually fragile "frozen" bone, atypical femur fractures, osteonecrosis of the jaw, and esophageal cancer.

**1. Misrepresenting Safety of Atelvia® in Comparison to Actonel®**

268. A core part of the Atelvia® sales message has been to misrepresent its safety in comparison to Actonel®. For example, during EEP calls on December 20 - 21, 2010 in lower Michigan, Relator Alexander witnessed DM Johnson misrepresenting the superiority of Atelvia® over Actonel®, telling physicians that Atelvia® is better tolerated when there is no evidence to support this claim. During calls with key customers, DM Johnson on three separate sales calls affirmatively told physicians (or agreed with physicians) that Atelvia® had better gastrointestinal tolerability than Actonel® due to its enteric coating. DM Johnson did this with Dr. Robert P. Mee, Gaylord, Michigan; Dr. Charles J. Huebner, Petoskey, Michigan; and Dr. Christopher M. Milan, Gaylord, Michigan. DM Johnson did this despite the fact that the Atelvia® package insert specifically notes it had worse gastrointestinal tolerability than Actonel®.

269. The approval study for Atelvia® (as shown in the package insert under "Adverse Events") showed significantly more gastrointestinal adverse events with Atelvia® 35 mg as compared with Actonel® 5 mg. Nonetheless, sales representatives have been directed to downplay Atelvia®'s gastrointestinal tolerability profile. They are to say: "Doctor, Atelvia® is comparable to Actonel®." Representatives have also been directed to misrepresent Atelvia®'s gastrointestinal tolerability profile, saying: "Doctor, Atelvia® has better GI tolerability than Actonel®." The obvious concern is that patients are incorrectly identified as "good candidates"

for Atelvia® based upon Warner Chilcott's blatant misrepresentations of its superior gastrointestinal tolerability.

270. The data in the Atelvia® package insert shows clearly that Actonel® has superior tolerability:

- Constipation: Atelvia, 4.9%; Actonel, 2.9% (almost two times higher);
- Vomiting: Atelvia, 4.9%; Actonel, 1.6% (almost three times higher); and
- Diarrhea: Atelvia, 8.8%; Actonel, 4.4% (two times higher).

271. Warner Chilcott's misrepresentations are the potential source of serious patient harm. Particularly for patients with a history of history of GI tolerability issues, these may be important factors for physicians in making their prescribing decisions. By prescribing Atelvia® rather than Actonel® as the better-tolerated medication based on the erroneous information of Warner Chilcott sales representatives, these at-risk patients are exposed to even greater risk of harm. In addition to the significant costs to these patients, Warner Chilcott's blatant misrepresentations also increase the burden on the overall healthcare system.

272. DM Johnson also told physicians that Atelvia® could be taken anytime — with breakfast, or with a cup of coffee — despite the fact that the label states Atelvia® is only indicated to be taken in the morning immediately following breakfast with at least four ounces of plain water. DM Johnson made similar misrepresentations in the presence of as well to other physicians during the sales calls she conducted. For example, she made similar inaccurate claims during EEP calls in November and December with other representatives in the Wisconsin District, including John Payne, Peter Zimmerman, Molly Carpiaux, and Abby Flenker. These inaccurate claims were not exclusive to the Wisconsin district. Minnesota District Manager Craig Ott made these same claims on EEP call with sales representative Shannon Schneider.

273. Also, on December 20, 2010, during a ride-along with DM Johnson, during a lunch in Gaylord, Michigan at Dr. Robert P. Mee's Office, when Johnson had stepped out of the room nurse practitioner Eileen Conklin stepped in and asked whether there were any drug interactions with Atelvia®. Just as Johnson walked back into the room, Relator Alexander responded that Proton Pump Inhibitors ("PPIs") such as Prilosec® should not be taken concurrently. The information conveyed by Relator Alexander is in the FDA-approved prescribing information for Atelvia®, which states that calcium supplements, antacids, magnesium-based supplements, or laxatives, and iron preparations may reduce the bioavilability of Atelvia® and thus should not be taken together with drugs that raise stomach pH (e.g., $H_2$ blockers, PPIs, or antacids), which may affect the enteric coating on Atelvia® tablets and thereby reduce bioavailability of Atelvia®.

274. Nonetheless, after the nurse practitioner left, Johnson harshly scolded Relator Alexander for warning about the concomitant use of PPIs and said Alexander should have replied that there are not interaction issues with any drugs used with Atelvia®. When Alexander expressed her concern that this was neither fair nor balanced and contrary to section 7.4 of the FDA-approved prescribing information, Johnson became very annoyed, telling Relator, to this effect: "Read it again! The training Module says PPIs *may* raise stomach pH. This is exactly the type of information our competition will use against us. It is Warner Chilcott direction that you do *not* discuss this with your physicians."

275. By deliberately concealing that taking Atelvia® concurrently with PPIs and the other above-listed medications may result in reduced absorption and efficacy of Atelvia®, Warner Chilcott exposed patients to serious harm from the very diseases they sought to prevent, generally fractures.

276. Likewise, during the January 3-6, 2010 Atelvia® launch meeting in Orlando, Florida "Objection Handling Workshop," VP Koellhoffer specifically told sales representatives to sell Atelvia® beyond just its labeled use after breakfast. Per VP Koellhoffer, the definition of "breakfast" should be construed very liberally, stating that for some people breakfast is simply a cup of coffee. Therefore, sales representatives were to sell Atelvia® to doctors: Doc, just have patients pop this drug in their pill box for Sunday and just down it with their other meds! The message from Koellhoffer was to "keep it simple," and don't get into the indication details on the label.

277. By instructing sales representatives to promote Atelvia® in a manner directly contrary to the warnings of its prescribing information, Warner Chilcott exposed patients to significant risk of harm. The package insert specifically states that Atelvia® is to be taken immediately following breakfast, and that taking the drug before breakfast has been shown to cause significantly greater GI tolerability issues. In the extreme case, this may mean esophageal bleeding and death. In addition, failing to take Atelvia® per these specific instructions has been shown to reduce absorption of the drug, compromising the efficacy of the product and exposing patients to the serious fractures they sought to prevent by taking the drug in the first place.

**2. Using Med-Ed Programs to "Buy" Atelvia® Prescriptions from Speakers and Attendees**

278. A significant part of the strategy for promoting Atelvia® has been to have representatives recruit speakers based on their promise to prescribe the drug. Although Warner Chilcott's compliance guidelines (limited as they are) state that representatives should only have a maximum of five percent of their call panel as active speakers, that guideline is ignored. In fact, sales representatives are being required to enlist a growing number of Atelvia® speakers because the vast majority of new prescriptions for the drug are being written by speakers.

279. Since the official launch in January 2011, the development of Atelvia® speakers has become a focal point to the sales strategy. Two months following the January 2011 launch of Atelvia®, as of March 1, 2011, there were already some 708 Atelvia® speakers. In March 2011, there was also a push announced (per directions from President Reichel) for every sales representative to increase the number of Atelvia® speakers to nine per territory or a goal of some 3,330 speakers nationwide.

280. Developing speakers was part of its "buying the business" strategy. For example, in a "success story" forwarded by VP Koellhoffer from a district manager discussed driving market share by demanding that speakers prescribe Atelvia®. And during a March 1-2, 2011 Field Visit with her manager, Relator Alexander was told she must sign up more speakers, as these are the people currently writing all the Atelvia® scripts. This point was further emphasized when Relator Alexander received her field coaching guide (a recap) from the March 1-2, 2011 field visit. In this document, DM Johnson pointed out that in the Wisconsin District, over fifty-eight percent of all Atelvia® prescriptions were written by "advocates," that is, speakers. DM Johnson further stateed that "[Alexander] is not taking advantage of this opportunity... [Y]ou need to increase your sense of urgency and add advocates in your geography." In yet another example, on March 7, 2011 during a one-on-one conference call between Relator Alexander and DM Johnson, Johnson gave the example of a territory in New York City where the representative has enlisted some 248 speakers out of a total call panel of 270 physicians. That is, ninety-two percent of this representative's assigned doctors were speakers.

**3. Unfounded Superiority Claims for Atelvia®**

281. A key part of the off-label sales message for Atelvia® is that it results in superior bone mineral density ("BMD"), which is a measure of the matter per square centimeter of bones,

an indirect indicator of osteoporosis and fracture risk. Despite making this a key component of its promotional strategy, Warner Chilcott has no evidence to support this claim. Rather, Atelvia®'s approval was derived from a non-inferiority, head-to-head trial with Actonel® 5 mg which only compared BMD. As part of its off-label "upgrade" strategy, Warner Chilcott hopes to convince physicians that Atelvia® is effective in treating osteoporosis when it has no data to support these claims.

282. Despite no substantial evidence to support these claims, Warner Chilcott sales representatives are directed by their managers to claim:

> Absorption is a huge problem with bisphosphonates and if your patients aren't taking their medication correctly, then absorption can be reduced by ninety to one-hundred percent, resulting in no fracture protection. Doctor, you can ensure absorption with Atelvia® or risk absorption with Actonel®/Fosamax®/Boniva®. In addition, by ensuring absorption, you ensure better BMD builds. In a head-to-head comparison with Actonel®, Atelvia® showed superior BMD builds after two years."

Even though representatives were trained on this data, they were not provided with the actual documentation or a study to back up this claim.

283. During the Objection Handling Workshop held during the Atelvia® National Launch Meeting on January 3-6, 2011, in Orlando, Florida, sales representatives were told to tell doctors: "Risedronate is risedronate is risedronate!" Risedronate is the active ingredient in Actonel® and Atelvia®. During one sample objection rehearsed before the entire sales force, a district manager role playing as a doctor asked about the fracture data for Atelvia®, sales representatives were instructed to tell doctors that Atelvia® had superior "BMD builds" to Actonel®. If a doctor objects, they were instructed to say: "Doc, this is risedronate, the same molecule that is in Actonel®!"

284. When Relator Alexander expressed concern to Craig Ott (the Minnesota District Manager) and DM Johnson about this response and asked if there was not a more direct and truthful way to answer the physician, Relator Alexander was taken aside and told not to discuss such things around the newer representatives. Instead, Alexander was instructed to follow Warner Chilcott direction and "keep your mouth shut."

### D. USE OF ACTONEL® CREDIT CARDS AND COUPONS TO INDUCE PRESCRIBING OF ACTONEL®

285. One of the key tools the Warner Chilcott Actonel® sales force has used to stave off conversion to generic Fosamax® was to provide physicians stacks of discount coupons, using "Pay No More" $25 per month credit cards in combination with a $20 rebate coupon sales messages. The primary sales message representatives were to use was that these two discount cards, when combined, made Actonel® a $5.00 out-of-pocket drug, making it competitive with the generic Fosamax®. If a patient maxed out the limit on the cards, representatives were instructed to supplement the patients with samples until the new calendar year.

286. Although the credit cards and coupons explicitly say they are not to be used for any Government Program (including Medicare or Medicaid), Warner Chilcott has directed its sales force to aggressively promote them for use by Government Program beneficiaries. This direction was specifically given to the sales force by VP Koellhoffer and DM Ott during a POA meeting on January 27-28, 2011 in Minneapolis, Minnesota. Former Warner Chilcott employee and P&GP legacy representative Paul Jaglinski (Wausau, Wisconsin) expressed concern about the details of this promotion and was verbally reprimanded. The Actonel® credit cards and coupons were terminated in late 2010.

287. Among the list of numerous physicians in Relator Alexander's territory who had written Actonel®, and then drastically reduced the amount of Actonel® they prescribed when

the coupons were discontinued are (based on thirteen week rolling early view data from February/March 2010 to discontinuation in late 2010): Dr. James Batti, 1711 S. Stephenson Avenue, Iron Mountain, Michigan (eight scripts down to four scripts); Dr. John Cook, 1001 S. Hemlock Street, Iron Mountain, Michigan (twelve scripts down to zero scripts); Dr. Stephen Slajus, 1711 S. Stephenson Avenue, Iron Mountain, Michigan (seven scripts down to three scripts); and Dr. John Groeneveld, 800 East Blvd., Kingsford, Michigan (ten scripts down to five scripts).

288. These kickbacks were intended to increase sales of Warner Chilcott's drugs generally, as well as Federal and State Program reimbursements in particular. Warner Chilcott knew and intended that using the coupon and rebates would result in increased sales of Actonel® on Government health plans. The bribes did improperly and illegally influence the selection of Actonel® for prescriptions provided to Government Program beneficiaries in violation of the AKA, 42 U.S.C. § 1320a-7b(b).

289. The Warner Chilcott managers and employees involved in the Fraudulent Marketing Scheme were fully aware that it was against Warner Chilcott policy, and also illegal, to provide Actonel® coupons and rebates in exchange for prescriptions of Actonel®. Warner Chilcott's Code of Ethics, which all Warner Chilcott employees are now required to sign an acknowledgement that they have read and agree to abide by, explicitly prohibits providing an inducement to a Warner Chilcott customer with the intent to influence that person to recommend or purchase a health care product that may be reimbursed by a federal health care program. (Until just recently, the only document Relator Alexander was required to sign was one stating that she had completed a twenty-minute online compliance module, which had nothing to do with sales representatives' promotional activities). In addition, Warner Chilcott employees are

prohibited from providing anything to a customer in exchange for any implicit or explicit agreement or understanding to use, purchase, order, recommend, prescribe, or dispense any Warner Chilcott product. Nonetheless, in flagrant violation of Warner Chilcott's own stated policies, these managers and employees engaged in the practice anyway because they understood that the Company's first priority was to promote its products, not comply with the law.

290. Warner Chilcott's payment of, or offer to pay, kickbacks was made knowingly and with the intent to induce Government Program payments through a pattern of corrupt and illegal conduct, in violation of the federal False Claims Act, 31 U.S.C. § 3729.

291. The Defendants thus knowingly and willfully offered, paid, and received illegal remuneration in violation of the AKA, 42 U.S.C. § 1320a-7b(h)(2). But for the illegal kickbacks, Government Programs would not have paid for the prescription claims tainted by these kickbacks.

292. As a result of these kickbacks, Government Programs have suffered significant damages.

### E. WARNER CHILCOTT DISTRIBUTES FREE SAMPLES OF ATELVIA® TO ILLEGALLY PROMOTE OFF-LABEL SALES AND USE OF THE DRUG BY FEDERAL PROGRAM BENEFICIARIES

293. Congress has recognized that the distribution of prescription drug samples can improperly influence health care professional conduct and negatively impact patient safety. Thus, the Prescription Drug Marketing Act ("PDMA") of 1987 governs the distribution of drug samples. The PDMA restricts the manner in which pharmaceutical companies may use samples of their prescription drug products. For example, companies such as Warner Chilcott may not provide drug samples to health care professionals:

- if the health care professional intends to seek reimbursement from the Government for the sample;

- if the health care professional intends to use the sample for his or her own personal use;
- to reward the health care professional for his or her past prescribing habits, or as a financial inducement to encourage future prescriptions; or
- if it is reasonably certain that the health care professional intends to prescribe the samples for an off-label use.

294. Nevertheless, Warner Chilcott routinely, systematically, and intentionally has engaged in a nationwide scheme to use free samples to illegally promote off-label sales and use of Atelvia® and to induce future prescribing. At all times material hereto, Warner Chilcott has done this with the expectation that such off-label uses will lead to the submission of false claims for reimbursement by Government Programs.

295. Warner Chilcott understood that the financial success of Atelvia® (and thus the financial success of Warner Chilcott) would hinge on the Company's ability to expand the market for Atelvia® beyond the few patients who would be treated for its on-label use. Thus, Warner Chilcott developed a marketing scheme by which to encourage health care professionals to prescribe Atelvia® not simply for the handful of on-label cases they might treat, but also for off-label uses as well.

296. Warner Chilcott has understood that it could not expand the market for Atelvia® patients if it were to limit its promotional activities to the handful of doctors likely to treat patients for its limited on-label use and without the payment of kickbacks. Thus, similar to the coupon scheme executed by Warner Chilcott, beginning in 2011, upper management is now employing a new technique to induce physicians to prescribe their medications.

297. By offering countless samples to patients to help offset co-pay costs, Warner Chilcott is further violating the Medicaid Best Price statute. It is not uncommon to offer six

months of samples in exchange for the physician writing one prescription (i.e., a one month's supply). The goal was simply to get an "NRx" (since representatives only receive sales credit for NRx's and not for refills).

298. On March 11, 2011 during her weekly checkpoint review, Relator Alexander was told by DM Johnson that, atWarner Chilcott we only get credit for the first new prescription. DM Johnson continued, if an office objects about price or the hassle of doing prior authorizations, offer them as many samples per patient as is needed to get the prescription written. We have tons of samples. This direction was further clarified by DM Johnson via an e-mail sent March 14, 2011, recapping their March 11, 2011 discussion: "If there is a way to use samples in combination with a script to offset cost, go for it!"

299. Likewise, on March 18, 2011 an e-mail was sent out by VP Koellhoffer to all Primary Care District Managers (which was then forwarded to all primary care sales representatives), summarizing the upcoming months' plan of attack for Atelvia® sales. In this e-mail, representatives were urged to use samples to address cost concerns as needed.

300. This strategy of utilizing samples to combat the "cost objection" is not new to Warner Chilcott, nor is it exclusive to Atelvia®. At the January 27-28, 2010 POA meeting in Milwaukee, Minnesota, representatives were told by DM Ott and VP Koellhoffer to utilize excessive sampling in combination with the fraudulent credit card / rebate promotion for Actonel®. Because the Actonel® "Pay No More than $25.00" credit cards had a maximum value of $600 per year, representatives were instructed to tell doctors that they would supplement patients with samples once their discount cards ran out. The aim was to get the patient and the doctor "hooked" on using Actonel® in this way. Once the "Pay No More than $25.00" cards and samples ran out, the patient was then forced to pick up the cost of Actonel®.

301. Warner Chilcott knowingly (or with reckless disregard for the truth) made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government. Specifically, for the period noted above, and continuing through the present, the "Best Price" on Atelvia was the "free goods" price for the samples provided to induce the purchase by healthcare professionals. As a result, Warner Chilcott knowingly (or in reckless disregard of the truth) submitted false quarterly statements to CMS of its Best Prices on Atelvia® to reduce improperly its rebate obligation to the States under the Best Price Program.

### F. HIPAA VIOLATIONS TO OVERCOME PRIOR AUTHORIZATION LIMITS AND ENCOURAGE OFF-LABEL PRESCRIBING OF ACTONEL® AND ATELVIA®

302. A secondary sales message for Actonel® has been that sales representatives are to assist physicians in overcoming prior authorization limits to ensure Warner Chilcott drugs are approved by all managed care (especially Medicare Part D) plans.

303. Prior authorization in the context of a health care plan refers to the process of obtaining prior approval from a private or public third-party prescription insurer about the correctness, suitability, and coverage of a service or medication that allows a beneficiary to know in advance about whether a procedure, treatment, or service will be covered under his/her plan.

304. Warner Chilcott has made it a priority to increase sales of its drugs through the manipulation of prior authorization limits intended to control over-utilization and off-label promotion. In one example of violating HIPAA privacy requirements, in a January 13, 2011 voicemail chain (which was cascaded up through Regional Vice Presidents, Sirine Tabbara, Mike Koellhoffer and Mark Moscowitz, and was then sent out to all district managers and sales representatives nationwide), a sales representative in Walnut Creek, California, Prabhakar ("Mo") Polani (#2 Atelvia® representative in the country) touted a "best practice" for others to emulate where he tells how he was able to go into doctor's offices at 5:30 in the morning to fill

out the prior authorization paperwork for Atelvia®. Southwest Regional Vice President Sirine Tabbara (who had forwarded the voicemail chain) stated that it is best not to let the physician know that representatives have filled out the prior authorization and instead work only through the office staff. On the chain also VP Koellhoffer proclaimed "[t]here is really nothing that stops any representative from doing [completion of prior authorizations]. What he is doing [Polani]…. except their own personal passion to win.... I think the ownership and the business-like approach to this is important... In a world of no excuses, in a world where performance matters!"

305. During a breakout session at the National Atelvia® Launch Meeting, January 3-6, 2011 in Orlando, Florida, District Manager Julie Johnson discussed the importance of talking to office staff who handle prior authorizations, and raised a separate example of yet another California representative who was filling out the paperwork, Eduardo Chang (#3 Atelvia® representative in the country), as a paradigm of what sales representatives should be doing. In a candid moment, manager Johnson mentioned that this representative had some of the best Atelvia® business in the country. When representative Pete Zimmerman expressed concern that this would be a HIPAA violation, DM Johnson responded: "In this company, it's the results that matter."

306. President Reichel has made it clear on multiple conference calls that manipulating prior authorizations is a "core competency" for all Warner Chilcott sales representatives in the sales of Atelvia®. Specifically, on February 2, 2011, Reichel sent a national Audix message to the primary care sales force in which he stated: "I think this has to become a core competency of Warner Chilcott, is how to work with Prior Auths...."

307. A month later sales representatives all received training on the fact that it would violate Warner Chilcott's Code of Ethics to in any way coach healthcare professionals in the

completion of prior authorizations forms. However, privately sales representatives (including Relator Alexander) have been told by their managers that, if they do not get prior authorizations Atelvia® will not be filled at the pharmacy because we do not have coverage. If that happens, representatives will be fired for no sales. As a result, sales representatives are told they are to break Warner Chilcott rules and the law or get fired. For example, at the national launch Atelvia® launch meeting, January 3-6, 2011 in Orlando, Florida, many representatives were given copies of the Medicare Part D form (generic prior approval form for all Medicare Part D Plans).

308. Representatives were instructed to utilize these prior authorization forms in offices to drive market share of Atelvia®. On a national basis, via e-mail, prior authorization forms for countless plans were shared across various teams. Specifically, from January 27-30, 2011, in the Wisconsin district, DM Johnson, with the assistance of Managed Care Account Executive Mark Ritter, shared via e-mail the following prior authorization forms with her sales team: Medicare Part D (generic form for all Medicare Part D Plans), Dean, Humana, Physicians Plus PA, United, Unity Health, Wellmark and Wisconsin Medicaid. They were then coached how they should work with healthcare professionals, and in particular the physician's staff, to get these forms completed.

309. Recently, in an apparent about face, on February 11, 2011, Bill Poll, Vice President of Finance, sent a memorandum to the entire sales force, telling them that they could not in any way be involved in assisting physicians' offices with prior authorizations. However, shortly after they received this memorandum, during her March 1-2, 2011 field visit in Lower Michigan, Relator Alexander was told by DM Johnson that (in spite of all sales representatives had to sign and return memoranda indicating they had been compliance trained) she was still

expected to "work closely" with her offices to ensure that prior authorizations were not an obstacle preventing physician's from prescribing Atelvia®.

## VIII. AGGRESSIVE MARKETING OF ASACOL® HD THROUGH OFF-LABEL PROMOTION AND PAYMENT OF KICKBACKS

310. Since its acquisition of the Asacol® franchise from P&GP in 2009, Warner Chilcott has engaged in an off-label promotional scheme aimed at growing sales of the newest Asacol® product, Asacol® HD. This scheme required not just converting patients from the products of competing companies but, most importantly, converting patients from its own predecessor medication, Asacol (400 mg). Toward that end, Warner Chilcott used and continues to use clinically unreliable data coupled with misleading sales tactics, as well as the dinner programs and other kickbacks described *supra*. By doing so, the Company has succeeded at growing sales of Asacol® HD far beyond what P&GP originally estimated to be a reasonable goal. As a result, government programs have made considerable reimbursements for a medication that the Company's own studies have demonstrated is not superior to the soon-to-be generic version, and patients have been exposed to an increased risk of serious side effects. Neither consequence would have occurred in the absence of Warner Chilcott's illegal, off-label promotional efforts for Asacol® HD.

### A. BACKGROUND ON ASACOL® (400 MG) AND ASACOL® HD

311. Ulcerative colitis is a form of inflammatory bowel disease characterized by ulcers, or open sores, in the colon. In active disease, the result is generally constant diarrhea mixed with blood, often accompanied by abdominal pain. The disease is classified as mild to severe depending on a number of factor including frequency of bowel movements, presence of blood, and severity of abdominal pain. In addition, as ulcerative colitis is believed to be systemic in origin, severer presentations of the disease may include extra-gastrointestinal symptoms.

312. Asacol® (400 mg) was first approved on January 31, 1992 for the treatment of mildly to moderately active ulcerative colitis. That indication was extended on August 19, 1997 to provide for the maintenance of remission of ulcerative colitis. The prescribing information instructs that, for treatment, patients take two tablets three times daily, for a total of 2.4 g; and that, for maintenance therapy, they take 1.6 g daily in divided doses.

313. The patent holder for Asacol® (400 mg) is Medeva plc, though the drug was licensed to P&GP at the time of its launch, and that license was assumed by Warner Chilcott as part of the P&GP acquisition. The patent for Asacol® (400 mg) expires in July 2013, though litigation with Roxane Laboratories is currently pending, which may result in generic competition prior to that date.

314. In response to this impending patent expiration, a follow-on version of Asacol® (400 mg), termed Asacol® HD, was launched. Asacol® HD was approved on May 29, 2008 for the treatment of moderately active ulcerative colitis. The prescribing information instructs that patients are to take three 800 mg tablets daily, for a total of 4.8 g. Unlike Asacol® (400 mg), Asacol® HD is neither indicated for the treatment of mildly active ulcerative colitis, nor is it indicated for the maintenance of remission of ulcerative colitis.

### B. THE CONTROLLED-RELEASE FORMULATIONS ARE KEY TO THE EFFECTIVENESS OF ASACOL® (400 MG) AND ASACOL® HD

315. The effectiveness of pharmaceutical products is generally discussed with regard solely to their active ingredients. Other characteristics such as the release formulation are given secondary, if any, consideration. In the case of Asacol® (400 mg) and Asacol® HD, however, the release formulations are the key to both drugs' effectiveness, as well as to differentiating them not only from each other but also from the numerous other FDA-approved formulations of mesalamine on the market.

316. Mesalamine, otherwise known as 5-aminosalacylic acid or "5-ASA," is a derivative of salicylic acid, and is closely related to aspirin. It operates topically, reducing inflammation in the large intestine. The difficulty, however, lies in delivering the drug to the large intestine. Because of the topical method of action, releasing the drug in an earlier stage of the gastrointestinal tract – either the stomach or small intestine – would result in significantly decreased effectiveness. The drugs' efficacies are thus highly dependent on their individual controlled-release formulations.

317. There are currently nine FDA-approved formulations of mesalamine, five of which, including Asacol® (400 mg) and Asacol® HD, are oral formulations. The Asacol® franchise's two primary competitors are Lialda® (Shire Pharmaceuticals) and Apriso® (Salix Pharmaceuticals). Both the large number of approved drugs as well as the variation in their indications speak to the importance of the controlled-release formulation.

318. The delayed-release mechanism for Asacol® (400 mg) is an acrylic-based resin coating called Eudragit S, which is sold by the German pharmaceutical company Evonik Röhm GmbH. Eudragit S is designed to dissolve at a pH 7 or greater. Asacol® HD also maintains an inner coating of Eudragit S; however, it also possesses an outer coating composed of a combination of Eudragit S and Eudragit L, another acrylic-based resin.

319. As a result, the two drugs dissolve and release their active ingredient in different manners — meaning that their efficacy and safety profiles are not the same. In fact, the FDA-approved prescribing information for Asacol® HD specifically states in two places that one Asacol® HD tablet has not been shown to be equivalent to two Asacol® (400 mg) tablets, and additionally, that patients should be instructed not to substitute one Asacol® HD tablet for two Asacol® (400 mg) tablets. The very reason that Asacol® HD was branded as "Asacol® HD"

instead of "Asacol® 800 mg" was to prevent confusion among physicians and patients that two Asacol® (400 mg) tablets were equivalent to one Asacol® HD tablet.

320. Nonetheless, despite the important differences in the delayed-release formulations between Asacol® (400 mg) and Asacol® HD and the drugs' potentially divergent safety and efficacy profiles, Warner Chilcott promoted Asacol® HD with the phrase "mesalamine is mesalamine."

### C. WARNER CHILCOTT ENGAGED IN ILLEGAL, OFF-LABEL PROMOTION TO CONVERT ALL ULCERATIVE COLITIS PATIENTS TO ASACOL® HD

321. In preparation for the loss in patent protection on Asacol® (400 mg), Warner Chilcott's upper management implemented a strategy to convert all Asacol® (400 mg) patients to Asacol® HD. This type of strategy – of converting prescriptions from a soon-to-expire drug to a newly-altered version – was a common Warner Chilcott practice, which it referred to as "lily padding." For Asacol® HD, this strategy included the conversion of both maintenance patients, who comprise the majority of sales in the ulcerative colitis market, as well as patients with mildly active ulcerative colitis. Asacol® HD is not indicated to treat either of these conditions.

322. CEO Boissonneault outlined this strategy on a conference call. After being asked whether the company's goal was to convert patients from Asacol® (400 mg) to Asacol® HD, Boissonneault answered referring to Warner Chilcott's Doryx® franchise, which they had succeeded in converting almost entirely to a new formulation:

> I think we call -- Asacol looks a lot like DORYX does. So what we have done with DORYX and the DORYX execution, we've moved -- we've been quite successful in moving part of the franchise into the 150 because quite frankly, it's a better product and looking at DORYX prescriptions this morning, 85% of the business is in the 150 product. Not only that, but we significantly increased the DORYX franchise along the way and we would envision a similar execution for Asacol.

323.

Transcript, Event Brief of Warner Chilcott Limited Acquires P&GP's Global Pharmaceuticals Business – Final (August 24, 2009), *available at* LEXIS FD (Fair Disclosure) Wire.

324. In another earnings call later that year, Boissonnealt explicitly discussed the conversion of Asacol® (400 mg) patients to Asacol® HD in off-label maintenance therapy:

> As far as ASACOL and the HD, it is an 800-milligram dosage but it's not twice the 400 in bio equivalence. But sometimes what you have got to look at is how well it works. And actually if you have a lower blood level that means the product might actually be better in reducing inflammation, at the site of inflammation in the G.I. tract. So we don't have that data.
>
> But when you look within the data, both these products probably work in maintenance. But when you have the acute situation -- so you have a situation with an individual who will get flares. When you look at how it performs against a flare, I think you will see a clinical benefit versus the 400 because you actually need more drug onboard. And I think we will be able to demonstrate these data in a relatively short period of time.

Transcript, Q3 2009 Warner Chilcott Limited Earnings Conference Call – Final (November 9, 2009), *available at* LEXIS FD (Fair Disclosure) Wire. No such data has been provided. While Boissonneault seeks to argue that the increased dosage should result in increased efficacy regardless of the precise indication, the available clinical evidence refutes this point. In fact, the data from P&GP's own ASCEND I trial – which was the first of three clinical trials submitted to the FDA for approval of Asacol® HD – showed that Asacol® HD was not superior to Asacol® (400 mg) for treatment of patients with mildly active disease.

325. Nonetheless, Warner Chilcott sales representatives were continually instructed that they were to promote Asacol® HD for *all* ulcerative colitis patients, regardless of indication. In one of Relator Goan's first experiences under Warner Chilcott management, during a ride along in October of 2009 with Jim Chirip, the head of training at Warner Chilcott, Chirip told Relator Goan that his bonus compensation would be based on his success at converting Asacol®

(400 mg) patients to Asacol® HD. This compensation incentive was particularly strong given that Relator Goan was told of this in immediate conjunction with being required to take a twenty-thousand dollar pay cut. Relator Goan asked Chirip how he was supposed to convert a substantial number of patients to Asacol® HD given that the drug lacked an indication for maintenance therapy. Chirip responded that Relator would have to "sell through that." Chirip explained to Goan that they would "sell through" the lacking indications for Asacol® HD by "spinning" the clinical data or eschewing clinical discussions altogether, instead relying on dinner programs and other components of the "simple sell."

326. This same message was repeated shortly thereafter at Relator Goan's first POA meeting, which took place on May 10, 2009 in Rockaway, New Jersey. President Reichel explicitly stated to the approximately 110 gathered sales representatives that the goal was to convert all Asacol® (400 mg) business to Asacol® HD. Following this statement, a former P&GP sales representative asked Reichel how this goal was to be accomplished given that Asacol® HD lacked an indication for maintenance of remission. Still in front of the gathered representatives, Reichel responded: It's time to sell, and if you can't sell, Warner Chilcott isn't the place for you. Reichel also made fun of anyone who said Asacol®, meaning the 400 mg formulation, instead of Asacol® HD. Reichel's statement, and particularly his treatment of the questioning sales representative, made it clear to Relator Goan that in order to not lose his job he would be required to sell Asacol® HD for the off-label maintenance and mildly active UC indications.

327. This same message was continually reiterated. On Relator Goan's first ride along with District Manager Leo Phoenix, which occurred in or around January of 2010, Phoenix told Goan that he needed to convert more Asacol® (400 mg) business to Asacol® HD. As he had

done with Trainer Chirip, Goan again expressed his concern about Asacol® HD's lack of a maintenance indication. Phoenix responded that the lack of indication did not matter. He proceeded to explain that Warner Chilcott did not care about anything Relator Goan did except his sales of Asacol® HD.

328. At his second POA meeting in January 2010, Relator Goan and his fellow representatives were told to sell Asacol® HD as superior to Asacol® (400 mg) for both maintenance therapy as well as treatment of mildly active disease.

329. On October 10, 2010, Relator Goan went on a ride along with his new District Manager, Jake Hawkins. During this ride along, Hawkins told Relator Goan that he had the best relationships with his physicians in the country and that he needed to leverage these relationships to get the physicians to convert their Asacol® (400 mg) patients to Asacol® HD. Relator Goan noted that not all these patients fit the indication for Asacol® HD, and indeed that some patients had only mildly active UC and that others were on maintenance therapy. Hawkins responded by telling Relator Goan that he needed to convert *all* these patients to Asacol® HD now, and that if he failed to do so, Relator Goan's job would be in jeopardy.

330. At Relator Goan's POA meeting in January 2011, the Director of Sales Nicola Crawford instructed sales representatives to use dinners with physicians and staff, as well as representatives new sales piece for Asacol® HD, to beat Lialda®, Apriso®, and most of all Asacol® (400 mg). The new sales piece to which Crawford was referring is a two-sided page, printed on card stock, one side of which displays a graph showing that the median times to resolution of rectal bleeding and stool frequency for patients with moderately active UC on Asacol® HD were nine days and ten days, respectively. On the sales piece, no comparison is made between Asacol® HD and Asacol® (400 mg), but sales representatives were nonetheless

instructed to use this sales piece to tout Asacol® HD as superior to Asacol (400 mg). However, reviewing the actual figures from the ASCEND II trial, from which the figures in the sales piece were taken, shows that the difference in time to resolution of stool frequency between Asacol (400 mg) and Asacol® HD was not statistically significant. Nor was the difference in median time to resolution of the combined symptoms statistically significant.

331. At the instructions of their managers, sales representatives engaged in numerous role-playing exercises, during which they practiced using this data to convince physicians to prescribe Asacol® HD instead of Asacol® (400 mg). Any reference to the statistical insignificance of the data, or to the fact that the patient population included only patients with moderately active UC, was omitted. Representatives repeatedly practiced glossing over these points and arguing that Asacol® HD was superior to Asacol® (400 mg), not only for patients with moderately active UC, but for maintenance patients and patients with mildly active UC as well. For example, in one of these role plays, sales representatives practiced the line: “Doctor, I know you have loved Asacol® all these years. We now have an upgrade in Asacol® called Asacol® HD. It works faster and has fewer side effects, and with our pay-no-more-than-$50 cards, it will cost your patients less money.” In addition, sales representatives role played using the data to argue that Asacol® HD was superior to both Lialda® and Apriso®, despite the fact that the ASCEND II study did not include comparisons of either of these medications.

332. On February 16, 2011, Relator Goan went on a ride along with DM Hawkins, during which both men called on Dr. Steven Klein at Botsford Hospital, Farmington Hills, Michigan. During the call, Hawkins expressed disappointment that Relator Goan failed to better engage Klein as to the benefits of Asacol® HD. Relator Goan explained that the majority of these patients for whom Dr. Klein continued to write Asacol® (400 mg) were maintenance

patients and that it would be inappropriate to promote Asacol® HD for that indication. Nonetheless, in Hawkin's performance evaluation of Goan, which he wrote following the ride along, Hawkins wrote that "[a] perfect example of a missed opportunity was our call with Dr. Klein," during which Relator Goan had "failed to engage him at all and sell the benefits of HD." Based on their prior conversation, this was clearly an instruction that Relator Goan should promote Asacol® HD for use with Dr. Klein's maintenance-therapy patients. DM Hawkins mailed this report to Mary Keslo, the head of human resources, and copied National Sales Director Crawford.

333. Even in the absence of instructions from DM Hawkins, it would have been apparent to Relator Goan, simply based on the requirements Warner Chilcott set for his market share, that it was necessary for him to sell Asacol® HD for maintenance therapy and other off-label indications in order to keep his job. Despite that new data shows Asacol® HD has a nearly fifty-percent market share for new ulcerative colitis patients, Relator Goan and his fellow sales representatives are held responsible for prescriptions of *all* ulcerative colitis patients, most of which receive maintenance therapy. Relator Goan received a rating of "Needs Improvement" for his performance evaluation. If he receives a second "Needs Improvement" rating, he will likely be fired.

### D. WARNER CHILCOTT ILLEGALLY PROMOTED ASACOL® HD OFF LABEL FOR ONCE-DAILY DOSING

334. The prescribing information for Asacol® (400 mg) instructs that, for maintenance therapy, patients are to take four pills daily in divided doses. That requirement, however, resulted in difficulties for Warner Chilcott sales representatives, as one of the competing formulations of mesalamine, Lialda®, was indicated for once-daily dosing. Many physicians

find that once-daily dosing improves patient compliance (and hence efficacy), thus giving Lialda® a significant competitive advantage over Asacol® (400 mg).

335. In order to better compete with Lialda®, Warner Chilcott managers have continually instructed sales representatives to promote Asacol® HD off label for once-daily dosing. At Relator Goan's January 2010 POA meeting in Hartford, Connecticut, DM Leo Phoenix provided him and his fellow sales representatives with an abstract of the "QDIEM study." M. Safdi et al., *Once Daily Dosing of Delayed-Release Oral Mesalamine (400 MG Tablet) is as Effective as Twice Daily Dosing for Maintenance of Remission of Ulcerative Colitis: Results of the QDIEM Study*, 138 Gastroenterology 1286 (2010) (abstract). Phoenix instructed representatives to locate and print their own full copies of the study online.

336. The QDIEM study only applies to Asacol® (400 mg); however, during this meeting, DM Leo Phoenix instructed sales representatives to use the study to promote Asacol® HD for once-daily dosing. A local gastrointestinal physician gave a presentation to sales representatives on the QDIEM study. When questioned about the lack of an indication, he responded that "gastrointestinal physicians frequently prescribe off label, so it wasn't an issue." The physician stated that Asacol® HD could be prescribed for once-daily maintenance therapy and that he did so all the time.

337. In Relator Goan's first ride along with District Manager John Lufburrow in April 2010, Lufburrow told Goan to sell Asacol® HD for once-daily dosing head-to-head against Lialda®. There are no head-to-head studies comparing Asacol® HD to Lialda®. More egregious, however, was Lufburrow's instruction to use the QDIEM study in support of the efficacy and safety of Asacol® HD, when the study only examined once-daily use of Asacol® (400 mg).

338. At his POA meeting in January 2011, Relator Goan was given an abstract of the QDIEM study, along with a news article summarizing the study. He was not given copy of the full study. Based on the context as well as prior instructions, it was clear to Relator Goan that he was expected to use these materials to promote Asacol® HD for once-daily dosing. Both Director of Sales Nicola Crawford and District Manager Jake Hawkins were in the room when Relator Goan received the QDIEM abstract and news article.

339. On February 16, 2011, during his second ride along with DM Hawkins, Goan asked Hawkins how he was supposed to increase sales of Asacol® HD in the face of competition from once-a-day Lialda®. Hawkins responded that Relator Goan should use the QDIEM study to promote Asacol® HD for once-daily dosing and as superior to Lialda®.

340. By continually misrepresenting the QDIEM study as applicable to Asacol® HD, when it in fact only studied Asacol® (400 mg), Warner Chilcott caused patients to be exposed to an increased risk for serious adverse events, particularly those resulting from increased dosage during a compacted timeframe. The increased risk for adverse events as a result of Warner Chilcott's unlawful off-label promotional activities is discussed in the dedicated section *infra*.

### E. WARNER CHILCOTT ILLEGALLY PROMOTED ASACOL® HD OFF LABEL FOR PEDIATRIC USE

341. In November 2009, shortly after the P&GP acquisition, Relator Goan received a new call list, which included pediatric gastrointestinal physicians. Their presence on the list indicated that Relator Goan was expected to call on and promote to these physicians. However, neither Asacol® (400 mg) nor Asacol® HD is indicated for the treatment of pediatric patients. Relator Goan requested to DM Hawkins and Director Crawford that they "SODA out" these physicians. "SODA out" refers to the process by which physicians are removed from a call list. Both DM Hawkins and Director Crawford responded that Relator Goan was expected to sell to

*all* physicians on his list, including pediatric ones. Relator Goan understood that this instruction included the expectation that he would sell Asacol® HD to these pediatric physicians, none of whom would have used Asacol® HD on-label to treat their patients. Goan, understandably, believed that if he questioned further at this time, he would be fired.

342. On Relator Goan's first ride along with DM Hawkins on October 10, 2010, Relator Goan again broached the issue of why a pediatric gastrointestinal physician was on his call list. Relator specifically asked DM Hawkins what he was supposed to do with this physician. DM Hawkins responded that he should promote Asacol® HD to the physician. Relator Goan and DM Hawkins called on the physician — Dr. Hernando J. Lyons, St. John Children's Center, Detroit, Michigan — together.

343. Given the intense pressure to sell, Relator Goan understandably believed he would be fired if he refused to call on pediatric physicians, and as such, he does call on them. However, despite the clear instructions of his managers, he does not promote Asacol® HD to them, as he believes doing so may result in serious and potentially life-threatening side effects. These are discussed in greater detail *infra*. However, based on discussions with other Warner Chilcott sales representatives, Relator Goan believes that many do promote Asacol® HD to pediatric physicians.

### F. WARNER CHILCOTT USED DINNER AND SPEAKER PROGRAMS AS KICKBACKS TO INDUCE PHYSICIANS TO PRESCRIBE ASACOL® HD

344. The centerpiece of Warner Chilcott's strategy to promote Asacol® HD was not clinical evidence, but rather rampant use of dinner programs and happy hours. These entailed little, if any, discussion of clinical data and were clearly intended as inducements to convince physicians to prescribe Asacol® HD. Similarly, sales representatives were instructed to make selective use of speakers' fees in order to induce potentially high-prescribing physicians to

prescribe Asacol® HD. Warner Chilcott's broad scheme of kickbacks through dinner and speaker programs is outlined *supra* in Section VI, Part D.

345. At Relator Goan's first POA meeting in November 2009, in response to a question about how sales representatives were supposed to promote Asacol® HD over Asacol® (400 mg), President Reichel told the gathered sales representatives that at Warner Chilcott, selling was not about clinical data but rather about business relationships and holding doctors accountable for their prescribing behavior. By "holding physicians accountable," Reichel meant that physicians owed representatives prescriptions of Asacol® HD in exchange for dinners and speakers fees. To make this happen, Representatives would be expected to conduct two to three dinner events each week and add top prescribers as speakers.

346. These instructions were continually reiterated by each of Relator Goan's successive District Managers. On his first ride along with John Lufburrow in April 2010, Lufburrow instructed Relator Goan that he was expected to host regular physician-attended dinner programs, officially referred to as "Med-Ed events," and to hold physicians accountable for their prescribing behavior. Again, Relator Goan understood these instructions to mean that physicians were expected to prescribe Asacol® HD in exchange for attendance at these events.

347. Later that same month, on Relator Goan's first conference call with DM Hawkins and sales representatives for Hawkins' territory, DM Hawkins instructed sales representatives to take out both physicians and office staffs for dinner and drinks and, again, to hold them accountable.

348. At Relator Goan's January 2011 POA, Director Nicola Crawford instructed the gathered sales representatives that in order to beat Lialda®, Apriso®, and Asacol® (400 mg), she expected them to maintain at least five speakers per representative. Each of these speakers is

paid for multiple talks per year. Speakers with fewer than two engagements in a year are dropped. Director Crawford also instructed the representatives to hold more dinner programs.

349. As the result of these repeated instructions from his managers, Relator Goan held numerous such dinner programs and happy hours. For example, at a CME conference in Sarasota, Florida, Relator Goan took key high-prescribing physicians, including Drs. William Chey and Peter Higgins, among others, out for dinner at Derek's Restaurant. The wives of many of the physicians attended as well. There was no discussion of Asacol® or any other Warner Chilcott product. The bill was $947.

350. On October 19, 2010, at Bacco's in Southfield, Michigan, Relator Goan held a Med-Ed with Dr. Mark Devore and three of his fellows. The event included an approximately two minute discussion of Asacol® HD, but by Relator Goan's account, it was otherwise a "party." The bill was $500.

351. On a ride along with DM Hawkins on February 16, 2011, Hawkins instructed Relator Goan that, given how many dinners and speaker programs Relator holds, he should be holding more physicians accountable for Asacol® HD prescriptions. In a follow-up evaluation report for this ride along, DM Hawkins wrote that Relator Goan needed to "start challenging these docs on why they aren't writing HD yet." He additionally wrote: "If you can effectively combine an increase in reach with the appropriate business convos, and start holding these docs accountable while asking for the business, then your numbers should start heading in the right direction." This is the same evaluation referenced *supra* at ¶ 332, which DM Hawkins mailed to Mary Keslo, the head of human resources, and copied to Director Crawford.

352. DM Hawkins made a similar point in an e-mail sent shortly prior to this ride along in which he informed Relator Goan that Dr. Raymond Landes could not be added as a speaker

because he was not prescribing sufficient quantities of Asacol® HD. DM Hawkins stated that Dr. Landes would need "more clinical experience with Asacol HD" before being added as a speaker, and that he believed Relator Goan's "territory has bigger and better opportunities to add as speakers." DM Hawkins concluded by advising Relator Goan to "[k]eep me posted on his numbers and if can get more clinical experience with HD, then we can possibly add him later." Dr. Landes prescribes a sixty percent share of Asacol® (400). This e-mail, as well as numerous other conversations Relator Goan has had with DM Hawkins and other members of Warner Chilcott's management, confirm that speaker programs were knowingly used to induce physicans to prescribe Asacol® HD.

353. In addition to attendance at Med-Ed events and the provision of speakers fees, Warner Chilcott used various other means to induce physicians to prescribe Asacol® HD. These included preceptorships, discussed *supra* at ¶¶ 200-202, which Warner Chilcott used to funnel money to physicans under the guise of paying to learn about the physician's practice, as well as golf outings and other social events, which were even less veiled as to their true purpose. In another example, at the instruction of his manager, Relator Goan purchased thirty honey-baked hams and wine as gifts for high-prescribing or potentially high-prescribing gastrointestinal physicians. This is also related *supra* at ¶ 204. Combined, all these various forms of kickbacks were instrumental in convincing physicans to prescribe Asacol® HD.

### G. WARNER CHILCOTT USED PATIENT SAVINGS CARDS TO TRANSITION PATIENTS, INCLUDING MEDICARE AND MEDICAID PATIENTS, TO ASACOL® HD

354. In order to convert patients to Asacol® HD from both Asacol® (400 mg) and other competing medications, Warner Chilcott implemented a patient savings card program, which allowed patients to receive prescriptions of Asacol® HD for no more than fifty dollars. (Background on Warner Chilcott's broad use of patient savings cards and co-payment waivers is

located *supra* at ¶¶ 166-179.) While this card explicitly stated that it was not to be used by Government Program beneficiaries, Warner Chilcott explicitly instructed sales representatives to promote the card for such use. Sales representatives were instructed to tell physicians to tell their Medicare and Medicaid patients that they could take this card to their pharmacy and ask the pharmacist to bypass their Medicare Part D or Medicaid insurance and instead pay cash. By doing so, the patient would pay the co-payment of fifty dollars, and Warner Chilcott would pay the remainder of the cost.

355. Relator Goan was told to promote the Asacol® HD patients savings cards in this way from the time he arrived at Warner Chilcott. At a POA meeting in Hartford, Connecticut, in January 2010, which was shortly following the P&GP acquisition, sales representatives were instructed to promote Asacol® HD patient savings cards to both Medicare and Medicaid patients. Apparently aware of the illegality of doing so, managers instructed sales representatives to tell physicians to tell patients to lie to the pharmacist and say that they did not have insurance and instead wished to pay cash. DM Phoenix and VP Crawford were in attendance at this meeting.

356. This patient savings card program was very successful at influencing physicians to prescribe Asacol® HD for their patients — both for new-therapy patients and for those previously on a competing therapy. Warner Chilcott's aim was to "hook" these patients on Asacol® HD with the patient savings card. Then, following the card's expiration, patient's insurers, including Government Programs, would incur the cost of the more expensive Asacol® HD therapy, rather than generic or soon-to-be generic alternatives. By engaging in this Scheme, Warner Chilcott sought to, and did, evade Government Program cost-containment measures, which seek to influence patients to make more cost-effective prescribing decisions.

357. While Warner Chilcott aimed to "hook" patients with savings cards for many of its drugs, in the case of Asacol® HD, this mechanism was particularly effective. Ulcerative colitis patients taking an mesalamine-based prescription such as Asacol® HD risk a severe flare-up when switching between medications — even if switching between two medications with the same active ingredient, i.e., from one mesalamine formulation to another mesalamine formulation. As such, ulcerative colitis patients beginning therapy on Asacol® HD were particularly reluctant to switch, even following expiration of the savings card.

358. As a result of Warner Chilcott's unlawful kickbacks, Government Programs have paid or reimbursed for Asacol® HD prescriptions that were not eligible for reimbursement, or it was foreseeable that Warner Chilcott's unlawful Scheme would and did cause the submission of false claims for payment or reimbursement of Asacol® HD.

### H. WARNER CHILCOTT'S ILLEGAL OFF-LABEL PROMOTIONS WERE TREMENDOUSLY SUCCESSFUL AT GROWING SALES OF ASACOL® HD

359. In combination, Warner Chilcott's kickbacks and off-label promotions have been tremendously successful at increasing sales of Asacol® HD. A graph in an e-mail originally sent by Director Crawford and then forwarded to sales representatives by DM Hawkins shows the tremendous increase in Asacol® HD sales following Warner Chilcott's assumption of its promotion. At the time of Warner Chilcott's acquisition of P&GP, sales of Asacol® HD were approximately 500 new prescriptions per week. They are currently approaching 2,500 new prescriptions per week. Director Crawford attributes this rapid increase to the success of their sales message, noting that "there is no reason why we can't be # 1 with this brand."

360. DM Hawkins showed Relator Goan similar figures as part of a slide presentation during the January 2011 POA meeting. These showed that under P&GP's promotional methods, new prescriptions of Asacol® HD were approximately 500 per week. That figure quickly rose to

1500 prescriptions per week after Warner Chilcott assumed control of the promotional strategy. (Relator Goan believes that the discrepancy in the new prescription data between Crawford's e-mail, *supra*, and the slide presentation was likely due to different timeframes.) Hawkins showed these slides to Relator Goan on the former's laptop at Relator Goan's request. However, when Relator Goan requested a copy of the slides, Hawkins refused, explaining that District Managers were specifically instructed by upper management not to give copies of these slides to sales representatives.

361. Even more telling of the success of Warner Chilcott's methods is success of Asacol® HD relative to P&GP's own sales projections for the drug. P&GP projected Asacol® HD would gain an eight percent share of sales over its lifetime. Already, less than three years after its initial approval, Asacol® HD has a fifteen percent market share. Likewise, P&GP projected that sales of Asacol® HD would constitute thirty percent of the overall Asacol® franchise. At this point, they already constitute over fifty percent.

362. P&GP's estimates were premised on an on-label sales strategy, which abided by the regulatory guidelines. The divergence between P&GP's estimates and the current level of sales is due to Warner Chilcott's illegal and off-label promotional methods. In the absence of these methods, sales of Asacol® HD would be substantially less.

### I. WARNER CHILCOTT'S ILLEGAL OFF-LABEL PROMOTION OF ASACOL® HD EXPOSED PATIENTS TO INCREASED RISK OF SERIOUS ADVERSE EVENTS

363. By promoting Asacol® HD as a substitute for Asacol® (400 mg) for indications for which Asacol® HD was not approved, as well as by deliberately concealing the potential dangers of doing so, Warner Chilcott exposed Asacol® HD patients to an increased risk of serious adverse events. Perhaps the most serious of these were renal impairment and renal failure, which are both listed in the Warnings and Precautions section of the FDA-approved

prescribing information. The prescribing information further instructs that all patients should have their renal function monitored both prior to and during therapy with Asacol® HD.

364. By promoting Asacol® HD for all ulcerative colitis patients, including those with only mildly active disease for which Asacol® HD is not indicated, Warner Chilcott caused Asacol® HD patients to receive double the dose of mesalamine they would otherwise have received on Asacol® (400 mg). By doubling the dose, these renal side effects were potentially increased, and for no apparent benefit, as P&GP's own ASCEND I trail showed that patients with mildly active ulcerative colitis received no clinical benefit from Asacol® HD versus Asacol (400 mg).

365. This same risk was amplified in the elderly, who tend to have a higher incidence of renal impairment. Those predisposed may be incapable of processing the increased dose of mesalamine, which is excreted by the kidney. The prescribing information, therefore, recommends that physicians take increased caution when prescribing Asacol® HD to these individuals. In addition, the clinical information states that patients over the age of sixty five demonstrated a higher incidence of blood dyscrasias (i.e., agranulocytosis, neutropenia, pancytopenia), and that as such, caution should be taken to closely monitor blood cell counts during therapy.

366. Relator Goan has also learned anecdotally of a small number of patients who suffered severe stomach pain after switching to therapy with Asacol® HD. Dr. Mark Devore told Relator Goan that one such patient was twenty-two years old and had been on Asacol® (400 mg) for around three years prior to transitioning to Asacol® HD. Within a week of conversion to Asacol® HD, this patient complained of severe stomach pains. The patient returned to Asacol® (400 mg) and the problem resolved.

367. Rather than present these precautions in a fair and balanced manner (as they were legally required to do), Warner Chilcott's sales representatives deliberately concealed these risks at the instruction of their managers, instead telling physicians that Asacol® HD is better, safer, and an overall upgrade to Asacol® (400 mg). There were no caveats to that statement. In fact, representatives who discussed these sorts of precautions or other detailed clinical information with physicians were reprimanded and told that that sort of promotion was out of keeping with Warner Chilcott's "keep it simple" philosophy. Relator Goan felt that he would be fired if he brought up the topic of stomach pain in Asacol® HD patients at a sales meeting. As such, he does not know if Dr. Devore's patient represented one of a small handful of isolated incidents or if the problem is more widespread.

368. In addition to concealing the potential for increased renal and hematological adverse events, sales representatives were specifically instructed to deflect any physician concerns over Asacol® HD's Category C pregnancy rating. A Category C rating means that studies in animals have demonstrated adverse events on the fetus when a drug is used during pregnancy, and that no adequately controlled trials exist in humans. The prescribing information recommends that this information be weighed carefully in making a prescribing decision in order to determine whether the risks of prescribing Asacol® HD outweigh its potential benefits. By intentionally attempting to mislead physicians about the importance of this pregnancy rating, Warner Chilcott precluded physicians and their patients from making the carefully weighed decision recommended by the prescribing information. As a result, many patients were likely prescribed Asacol® HD and potentially suffered adverse events as the result of Warner Chilcott's misleading promotional strategy.

# IX. AGGRESSIVE MARKETING OF DORYX® THROUGH ILLEGAL INDUCEMENTS AND OFF-LABEL PROMOTION

## A. BACKGROUND ON APPROVAL, LAUNCH, AND OFF-LABEL PROMOTION OF DORYX®

369. Doryx® is a delayed release, enteric-coated form of doxycycline hyclate. Doxycycline is used to treat bacterial infections, including pneumonia and other respiratory tract infections; Lyme disease; acne; infections of skin, genital, and urinary systems; and anthrax poisoning (after inhalational exposure). It is also used to prevent malaria. Doxycycline is a tetracycline-class antibiotic, which works by preventing the growth and spread of bacteria. Doryx® is formulated so that the active ingredient does not release until it reaches the small intestine. This formulation helps prevent gastrointestinal side effects, which are a common side effect of other formulations of doxycycline hyclate.

370. Doryx® was first introduced in capsule form in 1985, and in 1986 Warner-Lambert (a predecessor to Warner Chilcott) purchased the formulation. In 2005, Mayne Pharma ("Mayne"), which held at least one of the patents for the original capsule form, received approval for a tablet form. The capsule forms were discontinued, and Warner Chilcott marketed Doryx® tablets in 75 mg, 100 mg and 150 mg doses. The 150 mg dose was launched by Warner Chilcott in 2008. Shortly thereafter, Warner Chilcott discontinued marketing the 75 mg and 100 mg doses and exclusively markets the 150 mg dose.

371. Doryx® is approved by the FDA for a number of indications; however, its commercial success is tied to its use in the treatment of acne. Doryx® is FDA indicated as adjunctive therapy for severe acne.

372. The FDA-approved dosage and administration for Doryx® is as follows:

- For adults: the usual dose of oral doxycycline is 200 mg on the first day of treatment, administered 100 mg every twelve hours, followed by a maintenance

dose of 100 mg per day. To manage more severe infections (particularly chronic infections of the urinary tract), 100 mg every twelve hours is recommended.

- For children above eight years of age: The recommended dosage schedule for children weighing one-hundred pounds or less is 2 mg per pound of body weight divided into two doses on the first day of treatment, followed by 1 mg per pound of body weight given as a single daily dose or divided into two doses on subsequent days. For more severe infections up to 2 mg per pound of body weight may be used. For children over one-hundred pounds, the usual adult dose should be used.

### B. WARNER CHILCOTT PROMOTED DORYX® OFF-LABEL FOR INDICATIONS AND AT DOSAGES NOT APPROVED BY THE FDA

373. At all times material hereto, Warner Chilcott was aware that promotion for uses and doses outside of those approved by the FDA is illegal, as described *supra* at ¶¶ 37-55.

374. In 2008, Warner Chilcott began unlawfully promoting and continues to promote Doryx® off label for all forms of acne, rather than its more narrow FDA-approved indication as adjunctive treatment for severe acne. Starting with the introduction of the 150 mg dosing of Doryx®, Warner Chilcott began unlawfully promoting and continues to promote off-label for higher-than-approved doses. That is, Warner Chilcott began unlawfully promoting the 150 mg daily dose of Doryx®, which is contrary to its FDA-approved adult dose of 200 mg on the first day of treatment (administered 100 mg every 12 hours), followed by a maintenance dose of 100 mg per day. This misbranding of Doryx® includes use in teenagers, the demographic who most often use the drug.

375. For children over eight years of age, although the recommended dosage is much lower than 150 mg, Warner Chilcott has nonetheless continued to unlawfully promote the 150 mg daily dose of Doryx®.

### C. WARNER CHILCOTT'S STRATEGY TO TRANSITION THE MARKET TO DORYX® 150 MG THROUGH ILLEGAL COUPON AND PATIENT LOYALTY CARD CAMPAIGN

376. Although there are many generic formulations of doxycycline aimed at mitigating gastrointestinal and other side effects, not all these formulations are considered ready substitutes. Doryx®'s primary two competitors and potentially best substitutes are Solodyn® (made by Medicis) and Adoxa® (made by Bradley). Both are currently available in generic form.

377. In December 2008 and January 2009, Warner Chilcott received so-called "Paragraph IV" certification notice letters from Actavis, Mutual, Mylan, Impax and Sandoz, indicating that each had submitted an ANDA to the FDA seeking approval to manufacture and sell generic versions of Doryx® 75 mg and 100 mg delayed-release tablets. Even though it filed patent infringement suits to bar these generic manufacturers from obtaining final approval to market generic versions of Doryx®, Warner Chilcott has stated in its financial reports that it is reasonably likely that the generic companies' patent challenges may succeed with regard to the 75 and 100 mg formulations. Thus, Warner Chilcott has focused on transitioning all Doryx® users to the newer 150 mg formulation, which Warner Chilcott considers better protected. By 2009, Warner Chilcott converted eighty-five percent of Doryx® patients to the 150 mg dose.

378. A key component of Warner Chilcott's strategy to convert 75 mg and 100 mg Doryx® customers to 150 mg were "patient savings cards." In 2009, Warner Chilcott implemented a patient savings card program that applied only to 150 mg customers. At the instruction of their managers, sales representatives promoted Doryx® by offering physicians the

"Doryx® 150 mg patient savings card," which ensured that patients would pay no more than $25 for a prescription of Doryx® 150 mg. That is, the card "capped" the amount patients would have to pay for Doryx®. These savings cards were instrumental in helping Warner Chilcott achieve a ninety percent market share for 150 mg Doryx®.

379. Warner Chilcott's Doryx® 150 mg patient savings card program was intended to induce doctors to prescribe Doryx® 150 mg for a ninety-day period (the savings card was valid for three prescriptions of thirty tablets). Thereafter, patients' insurers, including Government Programs, incurred the costs of the more expensive Doryx® 150 mg, as patients and dermatologists become "hooked" on this branded therapy. The pharmacist processes the savings card claim as instructed on the card, which includes detailed information such as bin number, RxPCN, cardholder ID, group number for insured patients, and group number for cash-paying patients. Any amounts over $25, whether the patient is insured or paying cash, are submitted by the pharmacist to Therapy First Plus, a pharmacy network which will reimburse the pharmacist for costs over $25 as well as a "handling fee."

380. In order to successfully use the patient savings cards to increase Doryx® 150 mg prescriptions, Warner Chilcott directs its sales force to promote the cards for use as cash, so that they were not processed at the pharmacy as Medicare or Medicaid claims.

381. Warner Chilcott actively promoted these savings cards to physicians who were concerned about the cost of Doryx® for their patients, including Medicare and Medicaid beneficiaries. At the instructions of their managers, sales representatives encouraged the "cash and carry" method, telling physicians and their staff to tell Government Program patients to instruct the pharmacist to "bypass" their Medicare Part D plans or Medicaid. That is, these patients were instructed to inform the pharmacist that instead of using their Medicard Part D or

Medicaid benefits, they would prefer to pay cash. The patient savings card program resulted in additional prescriptions paid for by Medicare or Medicaid patients via a "cash" purchase. But for the patient savings cards promotion, their doctors would have prescribed a cheaper generic alternative.

382. Warner Chilcott knows that once a physician starts writing a product such as Doryx® 150 mg, that physician is likely to continue writing the same product. Warner Chilcott sought to create a "spill-over effect" in which the costs assumed by Warner Chilcott during initial treatment cycles were then transferred to other payors, including Government Programs, once the savings card expired. If Doryx® is on formulary, it is usually in the third tier, meaning that Medicaid and Medicare Part D will generally pay for it, but the patient's co-pay obligation will be very high. Although Warner Chilcott ends up paying for the rest of the co-payment over $25, it earns substantial revenue once the patient and dermatologist get "hooked." The Scheme's end result was a compounding increase in Doryx® 150 mg sales.

383. If Doryx® is non-formulary, which means it receives no insurance coverage, the patient would still pay only $25, and Warner Chilcott would pay the rest of the cost. Warner Chilcott nonetheless calculated that it receives a benefit from these prescriptions, as Medicaid or Medicare Part D plans will be notified of the existence of a non-covered prescription. A sufficiently high volume of such prescriptions will help Warner Chilcott achieve formulary coverage. (Warner Chilcott also aims to push for formulary coverage via the influence of the physicians who attended its Med-Ed events and received other substantive benefits from the Company.)

384. The Doryx® 150 mg patient savings card was provided contingent on the prescribing doctor's agreement to write future prescriptions of Doryx®150 mg, a Scheme which was approved by the highest levels of Warner Chilcott's management.

385. Warner Chilcott uses the artificially increased prescription volume resulting from the patient saving card scheme to manipulate the public, shareholders, Wall Street, and its lenders.

386. Warner Chilcott terminated the patient savings card program as of January 1, 2011. The purported reason was the excessive program cost — i.e., some $128 million for Asacol® HD and Doryx® in 2010 alone.

387. As a result of Warner Chilcott's unlawful kickbacks, Government Programs have paid or reimbursed for Doryx® prescriptions that were not eligible for reimbursement, or it was foreseeable that Warner Chilcott's unlawful Scheme would and did cause the submission of false claims for payment or reimbursement for Doryx®.

### D. USE OF UNAPPROVED CLINICAL STUDIES AND WIDESPREAD MED-ED EVENTS TO INDUCE SALES OF DORYX® 150 MG

388. In keeping with its aggressive business model, Warner Chilcott used unapproved clinical studies and widespread Med-Ed events to induce sales of Doryx® 150 mg. Even at their first POA meeting in November 2009, former P&GP representatives selling Doryx® for the first time were never trained on any medical information related to the use of Doryx®. Rather, they were told to get dermatologists out to dinner and to add them as speakers without limit.

389. Beginning in January 2010, sales representatives were instructed to sell Doryx® as superior to Solodyn® (minocycline) and as possessing fewer side effects, despite the total lack of any head-to-head trials to support these claims. Instead, sales representatives were told to simply tell the story and then get doctors out of the office for Med-Ed events. For any doctors

who attended these Med-Eds and were the beneficiaries of Warner Chilcott's largesse, sales representatives were instructed to follow up with a "business conversation," during which sales representative "held the doctors accountable" for their prescriptions of Doryx® 150 mg.

390. Sales representatives attending a POA meeting, in New York City during January of 2011, were directed to download a clinical study to use during their promotional details: Leon H. Kircik et al., *Doxycycline and minocycline for the management of acne: a review of efficacy and safety with emphasis on clinical implications*, 9 Journal of Drugs in Dermatology 1407 (2010). The article, funded through a Warner Chilcott grant, concluded that Doryx® has superior safety to minocycline. However, the Kircik study had serious limitations, including the fact that it compared clinical trial results from non-head-to-head studies with entirely different protocols. The problem with doing so is noted in greater detail *supra* at ¶ 241.

391. On February 7, 2011, the Company held regional conference calls concerning the promotion of Doryx® 150 mg. The key topics discussed were: (a) the expectation that sales representatives complete prior authorizations for physicians, and (b) the need to get dermatologists and their staffs out to do Med-Ed events.

392. Following the repeated instructions of his managers, Relator Goan held numerous such Med-Ed events, including one attended by four dermatological fellows at Tallulah Wine Bar, in Birmingham, Michigan. By Relator Goan's account, a few minutes were spent discussing Doryx®, but the event was "mostly a party." By avoiding clinical discussion, Relator Goan was not deviating from the instructions of his managers; rather, he was explicitly following them. The bill was $331.

393. Similarly, a journal club for physicians at Botsford General Hospital was held at Shiro Restaurant in Novi, Michigan on September, 21, 2010. Dr. Brett Bender as well as nine

dermatology fellows attended. Despite the ostensibly academic nature of the journal club, there was only two minutes of discussion on Doryx®. The bill was $773.

394. Warner Chilcott promoted Doryx® for off-label conditions and dosages to the physicians of Government Program patients, including the following physicians who were Med-Ed event attendees and/or were targets for the prior authorization Scheme, and who treat a large number of Medicaid and Medicare patients: Bobbie Edwards, Southfield, Michigan; Ali Berry, Canton, Michigan; Karen Heidelberg, Detroit, Michigan; Robert Heidelberg, Detroit, Michigan; and Roger Byrd, Rochester, Michigan.

395. One of Warner Chilcott's most successful Doryx® sales representatives is Chris Baker of Detroit, Michigan, a long-time Warner Chilcott employee who is credited with some 120 Doryx prescriptions per week, despite the drug's lack of formulary coverage. Baker achieved this success by implementing Warner Chilcott's strategy of using Med-Ed events and prior authorizations. Other sales representatives successfully implementing Warner Chilcott's Fraudulent Marketing Scheme by targeting physicians with large volumes of Medicaid and Medicare patients include Ken Widman of Long Island, New York, and Stephine Franza of Hartford, Connecticut.

396. As a result of Warner Chilcott's unlawful promotion, Government Programs have paid or reimbursed Doryx® prescriptions that were not eligible for reimbursement, or it was foreseeable that Warner Chilcott's unlawful Scheme would and did cause the submission of false claims for payment or reimbursement for Doryx®.

### E. MANIPULATING PRIOR AUTHORIZATIONS TO INCREASE SALES

397. Completing prior authorizations on behalf of physicians and their staffs was another integral component of Warner Chilcott's strategy to grow sales of Doryx®, as it was with many of its other drugs. *See supra* ¶¶ 183-195 for background on the prior authorization

Scheme. Starting in early February 2011, success stories were sent (or "cascaded") via voicemail from sales representatives through their District Managers to National Vice President of Dermatology and Gastroenterology Nicola Crawford, who then sent these messages out to the entire sales team, including down through Relator Goan's District Manager, Jake Hawkins, and then on to Relator Goan.

398. These success stories included "partnering with the staff" and "partnering with the offices" to give them specific information that would help get prior authorizations approved. In addition, these success stories included use of "medical advocates" such as nurses and physicians' assistants to guide patients to Doryx® prior authorizations and away from formulary-listed drugs by asking leading questions, such as whether they had a sensitive stomach or were averse to large pills or generics. Also conveyed were "good stories to tell" about why Doryx® should not only be prescribed but submitted for prior authorization. Such reasons for prior authorization included: "forgetful about taking BID [twice-daily] drug," "stomach sensitivity," "trouble swallowing," and "dizziness from other drugs."

399. One sales representative shared that she made clear to a targeted practice that she "deserved" completed prior authorizations for Doryx® after all of the things she had done for the doctor's office in the past: "I take great care of you . . . . I'm not just here to drop off samples and bring the cookies and bagels and lunch." Indeed, the sales representatives were told as part of the prior authorization sale to "figure out who the key players were" and go to those "key players" if the doctor is not open to prior authorizations.

400. In another shared success story, distributed in February of 2011 to Relator Goan through his District Manager, a sales representative from Akron, Ohio, explained that by

teaching a "key player" how to fill out prior authorization forms within earshot of the doctor, he obtained a second chance to "detail," that is, promote Doryx® to the doctor.

401. This message was pushed by additional means as well. On February 7, 2011, VP Crawford hosted a POA teleconference with the District Manager Jeb Burrows, from Boston, Massachusetts, and his sales force. During this call participants discussed the process for filling out prior authorization forms, with sales representatives sharing their successes, including how to complete the "reasons" section on a prior authorization form and using meals and gifts as leverage to convince an office to facilitate the prior authorizations process.

402. During the call, sales representatives were asked to partner with offices' staffs in order to better fill out prior authorization forms. Several representatives shared that they had successfully filled in the comments section of forms for offices. Others openly discussed how they were training the staffs on what to write on prior authorization forms in order to get prescriptions approved. If the office staff was reluctant to do so, sales representatives were told to go to the office manager and get them to do so. Nicola Crawford led similar calls throughout the country.

403. On March 17, 2011, a message from President Reichel was forwarded through Nicola Crawford and Jake Hawkins to the sales force. In this message, Reichel stated that Doryx®, for the first time that year, was growing, having obtained 7,699 prescriptions and a 2.5% market share. Reichel stated that the key to further sales growth was "heavy lifting with talking to doctors about prior authorizations."

404. By bribing physicians and engaging in repeated violations of HIPAA patient privacy provisions, Warner Chilcott successfully manipulated the prior authorization process to gain market share and cause Government Programs to make reimbursements for Doryx®.

### F. WARNER CHILCOTT PROMOTES DORYX® OFF-LABEL DESPITE SERIOUS SIDE EFFECTS AND ATTEMPTS TO CONCEAL ADVERSE EVENTS

405. Warner Chilcott was aware that Doryx® possessed a number of potentially serious side effects, but it nonetheless continued to promote Doryx® for off-label uses while simultaneously attempting to conceal adverse events. Like other tetracycline-class antibiotics, Doryx® may cause fetal harm when administered to pregnant women. Tetracycline-class antibiotics used during tooth development (last half of pregnancy, infancy, and childhood to the age of eight years) may cause permanent discoloration of teeth and should not be used unless other drugs are not likely to be effective or are contraindicated. In addition, Doryx® may result in significant photosensitivity, of which the FDA-approved prescribing information instructs patients should be advised. *Clostridium difficile*-associated diarrhea (CDAD) has been reported with nearly all antibacterial agents and may range from mild diarrhea to fatal colitis. Adverse reactions may also include anorexia, vomiting, and rash.

406. In March 2003, Warner Chilcott received a Warning Letter from the FDA related to its failure to report adverse events, a number of which related to Doryx®. In the letter, the FDA admonished Warner Chilcott for the severity of the violations: "We want to re-emphasize that we consider your firm's inability to establish and implement adequate standard operating procedures for the handling of adverse drug experiences (ADEs), and your firm's failure to evaluate and submit to FDA reports of ADEs, as very serious problems."

407. Despite this clear warning, Warner Chilcott continues to avoid reporting adverse events. One of Warner Chilcott's key marketing messages, which it routinely espouses to physicians, is that Doryx® is superior to Soldyne® (generic minocycline) because Doryx® has fewer FDA-reported side effects than minocycline. One of the reasons that Warner Chilcott can

make this claim is because Warner Chilcott does not report, or encourage reporting of, adverse events related to its drug products.

408. As noted elsewhere in this Complaint, Warner Chilcott instructs its sales representatives to conceal and obfuscate information on patient harm and side effects in their discussions with physicians. Ideally, representatives are to avoid these discussions altogether by focusing on "the simple sell," touting a positive message of Doryx®'s superiority to competing generic doxycycline and tetracycline products. However, if the issue was raised by a physician, Warner Chilcott's policy was to leave the clinical discussion as the responsibility of its sales force, despite the fact that these discussions involve responding to studies, adverse events, side effects, and off-label uses, which its undertrained and inexperienced sales representatives were unqualified to discuss. Warner Chilcott currently has no Medical Science Liaisons and relies entirely on its sales force to answer these clinical questions concerning Doryx®.

409. Sales representatives received minimal training on negative side effects or adverse-event reporting for Doryx®. Relator Goan only learned, in an online tutorial, after he had already sold Doryx® for an extended period of time, that Warner Chilcott had prepared a 3x5 note card in case a physician wished to discuss an adverse event. In a memorandum to sales representatives from Jim Chirip, dated March 27, 2009, and entitled "Product Information and Adverse Event Reporting Card and Process," the sales force was informed that the note card should be used when a doctor "is requesting product/medical information that you as a Company representative cannot answer" or "is reporting an adverse event involving any of our products." These instructions are contrary to those given to sales representatives in nearly every other instance, which were to obfuscate and avoid whenever such an issue arises.

### 1. "Spinning" Doryx®'s Photosensitivity Risk

410. For example, Warner Chilcott specifically instructed its sales force to downplay — and made no mention of the above-referenced note card in conjunction with — a serious photosensitivity side effect of Doryx®. Photosensitivity commonly results in reddening and blistering of the skin with exposure to sunlight and, in time, heightens the risk of skin cancer. Although Warner Chilcott knows of instances in which several severe cases of photosensitivity have occurred as the result of the use of Doryx®, sales representatives were instructed, if dermatologists raised the issue, to attempt to "spin" the science by telling them that "it is not really a big deal; just use sun block."

411. In May 2010, at a national sales meeting, a guest speaker explained to sales representatives how to downplay the photosensitivity side effect. The presenter was Dr. Mark Goldstein, a highly paid Warner Chilcott speaker. Incredibly, the sales force was told that photosensitivity concerns were brought on by competitors' claims about Doryx® and not based on medical literature — this despite the well-known side effects of doxycycline which are contained in Doryx®'s own label.

412. However, Warner Chilcott's instruction to its sales force to advise dermatologists that sun block effectively mitigated the photosensitivity side effect was a lie. Relator Goan later learned from dermatologists that sun block did not help, and moreover, that Doryx® may still cause third-degree burns if patients taking Doryx® are exposed to the sun.

### 2. "Spinning" Doryx® IBD Risk

413. Another example of spinning the science by downplaying patient harm involves a recent study of doxycycline and other antibiotics. The study, Margolis DJ et al., *Potential Association Between the Oral Tetracycline Class of Antimicrobials Used to Treat Acne and*

*Inflammatory Bowel Disease*, 105 Am. J. Gastroenterology 2610 (2010), was presented at the at the 2011 Annual Meeting of the American Academy of Dermatology.

414. The study found that doxycycline was the antimicrobial associated with the highest risk for inflammatory bowel disease ("IBD"). The study involved 94,487 acne patients. The 15,032 patients who were prescribed doxycycline for their acne had a 2.25-fold greater risk of developing Crohn's disease than did acne patients not exposed to antibiotics. Warner Chilcott instructed its sales force to avoid any discussion of the study, but if asked about it by a physician, to handle any objections with a set of pre-determined responses sent by Warner-Chilcott management.

415. In an e-mail from Relator Goan's District Manager Jacob Hawkins to the "Derm Team," dated March 16, 2011, Hawkins forwards an e-mail he received earlier in the day from VP Crawford, and instructs his sales force, that if the study is raised, they should respond as follows:

> This study can't prove anything and even the authors of the study tell us that. It's pointless so don't spend a lot of time talking about this. Instead, answer their concern very quickly, then bring it back to the clinical sell of Doryx®. If you want to talk more about this give me a call.

416. The Hawkins e-mail was prompted by an earlier e-mail that day from VP Crawford, copied to Amber Boissonneault, with the subject line "Skin and Allergy News: Doxycycline and IBD article." In VP Crawford's e-mail, she advised how sales representatives should handle any questions about the study: "It's not possible to draw definitive conclusions from the tetracycline study.... We really can't point to a cause and effect relationship.... It's entirely possible that some patients who are predisposed to developing IBD are the same ones who require systemic therapy for their acne."

## X. AGGRESSIVE MARKETING OF ENABLEX® THROUGH OFF-LABEL PROMOTION, MISBRANDING, AND THE PAYMENT OF KICKBACKS TO INDUCE PRESCRIBING

### A. OVERVIEW OF ENABLEX®

417. Enablex® (darifenacin extended-release tablets) was approved by the FDA on December 22, 2004 for treatment of overactive bladder with symptoms of urge urinary incontinence (pressing impulse to void, followed by the involuntary leakage of urine as a result of the inability to control bladder function), urgency, and frequency. Darifenacin is an antimuscarinic-class drug, which works by relaxing the muscles of the bladder.

418. Warner Chilcott originally acquired Enablex® as part of a co-promotion agreement with Novartis with the P&GP acquisition in 2009. In October of 2010, Warner Chilcott acquired Novartis' stake in the co-promotion agreement for $400 million.

419. The patent for Enablex® was originally scheduled to expire in March 2010; however, it was extended to March 2015 to compensate for time lost during development. The patent protecting Enablex® expires in March 2015 and the formulation patent protecting Enablex® expires in August 2016.

420. U.S. Sales for Enablex® were $197.3 million in 2009; $176.3 million in 2008; and $147.4 million in 2007. Warner Chilcott first reported revenue from the Novartis co-promotion deal in its 2009 10-K (the first following the P&GP acquisition), where it reported $14.9 million in revenue, all in the fourth quarter. 2010 revenue — which spanned both the co-promotion agreement and Warner's total ownership — was $107.4 million.

421. Enablex®'s main competitors are Ditropan® XL (oxybutynin chloride, Ortho-McNeil Pharmaceuticals, Inc.); Detrol LA® (tolterodine tartrate, Pfizer, Inc.); Toviaz® (fesoterodine fumarate, Pfizer, Inc.); VESIcare® (solifenacin succinate, Astellas Pharma/GlaxoSmithKline); and Sanctura XR® (tropsium chloride, Allergan, Inc.).

422. Medicare Part D represents 35% and Medicaid 4.5% of all Enablex® purchases. As of September 2008, Enablex® was on ninety-four percent of Medicare Part D formularies and some forty Medicaid state preferred-drug-lists, including those for Florida, New York, California, Texas, and Illinois.

423. Warner Chilcott's Fraudulent Marketing Scheme, as described in this Complaint, was implemented to maintain and/or increase Enablex® sales through off-label promotion and unsupported superiority claims.

**B. Warner Chilcott Trained its Sales Force on Enablex® Off-Label Uses**

424. Warner Chilcott provided its sales representatives with information on the off-label uses of Enablex® in a not-so-subtle instruction to promote Enablex® for the the following unapproved conditions:

- Nocturia (getting up in the evening due to an urge to urinate);
- Stress urinary incontinence (involuntary leakage of urine due to weakened pelvic floor muscles that fail to remain closed during activities that increase abdominal pressure, e.g., straining, laughing, or coughing;
- Mixed urinary incontinence (incontinence with symptoms of both urge and stress urinary incontinence);
- Neurogenic Detrusor Overactivity (overactivity in the presence of confirmed neuropathy); and
- Treatment of pediatric patients aged six years and older with symptoms of detrusor overactivity associated with a neurological condition (e.g., spina bifida, multiple sclerosis, etc.).

425. Warner Chilcott provided training modules to sales representatives that included these off-label indications that sales representatives could use to promote Enablex® off-label.

426. Warner Chilcott's off-label promotion scheme caused the submission of false claims to Government Programs for reimbursement.

### C. MISBRANDING ENABLEX® AS SUPERIOR TO COMPETING OAB DRUGS

427. An additional way that Warner Chilcott schemed to bolster sales of Enablex® involved promoting Enablex® as superior to competing overactive bladder ("OAB") drugs to physicians who treat Government Program patients. These superiority claims included superiority in both efficacy and safety. Sales representatives, including Relator Alexander, received training from Warner Chilcott about how it intended to promote Enablex® on January 27-28, 2010 in Minneapolis, Minnesota. The trainers for Relator Alexander's region were VP Koellhoffer and DM Ott.

428. Warner Chilcott directed the sales force that one of the key promotional messages they were to use was that Enablex® works where other OAB therapies have failed. For example, sales representatives were trained to detail the following:

> Doctor, in patients where other OAB therapies have failed, Enablex® has been proven to work. In fact, those patients have seen up to an eighty-six percent reduction in their number of urge urinary incontinence episodes per week. Doctor, clearly Enablex® is the most effective therapy on the market. Based upon this data, why would Enablex® not be your first line overactive bladder therapy of choice?

429. Sales representatives were trained to, and subsequently did, use language from the Enablex® core visual aid, which was labeled EBX-800402 (November 2009) and relied on data from previously treated patients not on Enablex® to make this superiority claim. This visual aid is based on N. Zinner et al., *Darifenacin treatment for overactive bladder in patients who expressed dissatisfaction with prior extended-release antimuscarinic therapy*, 62 International Journal Of Clinical Practice 1664 (2008). There are numerous limitations to the Zinner Study,

including the fact that it was an open label trial of twelve weeks in duration with 497 patients, 218 of whom were previously on Ditropan® XL and 279 of whom were previously on Detrol® LA.

430. The deceptive Warner Chilcott superiority message intentionally did not clarify which overactive bladder medications the patients in the Zinner study had failed on. While only Ditropan® XL and Detrol® LA were included in this study, the study did not include other OAB drugs, including VESIcare®, Toviaz®, Sanctura®, and Oxytrol®, a fact not to be mentioned in the Warner Chilcott detail. Moreover, they were never instructed to mention the bold print in the disclaimer included in the Enablex® detail piece, on page 2: "The information above is not intended to imply superior efficacy or safety."

431. Warner Chilcott encourages a "non-scientific" safety sell to physicians. With regards to cardiac safety, sales representatives are encouraged to scare physicians into believing that most other OAB medications will cause serious cardiac adverse events, but that Enablex® will not. There are no superiority studies proving that Enablex will cause fewer cardiac adverse events than other OAB medications.

432. Another deceptive superiority sales message was that Enablex® had a better cognitive safety profile. Sales representatives were to tell healthcare professionals that, in a head- to-head study comparing Enablex® and Ditropan® XL, patients on Ditropan® XL had experienced significant cognitive impairment, the equivalent of ten years of "brain aging."

433. The study representatives were referring to in this detail was Gary Kay et al., *Differential Effects of the Antimuscarinic Agents Darifenacin [Enablex®] and Oxybutynin ER [Ditropan XL] on memory in older subjects*, 50 European Association Of Urology 317 (2006). Sales representatives were encouraged to scare physicians into believing that other OAB

medications would cause serious cognitive impairment and Enablex® would not. There is no data to support the claim that Enablex® has a superior cognitive safety profile compared to other OAB medications.

434. As part of its Enablex® sales message, Warner Chilcott trained its sales representatives to engage in widespread false superiority claims and deceptive scare tactics, misbranding Enablex® as superior to most other OAB drugs without substantial evidence to support these claims.

### D. WARNER-CHILCOTT'S FRAUDULENT MARKETING SCHEME RELATED TO ENABLEX® PATIENT CO-PAY CARDS

435. As described in this Complaint, Warner Chilcott employs a widespread practice of providing co-pay coupons for its brand-name drug products, including Enablex®. Warner Chilcott used coupons as a marketing tool to increase sales of Enablex® as a tactic to circumvent Government Program cost containment efforts, such as higher co-pays on costlier drugs that are used to encourage consumers to use less expensive products.

436. During the co-promotion agreement with Novartis, both Novartis and Warner Chilcott's logos appeared on the Enablex® co-Pay card, which was administered by Therapy First.

437. As described in this Complaint, Warner Chilcott's Scheme to target the promotion of co-pay cards to Medicaid and Medicare patients induced the prescribing of Warner Chilcott drug products paid for or reimbursed by Government Programs.

## XI. AGGRESSIVE OFF-LABEL PROMOTION AND KICKBACKS TO INDUCE PRESCRIBING OF OF LOESTRIN® 24 FE AND LO LOESTRIN®

438. Loestrin® 24 Fe is an oral contraceptive, introduced in 2006 by Warner Chilcott as a replacement for Loestrin® Fe 1/20, which was first introduced in 1973. The majority of oral contraceptive products currently used in the United States is based on a regimen of twenty-

one days of active hormonal pills followed by seven days of placebo. In contrast, Loestrin® 24 Fe therapy entails active treatment for twenty-four days followed by four days of placebo.

439. Each of Loestrin® 24 Fe's active-ingredient pills contains 1 mg norethindrone and 20 mg ethinyl estradiol (as stated above, the remaining four pills are placebo). In Lo Loestrin®, each of the 24 active-ingredient pills contains the same quantity of norethindrone, but only 10 mg of ethinyl estradiol (pills 25 and 26 contain only the active ingredient 10mg of ethinyl estradiol and the remaining two pills, 27 and 28 are placebo). By reducing the quantity of estradiol (estrogen), Warner Chilcott seeks to reduce resulting adverse events. Lo Loestrin® in turn is unique in its 10 mg estradiol content. Most all other available oral contraceptives using estradiol, which is most, contain 20 mg.

440. The market for oral contraceptives is extremely competitive, and as such, most of the major drug manufacturers do not participate, preferring instead to focus on areas with higher margins. The exception is Bayer, which sells the market-leader Yaz®, which had in excess of $1 billion in sales last year. Loestrin® 24 Fe held eight percent of the oral contraceptives market at end of 2009, compared to a five percent share at the end of 2008. The latest data from IMS for 2010 shows Loestrin® 24 Fe at a fifteen percent market share for new-start prescriptions.

**A. USE OF LOESTRIN CREDIT CARDS TO INDUCE PRESCRIBING**

441. The growth in sales of Loestrin® 24 Fe is directly related to Warner Chilcott's Patient Savings Card Program "Loestrin® 24 Fe Credit Card" ("Loestrin® Credit Card") introduced on May 1, 2009. Under the Loestrin® Credit Card, the maximum patients pay is $24 per month. Although the Loestrin® Credit Cards explicitly say they are not to be used for any Government Program (including Medicaid), Warner Chilcott explicitly directed its sales force to aggressively promote them for use by Government Program beneficiaries, including for Medicaid beneficiaries.

442. Warner Chilcott sold the Loestrin® Credit Cards as a way to evade coverage limitations on the use of Loestrin® 24 Fe. Thus, Warner Chilcott knowingly (or with reckless disregard for the truth) made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government. Specifically, for the period noted above, and continuing through the present, the "Best Price" on Loestrin® 24 Fe was the $24 price for the Loestrin Credit Cards provided to induce the purchase by healthcare professionals. As a result, Warner Chilcott knowingly (or in reckless disregard of the truth) submitted false quarterly statements to CMS of its Best Prices on Loestrin® 24 Fe to reduce improperly its rebate obligation to the States under the Best Price Program.

### B. WIDESPREAD SUPERIORITY CLAIMS TO YAZ®/BEYAZ®, MISBRANDING LOESTRIN® 24 FE AND LO LOESTRIN®

443. As part of its Loestrin® 24 Fe and Lo Loestrin® sales message, Warner Chilcott trained its sales representatives to engage in widespread false superiority claims, misbranding Loestrin® 24 Fe and Lo Loestrin®. Without substantial evidence to support these claims, Warner Chilcott representatives told healthcare professionals:

- "Loestrin® 24 Fe/Lo Loestrin® provides the 'shorter, lighter periods' you like about Yaz®/Beyaz®, without all the headaches";
- "Yaz®/Beyaz® work only for supermodels — i.e., women with a body mass index of 22 or lower. Loestrin® 24 Fe/Lo Loestrin® is going to work much better for your 'average' woman because unlike Yaz®, Loestrin® 24 Fe/Lo Loestrin® works in women up to a BMI of 35 — that's 250 pounds"
- "Doctor, did you know that Yaz®/Beyaz® doesn't work in women over the age of thirty five. Loestrin® 24 FE/Lo Loestrin® will work even in your peri-menopausal women, up to age forty five";

- "Doctor, aren't your patients terrified to take Yaz®/Beyaz®? I am sure you have seen all the bad press about them in the Media lately... In fact, it has gotten so bad that they have even received a warning letter from the FDA. Loestrin® 24 Fe/Lo Loestrin® utilize norethindrone acetate, a 'tried and tested' progestin. Yaz®/Beyaz® utilize drospirenone (DRSP), an untested progestin that is the cause of all the horrible side effects of Yaz®/Beyaz®."

444. Every one of these claims is either untrue or otherwise unsupported by reliable clinical evidence.

**C. WIDESPREAD SUPERIORITY CLAIMS TO ORTHO TRI-CYCLEN®, MISBRANDING LOESTRIN® 24 FE**

445. In order to counter the prescribing of generic oral contraceptives, Warner Chilcott trained its sales force to make false superiority claims about the generic Ortho Tri-Cyclen®: "Doctor, did you know that Ortho Tri-Cyclen® (generic Sprintec®) doesn't work in women heavier than 155 pounds? Loestrin® 24 and Lo Loestrin® are a much better choice for your 'average' women because unlike Ortho Tri Cyclen®, Loestrin® 24 and Lo Loestrin® work in women up to a BMI of thirty five — that's 250 pounds."

446. Warner Chilcott also trained its sales representatives to make false safety comparisons: "Doctor, did you know that Ortho Tri-Cyclen® has more breakthrough bleeding than Loestrin® 24/Lo Loestrin®? Ortho Tri Cyclen is twenty-one-day pill regime, while Loestrin® 24/Lo Loestrin® is a twenty-four-day pill regime. With Loestrin® 24 Fe/Lo Loestrin® your patients will be much happier because they will experience less breakthrough bleeding."

### D. OFF-LABEL PROMOTION OF LOESTRIN® 24 FE TO TREAT ACNE AND PMDD

447. Warner Chilcott trained its sales force to make off-label claims that Loestrin® 24 Fe and Lo Loestrin® could treat acne in order to compete with Yaz®/Beyaz®, which had an acne indication: "Doctor, I realize that you like the acne indication of Yaz®/Beyaz®, but did you know that Loestrin® 24 Fe/Lo Loestrin® can provide your patients with the exact same benefit?" This was a lie. There was no reliable clinical evidence to support that claim.

448. Likewise, Warner Chilcott trained its sales force to make off-label claims that Loestrin® 24 Fe and Lo Loestrin® could treat premenstrual dyphoric disorder ("PMDD") in order to compete with Yaz®/Beyaz®, which had an PMDD indication: "Doctor, I realize that you like the PMDD treatment indication for Yaz®. Did you know that because Loestrin® 24/Lo Loestrin® is a twenty-four-day therapy, it can provide you will the exact same benefit?" This, too, was a lie, not supported by any reliable clinical evidence.

### E. USE OF MED-ED EVENTS TO INDUCE PRESCRIBING OF LOESTRIN® 24 FE AND LO LOESTRIN®

449. As it had with its other drug products, Warner Chilcott trained its sales force to bribe nurses to encourage them to switch patients to Loestrin® 24 Fe and Lo Loestrin®. Sales representatives were trained to (and did) "stay close" to triage nurses, the most likely decision-makers in prescribing Loestrin® 24 Fe and Lo Loestrin®, through regular Med-Ed "happy hour" events.

450. Furthermore, Warner Chilcott trained its sales representatives to have the "business discussion" with doctors who attended Med-Ed events but did not prescribe Loestrin® 24 Fe/Lo Loestrin®. According to their training, sales representatives were to get "aggressive with doctors." They were to ask: "Doctor, do you hate my guts? Doctor, do you know how much Loestrin® 24 you have written over the past three months?" This last question was

especially useful with speakers who were accepting honoraria but not prescribing enough Loestrin® 24 Fe and Lo Loestrin®. The clear message was that these honoraria served as a quid pro quo.

## XII. WARNER-CHILCOTT'S FRAUDULENT MARKETING SCHEME VIOLATED THE ANTI-KICKBACK ACT

451. As described in this Complaint, Warner Chilcott's Fraudulent Marketing Scheme violated the federal health care Anti-Kickback Act, 42 U.S.C. §1320a-7b(b), which was enacted due to concerns that payoffs, like those made by Warner Chilcott, to those who influence health care decisions, will result in goods and services being provided that are unduly expensive, medically unnecessary, of poor quality, or even harmful to vulnerable patient populations.

452. The Anti-Kickback statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending, or arranging for the purchase of any item for which payment may be made under a federally-funded healthcare program. 42 U.S.C. §1320a-7b(b). Under this statute, Warner Chilcott may not offer or pay any remuneration, in cash or kind, directly or indirectly, to induce physicians or others to order or recommend drugs that may be paid for by a federal healthcare program. The law not only prohibits outright bribery schemes, but also prohibits any payment by a drug company that has as one of its purposes the inducement of a physician to write additional prescriptions for Warner Chilcott's pharmaceutical products.

453. Violation of the Anti-Kickback statute subjects the violator to exclusion from participation in federal health care programs, civil monetary penalties, and imprisonment of up to five years per violation. 42 U.S.C. §§1320a-7(b)(7), 1320a-7a(a)(7).

454. Concern about Fraudulent Marketing Schemes like those alleged in this Complaint prompted the Inspector General of HHS to issue a Special Fraud Alert in 1994

identifying prescription drug marketing practices that violate the Anti-Kickback law. *See* Special Fraud Alert: Prescription Drug Marketing Schemes. 59 Fed. Reg. 65,376 (Dec. 19, 1994). Among the suspect practices cited by the Inspector General were drug companies' payments to physicians who had offered no particular services of benefit to the drug company but who had generated in the past, or had the potential to generate in the future, a large volume of business for the drug company.

455. In May 2003, the Inspector General of HHS released a further Guidance identifying in greater detail several marketing practices of drug manufacturers that constitute "kickbacks and other illegal remuneration" infecting federal health care programs. *See* OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731 (May 5, 2003) ("2003 Guidance"). The 2003 Guidance cautions manufacturers against engaging in suspect practices that involve, *inter alia*, providing improper inducements, such as gifts, merchandise, entertainment, recreation, travel, meals, and other gratuities.

456. In addition, the 2003 Guidance stresses that under the anti-kickback statute, neither a legitimate purpose for an arrangement (e.g., physician education), nor a fair market value payment, will necessarily protect remuneration if there is also an illegal purpose (i.e., the purposeful inducement of business).

457. Any party convicted under the Anti-Kickback statute must be excluded (i.e., not allowed to bill for services rendered) from federal health care programs for a term of at least five years. 42 U.S.C. §1320a-7(a)(1). Even without a conviction, the Secretary may exclude that provider from federal health care programs for a discretionary period, and may seek a penalty of up to $50,000 for each improper act, as well as damages of up to three times the amount of

remuneration at issue (regardless of whether some of the remuneration was for a lawful purpose). 42 U.S.C. § 1320a-7a(a).

## XIII. WARNER-CHILCOTT'S FRAUDULENT MARKETING SCHEME VIOLATED WARNER-CHILCOTT'S OBLIGATIONS UNDER THE MEDICAID BEST PRICE STATUTE

458. As described above, Warner Chilcott's Fraudulent Marketing Scheme resulted in the provision of Warner Chilcott drug products through free samples, rebates, and coupons.

459. Medicaid thus did not receive the Best Price that Warner Chilcott was providing to healthcare professionals. Warner Chilcott knowingly (or with reckless disregard for the truth) made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government. Specifically, for each quarter noted above, and continuing through the present, Warner Chilcott knowingly (or in reckless disregard of the truth) submitted false quarterly statements to CMS of its Best Prices on the Warner Chilcott products to reduce improperly their rebate obligations to the States under the Best Price Program. Warner Chilcott's false quarterly statements of its Best Prices caused the States to submit false and inflated submissions to the Federal Government for reimbursement of Medicaid expenditures in violation of 31 U.S.C. § 3729(a)(2).

460. Warner Chilcott was required to certify its compliance with applicable law, including the Medicaid Rebate program. Warner Chilcott's knowing failure to comply renders its certifications false, either expressly or impliedly.

461. By virtue of the false or fraudulent claims that Warner Chilcott knowingly caused to be presented, the United States and the *Qui Tam* States have suffered actual damages and are entitled to recover treble damages plus a civil monetary penalty for each false claim.

462. The false reports of Best Price by Warner Chilcott trigger liability under the FCA and its state counterparts. Under the Best Price statute, Warner Chilcott was to report its truthful

prices to the Secretary, who in turn reported these prices to the states, who then invoiced Warner Chilcott the amount of Best Price rebates that were owing. Under the FCA and the State *Qui Tam* counterparts, Warner Chilcott is liable even if it did not make a false statement itself directly to the state "Medicaid agency," so long as a direct or indirect result of their conduct was causing a false statement to be made to the state Medicaid agency.

463. Because Warner Chilcott knowingly, and in reckless disregard for the truth, made false reports of Best Price or the AMP to the Secretary, then the "unit rebate amounts" or "URAs," which represent the products of calculations performed on AMPs and Best Prices, which were Warner Chilcott's responsibility to report, were also false. As such: (1) Warner Chilcott knowingly, and in reckless disregard for the truth, made, used, or caused to be used Best Price or AMP statements or records made to CMS to conceal, avoid, or decrease an obligation to the United States; (2) the statements or records were false; and (3) Warner Chilcott knew that the statements or records were false.

464. By virtue of the false or fraudulent claims that Warner Chilcott knowingly caused to be presented, the United States and the *Qui Tam* States have suffered actual damages and are entitled to recover treble damages plus a civil monetary penalty for each false claim.

## XIV. WARNER CHILCOTT VIOLATED THE FALSE CLAIMS ACT BY ITS FALSE CERTIFICATIONS OF COMPLIANCE WITH LAW

465. As a party to the Medicaid Rebate Agreement between the United States Secretary of Health and Human Services pursuant to the Social Security Act, 42 U.S.C. 1396s, Warner Chilcott (Labeler Code 00047), as well as various provider agreements, drug products are only eligible for reimbursement if and when Warner Chilcott is in compliance with applicable federal and state laws.

466. These laws include, but are not limited to, the federal and corresponding state anti-kickback statutes, the FDMA and the Food, Drug & Cosmetic Act (and all related regulations). As described in this Complaint, Warner Chilcott has been and continues to be in violation of the aforementioned laws.

467. Accordingly, Warner Chilcott has, expressly and impliedly, falsely certified its compliance with these federal and state statutes and regulations.

468. Warner Chilcott's false certifications have directly caused Government Programs to pay or reimburse for prescriptions not eligible for payment or reimbursement.

**COUNT I**
**(Violation of Federal False Claims Act)**
**(Former 31 U.S.C. § 3729(a)(1); Current 31 U.S.C. § 3729(a)(1)(A) (May 20, 2009))**

469. Relators incorporate herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

470. As a result of Defendants' actions as set forth in this Complaint, Defendants knowingly presented or caused to be presented to the United States of America false or fraudulent claims for payment or approval in violation of former 31 U.S.C. § 3729(a)(1), and current § 3729(a)(1)(A).

471. As a result of Defendants' actions as set forth above in this Complaint, the United States of America has been, and continues to be, severely damaged.

**COUNT II**
**(Violation of Federal False Claims Act)**
**(Former 31 U.S.C. § 3729(a)(2); Current 31 U.S.C. § 3729(a)(1)(B) (May 20, 2009))**

472. Relators incorporate herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

473. As a result of Defendants' actions as set forth in this Complaint, Defendants knowingly made, used, or caused to be made or used, false or fraudulent claims, records or

statements material to the payment of false or fraudulent claims, thereby causing false or fraudulent claims for payment to actually be paid or approved, in violation of former 31 U.S.C. § 3729(a)(2), and current § 3729(a)(1)(B).

474. The United States of America, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and is still paying or reimbursing for the Warner Chilcott drugs as set forth in this Complaint.

475. As a result of Defendants' actions as set forth above in this Complaint, the United States of America has been, and continues to be, severely damaged.

**COUNT III**
**(Violation of Federal False Claims Act)**
**(Former 31 U.S.C. § 3729(a)(3); Current 31 U.S.C. § 3729(a)(1)(C) (May 20, 2009))**

476. Relators incorporate herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

477. As detailed above, Defendants knowingly conspired with various healthcare providers identified in this Complaint (as well as other known and unknown co-conspirators described herein) to commit acts in violation of former 31 U.S.C. §§ 3729(a)(1) & (a)(2), and current §§ 3729(a)(1)(A) & (B).

478. Defendants and these healthcare providers committed overt acts in furtherance of the conspiracy as described above.

479. As a result of Defendants' actions as set forth above, the United States of America has been, and continues to be, severely damaged.

**COUNT IV**
**(Violation Of Federal False Claims Act)**
**(Former 31 U.S.C. § 3729(A)(7); Current 31 U.S.C. § 3729(a)(1)(G) (May 20, 2009))**

480. Relators incorporate herein by reference the preceding paragraphs of this Amended Complaint as though fully set forth herein.

481. Warner Chilcott knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the United States; or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the United States.

482. As a result of Defendants' actions as set forth above, the United States of America has been, and continues to be, severely damaged.

**COUNT V**
**(Violation of California False Claims Act)**

483. Relators incorporate herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

484. This is a civil action brought by Relators on behalf of the State of California against Defendants under the California False Claims Act, CAL. CODE § 12652(c).

485. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented to, and may still be presenting or causing to be presented to, an officer or employee of the State of California or its political subdivisions false or fraudulent claims for payment, in violation of CAL. CODE § 12651(a)(1).

486. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made

or used, false records or statements to get false or fraudulent claims paid in violation of CAL. CODE § 12651(a)(2).

487. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of California or its political subdivisions in violation of CAL. CODE § 1265 1 (a)(7).

488. The State of California, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for Warner Chilcott prescription drugs for recipients of state and state subdivision funded health insurance programs.

489. As a result of Defendants' actions as set forth above, the State of California, including its political subdivisions, has been, and may continue to be, severely damaged.

**COUNT VI**

**(Violation of Colorado False Claims Act)**

490. Relators incorporate herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

491. This is a civil action brought by Relators on behalf of the State of Colorado against Defendants under the Colorado False Claims Act, COLO. REV. STAT. § 25.5-4-304.

492. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented to, and may still be presenting or causing to be presented to, an officer

or employee of the State of Colorado or its political subdivisions false or fraudulent claims for payment, in violation of COLO. REV. STAT. § 25.5-4-305(a).

493. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid in violation of COLO. REV. STAT. § 25.5-4-305(b).

494. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Colorado or its political subdivisions in violation of COLO. REV. STAT. § 25.5-4-305(f).

495. The State of Colorado, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for Warner Chilcott prescription drugs for recipients of state- and state-subdivision-funded health insurance programs.

496. As a result of Defendants' actions as set forth above, the State of Colorado, including its political subdivisions, has been, and may continue to be, severely damaged.

**COUNT VII**
**(Violation of Connecticut False Claims Act)**

497. Relators incorporate herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

498. This is a civil action brought by Relators on behalf of the State of Connecticut against Defendants under the Connecticut False Claims Act, 2009 Conn. Pub. Acts No. 09-5.

499. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented to, and may still be presenting or causing to be presented to, an officer or employee of the State of Connecticut or its political subdivisions false or fraudulent claims for payment, in violation of 2009 Conn. Pub. Acts No. 09-5 § 2(a)(1).

500. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid in violation of Conn. Pub. Acts No. 09-5 § 2(a)(2).

501. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Connecticut or its political subdivisions in violation of Conn. Pub. Acts No. 09-5 § 2(a)(1).

502. The State of Connecticut, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for Warner Chilcott prescription drugs for recipients of state and state subdivision funded health insurance programs.

503. As a result of Defendants' actions as set forth above, the State of Connecticut, including its political subdivisions, has been, and may continue to be, severely damaged.

**COUNT VIII**
**(Violation of Delaware False Claims and Report Act)**

504. Relators incorporate herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

505. This is a civil action brought by Relators on behalf of the Government of the State of Delaware against Defendants under the State of Delaware's False Claims and Reporting Act, DEL. CODE ANN. tit. 6, § 1203(b).

506. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, directly or indirectly, to an officer or employee of the Government of the State of Delaware false or fraudulent claims for payment or approval, in violation of DEL. CODE ANN. tit. 6, §1201 (a)( 1 ).

507. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, directly or indirectly, false records or statements to get false or fraudulent claims paid or approved, in violation of DEL. CODE ANN. tit. 6, §1201(a)(2).

508. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, increase or decrease an obligation to pay or

transmit money to the Government of Delaware, in violation of DEL. CODE ANN. tit. 6, § 120l(a)(7).

509. The Government of the State of Delaware, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for Warner Chilcott prescription drugs for recipients of healthcare programs funded by the Government of the State of Delaware.

510. As a result of Defendants' actions, the Government of the State of Delaware has been, and may continue to be, severely damaged.

**COUNT IX**
**(Violation of District of Columbia False Claims Act)**

511. Relators incorporate herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

512. This is a civil action brought by Relators in the name of the District of Columbia against Defendants under the District of Columbia False Claims Act, D.C. CODE ANN. § 2-308.15(a).

513. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the District, a false or fraudulent claim for payment or approval, in violation of D.C. CODE ANN. § 2-308.14(a)(l).

514. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly used or caused to be used, and may continue to use or cause to be used, false records and/or

statements to get false claims paid or approved by the District, in violation of D.C. CODE ANN. § 2-308.14(a)(2).

515. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or used, or caused to be made or used, and may still be making or using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the District, in violation of D.C. CODE ANN. § 2-308.14(a)(7).

516. The District of Columbia, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay for Warner Chilcott prescription drugs for recipients of health insurance programs funded by the District.

517. As a result of Defendants' actions, as set forth above, the District of Columbia has been, and continues to be, severely damaged.

**COUNT X**
**(Violation of Florida False Claims Act)**

518. Relators incorporate herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

519. This is a civil action brought by Relators on behalf of the State of Florida against Defendants under the State of Florida's False Claims Act, FLA. STAT. ANN. § 68.083(2).

520. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to officers or employees of the State of Florida or one of its agencies false or fraudulent claims for payment or approval, in violation of FLA. STAT. ANN. § 68.082(2)(a).

521. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Florida or one of its agencies, in violation of FLA. STAT. ANN. § 68.082(2)(b).

522. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Florida or one of its agencies, in violation of FLA. STAT. ANN. § 68.082 (2)(g).

523. The State of Florida and its agencies, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for Warner Chilcott prescription drugs for recipients of health insurance plans funded by the State of Florida or its agencies.

524. As a result of Defendants' actions, as set forth above, the State of Florida and/or its agencies have been, and may continue to be, severely damaged.

**COUNT XI**
**(Violation of Georgia Medicaid False Claims Act)**

525. Relators incorporate herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

526. This is a civil action brought by Relators, in the name of the State of Georgia, against Defendants pursuant to the State of Georgia Medicaid Fraud False Claims Act, GA. CODE ANN. § 49-4-168 (2007), *et seq.*

527. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made or caused to be made, and may still be making or causing to be made, a false statement or misrepresentation of material fact on an application for any benefit or payment under the Georgia Medicaid program, in violation of GA. CODE ANN. § 49-4-168 (2007).

528. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made or caused to be made, and may still be making or causing to be made, a false statement or representation of material fact for use in determining rights to a benefit or payment, in violation of GA. CODE ANN. § 49-4-168 (2007).

529. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally concealed or failed to disclose, and may still be concealing or failing to disclose, an event with an intent to fraudulently secure the benefit or payment either in a greater amount or quantity than is due or when no benefit or payment is authorized, in violation of GA. CODE ANN. § 49-4-168 (2007).

530. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly offered or paid, and may still be offering or paying, remuneration, directly or indirectly, overtly or covertly, in cash or in kind, in return for purchasing, ordering or arranging for, or recommending purchasing or ordering of, a good, supply or service for which payment was made, in whole or in part, under the Medicaid program, in violation of GA. CODE ANN. § 49-4-168 (2007).

531. The State of Georgia or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Warner Chilcott prescription drugs for recipients of Medicaid.

532. As a result of Defendants' actions, as set forth above, the State of Georgia or its political subdivisions has been, and may continue to be, severely damaged.

**COUNT XII**
**(Violation of Hawaii False Claims Act)**

533. Relators incorporate herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

534. This is a civil action brought by Relators on behalf of the State of Hawaii and its political subdivisions against Defendants under the State of Hawaii's False Claims Act -False Claims to the State, HAW. REV. STAT. § 661-25.

535. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to officers or employees of the State of Hawaii, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of HAW. REV. STAT. § 61-21(a)(l).

536. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made and used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Hawaii, or its political subdivisions, in violation of HAW. REV. STAT. § 661-21(a)(2).

537. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Hawaii, or its political subdivisions, in violation of HAW. REV. STAT. § 661-21(a)(7).

538. The State of Hawaii, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay for Warner Chilcott prescription drugs for recipients of state-funded health insurance programs.

539. As a result of Defendants' actions as set forth above, the State of Hawaii and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XIII**
**(Violation of Illinois Whistleblower Reward and Protection Act)**

540. Relators incorporate herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

541. This is a civil action brought by Relators on behalf of the State of Illinois against Defendants under the State of Illinois Whistleblower Reward and Protection Act, 740 ILL, COMP. STAT. ANN. 175/4(b).

542. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Illinois or a member of the Illinois National Guard a false or

fraudulent claim for payment or approval, in violation of 740 ILL. COMP. STAT. ANN. 175/3(a)(I).

543. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Illinois, in violation of 740 ILL. COMP. STAT. ANN. 175/3(a)(2).

544. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the State of Illinois, in violation of 740 ILL. COMP. STAT. ANN. 175/3(a)(7).

545. The State of Illinois, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay for Warner Chilcott prescription drugs for recipients of state-funded health insurance programs.

546. As a result of Defendants' actions, as set forth above, the State of Illinois has been, and may continue to be, severely damaged.

**COUNT XIV**
**Violation of Indiana False Claims and Whistleblower Protection Act)**

547. Relators incorporate herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

548. This is a civil action brought by Relators on behalf of the State of Indiana against Defendants under the State of Indiana False Claims and Whistleblower Protection Act, IND. CODE ANN. § 5-11-5.5-4(a).

549. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented, or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval, in violation of IND. CODE ANN. § 5-11-5.5-2(b)(l).

550. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, a false record or statement to obtain payment or approval of false claims by the State of Indiana, in violation of IND. CODE ANN. § 5-11-5.5-2(b)(2).

551. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to avoid an obligation to pay or transmit money to the State of Indiana, in violation of IND. CODE ANN. § 5-11-5.5-2(b)(6).

552. The State of Indiana, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay for Warner Chilcott prescription drugs for recipients of state-funded health insurance programs.

553. As a result of Defendants' actions, as set forth above, the State of Indiana has been, and may continue to be, severely damaged.

**COUNT XV**
**(Violation of Louisiana Medical Assistance Programs Integrity Law)**

554. Relators incorporate herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

555. This is a civil action brought by Relators, on behalf of the State of Louisiana's medical assistance programs against Defendants under the State of Louisiana Medical Assistance Programs Integrity Law, LA. REV. STAT. § 46:439.1.

556. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims, in violation of LA. REV. STAT. § 46:438.3(A).

557. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly engaged in misrepresentation, and may still be engaging in misrepresentation, to obtain, or attempt to obtain, payment from medical assistance programs funds, in violation of LA. REV. STAT. § 46:438.3(B).

558. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly submitted, and may continue to submit, claims for goods, services or supplies which were medically unnecessary or which were of substandard quality or quantity, in violation of LA. REV. STAT, § 46:438.3(D).

559. The State of Louisiana, its medical assistance programs, political subdivisions and/or the Department, unaware of the falsity of the claims and/or statements made by Defendants, or its actions as set forth above, acted in reliance, and may continue to act in reliance, on the accuracy of Defendants' claims and/or statements in paying for Warner Chilcott prescription drugs for medical assistance program recipients.

560. As a result of Defendants' actions, the State of Louisiana, its medical assistance programs, political subdivisions and/or the Department have been, and may continue to be, severely damaged.

**COUNT XVI**
**(Violation of Maryland False Health Claims Act)**

561. Relators incorporate herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

562. This is a civil action brought by Relators on behalf of the State of Maryland against Defendants under the Maryland False Health Claims Act of 2010, M.D. CODE ANN. ch. 4, § 2-601.

563. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented a false claim for payment or approval, in violation of M.D. CODE ANN. ch. 4, § 2-602(a)(1).

564. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used false records or statements to obtain payment or approval of claims by the State of Maryland or its political subdivisions in violation of M.D. CODE ANN. ch. 4, § 2-602(a)(2).

565. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Maryland or one of its political subdivisions, in violation of M.D. CODE ANN. ch. 4, § 2-602(a)(8).

566. The State of Maryland, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

567. As a result of Defendants' actions, as set forth above, the State of Maryland or its political subdivisions have been severely damaged.

**COUNT XVII**
**(Violation of Massachusetts False Claims Act)**

568. Relators incorporate herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

569. This is a civil action brought by Relators on behalf of the Commonwealth of Massachusetts against Defendants under the Massachusetts False Claims Act, MASS. LAWS ANN. ch. 12, § 5C(2).

570. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval, in violation of MASS. LAWS ANN, ch. 12, § 5B(1).

571. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain payment or approval of claims by the Commonwealth of Massachusetts or its political subdivisions in violation of MASS. LAWS ANN. ch. 12, § 5B(2).

572. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Massachusetts or one of its political subdivisions, in violation of MASS. LAWS ANN. ch. 12, § 5B(8).

573. The Commonwealth of Massachusetts, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Warner Chilcott prescription drugs for recipients of health insurance programs funded by the state or its political subdivisions.

574. As a result of Defendants' actions, as set forth above, the Commonwealth of Massachusetts or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XVIII**
**(Violation of Michigan Medicaid False Claims Act)**

575. Relators incorporate herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

576. This is a civil action brought by Relators in the name of the State of Michigan against Defendants under the State of Michigan Medicaid False Claims Act, MICH. COMP. LAWS SERV. § 400.610a(l).

577. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, a false statement or false representation of a material fact in an application for Medicaid benefits, in violation of MICH. COMP. LAWS. SERV. § 400.603(1).

578. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or cause to be made a false statement or false representation of a material fact for use in determining rights to a Medicaid benefit, in violation of MICH. COMP. LAWS. SERV. § 400.603(2).

579. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, and may still be concealing or failing to disclose, an event affecting their initial or continued right to receive a Medicaid benefit or the initial or continued right of any other person on whose behalf Defendants have applied for or are receiving a benefit with intent to obtain a benefit to which Defendants are not entitled or in an amount greater than that to which Defendants are entitled, in violation of MICH. COMP. LAWS. SERV. § 400.603(3).

580. Defendants, in possession of facts under which they are aware or should be aware of the nature of its conduct and that its conduct is substantially certain to cause the payment of a Medicaid benefit, knowingly presented or made or caused to be presented or made, and may still be presenting or causing to be presented a false claim under the social welfare act, Act No. 280

of the Public Acts of 1939, as amended, in violation of MICH. COMP. LAWS. SERV. § 400.607(1).

581. The State of Michigan, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Warner Chilcott prescription drugs for recipients of Medicaid.

582. As a result of Defendants' actions, as set forth above, the State of Michigan or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XIX**
**(Violation of Minnesota Medicaid False Claims Act)**

583. Relators incorporate herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

584. This is a civil action brought by Relators in the name of the State of Minnesota against Defendants under the State of Minnesota Medicaid False Claims Act, Minn. Stat. § 15C.01.

585. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, a false statement or false representation of a material fact in an application for Medicaid benefits, in violation of Minn. Stat. § 15C.02(a)(1).

586. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or cause to be made a false statement or false representation of a material fact for use in determining rights to a Medicaid benefit, in violation of Minn. Stat. § 15C.02(a)(2).

587. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, and may still be concealing or failing to disclose, an event affecting its initial or continued right to receive a Medicaid benefit or the initial or continued right of any other person on whose behalf Defendants have applied for or are receiving a benefit with intent to obtain a benefit to which Defendants are not entitled or in an amount greater than that to which Defendants are entitled, in violation of Minn. Stat. § 15C.02(a)(2).

588. Defendants, in possession of facts under which they are aware or should be aware of the nature of their conduct and that their conduct is substantially certain to cause the payment of a Medicaid benefit, knowingly presented or made or caused to be presented or made, and may still be presenting or causing to be presented a false claim under the social welfare act, Act No. 280 of the Public Acts of 1939, as amended, in violation of Minn. Stat. § 15C.02(a)(7).

589. The State of Minnesota, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for Warner Chilcott prescription drugs for recipients of Medicaid.

590. As a result of Defendants' actions, as set forth above, the State of Minnesota or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XX**
**(Violation of Montana False Claims Act)**

591. Relators incorporate herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

592. This is a civil action brought by Relators on behalf of the State of Montana against Defendants under the State of Montana False Claims Act, MONT. CODE ANN. § 17-8-406(1).

593. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval, in violation of MONT. CODE ANN. § 17-8-403(l)(a).

594. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get a false claim paid or approved, in violation of MONT. CODE ANN. § 17-8-403(1)(b).

595. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Montana or one of its political subdivisions, in violation of MONT. CODE ANN. § 17-8-403(l)(g).

596. The State of Montana, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Warner Chilcott prescription drugs for recipients of health insurance programs funded by the state or its political subdivisions.

597. As a result of Defendants' actions, as set forth above, the State of Montana or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXI**
**(Violation of Nevada Submission of False Claims to State or Local Government Act)**

598. Relators incorporate herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

599. This is a civil action brought by Relators on behalf of the State of Nevada against Defendants under the State of Nevada Submission of False Claims to State or Local Government Act, NEV. REV. STAT. ANN. § 357.080(1)

600. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval, in violation of NEV. REV. STAT. ANN. § 357.040( l)(a).

601. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain payment or approval for false claims in violation of NEV. REV. STAT. ANN. § 357.040(1)(b).

602. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Nevada or one of its political subdivisions, in violation of NEV. REV. STAT. ANN. § 357.040(1)(g).

603. The State of Nevada, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Warner Chilcott prescription drugs for recipients of health insurance programs funded by the state or its political subdivisions.

604. As a result of Defendants' actions, as set forth above, the State of Nevada or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXII**
**(Violation of New Hampshire Medicaid False Claims Act)**

605. Relators incorporate herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

606. This is a civil action brought by Relators on behalf of the State of New Hampshire against Defendants under the State of New Hampshire Medicaid False Claims Act, N.H. REV. STAT. ANN. § 167:61-cII.(a).

607. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval, in violation of N.H. REV. STAT. ANN. § 167:61-bI.(a).

608. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get a fake claim paid or approved, in violation of N.H. REV. STAT. ANN. § 167:61-bI.(b).

609. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Hampshire or one of its political subdivisions, in violation of N.H. REV. STAT. ANN. § 167:61-bI.(e).

610. The State of New Hampshire, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Warner Chilcott prescription drugs for recipients of health insurance programs funded by the state or its political subdivisions.

611. As a result of Defendants' actions, the State of New Hampshire or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXIII**
**(Violation of New Jersey False Claims Act)**

612. Relators incorporate herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

613. This is a civil action brought by Relators, in the name of the State of New Jersey, against Defendants pursuant to the State of New Jersey Fraud False Claims Act, N.J. STAT. ANN. § 265 (2007), *et seq.*

614. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made or caused to be made, and may still be making or causing to be made, a false statement or misrepresentation of material fact on an application for any benefit or payment under the New Jersey Medicaid program, in violation of N.J. STAT. ANN. § 265 (2007).

615. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

or intentionally made or caused to be made, and may still be making or causing to be made, a false statement or representation of material fact for use in determining rights to a benefit or payment, in violation of N.J. STAT. ANN. § 265 (2007).

616. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally concealed or failed to disclose, and may still be concealing or failing to disclose, an event with an intent fraudulently to secure the benefit or payment either in a greater amount or quantity than is due or when no benefit or payment is authorized, in violation of N.J. STAT. ANN. § 265 (2007).

617. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly offered or paid, and may still be offering or paying, remuneration, directly or indirectly, overtly or covertly, in cash or in kind, in return for purchasing, ordering or arranging for, or recommending purchasing or ordering of, a good, supply or service for which payment was made, in whole or in part, under the Medicaid program, in violation of N.J. STAT. ANN. § 265 (2007).

618. The State of New Jersey or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Warner Chilcott prescription drugs for recipients of Medicaid.

619. As a result of Defendants' actions, as set forth above, the State of New Jersey or its political subdivisions has been, and may continue to be, severely damaged.

**COUNT XXIV**
**(Violation of New Mexico Medicaid False Claims Act)**

620. Relators incorporate herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

621. This is a civil action brought by Relators on behalf of the State of New Mexico against Defendants under the State of New Mexico Medicaid False Claims Act, N.M. STAT. ANN. § 27-14-7(B).

622. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, a false or fraudulent claim for payment under the Medicaid program, in violation of N.M. STAT. ANN. § 27-14-4A.

623. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may be continuing to present or causing to be presented a claim for payment under the Medicaid program that is not authorized or is not eligible for benefit under the Medicaid program, in violation of N.M. STAT. ANN. § 27-14-4B.

624. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get a false or fraudulent claim paid or approved, in violation of N.M. STAT. ANN. § 27-14-4C.

625. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Mexico or one of its political subdivisions, in violation of N.M. STAT. ANN. § 27-14-4E.

626. The State of New Mexico, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Warner Chilcott prescription drugs for recipients of health insurance programs funded by the state or its political subdivisions.

627. As a result of Defendants' actions, as set forth above, the State of New Mexico or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXV**
**(Violation of New York False Claims Act)**

628. Relators incorporate herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

629. This is a civil action brought by Relators on behalf of the State of New York against Defendants under the State of New York False Claims Act, N.Y. CLS St. Fin. § 190.2.

630. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval, in violation of N.Y. CLS St. Fin. § 189(a).

631. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get a false claim paid or approved, in violation of N.Y. CLS St. Fin. § 189(b).

632. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New York or one of its political subdivisions, in violation of N.Y.CLS St. Fin. § 189(g).

633. The State of New York, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Warner Chilcott prescription drugs for recipients of health insurance programs funded by the state or its political subdivisions.

634. As a result of Defendants' actions, as set forth above, the State of New York or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXVI**
**(Violation of North Carolina False Claims Act)**

635. Relators incorporate herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

636. This is a civil action brought by Relators on behalf of the State of North Carolina against Defendants under the North Carolina False Claims Act, N.C. GEN. STAT. § 1-605.

637. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

presented or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval, in violation of N.C. GEN. STAT. § 1-607(a)(1).

638. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain payment or approval of claims by the State of North Carolina or its political subdivisions in violation of N.C. GEN. STAT. § 1-607(a)(2).

639. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of North Carolina or one of its political subdivisions, in violation of N.C. GEN. STAT. § 1-607(a)(7).

640. The State of North Carolina, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Warner Chilcott prescription drugs for recipients of health insurance programs funded by the state or its political subdivisions.

641. As a result of Defendants' actions, as set forth above, the State of North Carolina or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXVII**
**(Violation of Oklahoma Medicaid False Claims Act)**

642. Relators incorporate herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

643. This is a civil action brought by Relators, in the name of the State of Oklahoma, against Defendants pursuant to the State of Oklahoma Medicaid Fraud False Claims Act, OKLA. STAT. tit. 63, § 5053 (2007), *et seq.*

644. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made or caused to be made, and may still be making or causing to be made, a false statement or misrepresentation of material fact on an application for any benefit or payment under the Oklahoma Medicaid program, in violation of OKLA. STAT. tit. 63, § 5053 (2007).

645. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made or caused to be made, and may still be making or causing to be made, a false statement or representation of material fact for use in determining rights to a benefit or payment, in violation of OKLA. STAT. tit. 63, § 5053 (2007).

646. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally concealed or failed to disclose, and may still be concealing or failing to disclose, an event with an intent fraudulently to secure the benefit or payment either in a greater amount or quantity than is due or when no benefit or payment is authorized, in violation of OKLA. STAT. tit. 63, § 5053 (2007).

647. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly offered or paid, and may still be offering or paying, remuneration, directly or indirectly, overtly or covertly, in cash or in kind, in return for purchasing, ordering or arranging for, or

recommending purchasing or ordering of, a good, supply or service for which payment was made, in whole or in part, under the Medicaid program, in violation of OKLA. STAT. tit. 63, § 5053 (2007).

648. The State of Oklahoma or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Warner Chilcott prescription drugs for recipients of Medicaid.

649. As a result of Defendants' actions, as set forth above, the State of Oklahoma or its political subdivisions has been, and may continue to be, severely damaged.

**COUNT XXVIII**
**(Violation of Rhode Island False Claims Act)**

650. Relators incorporate herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

651. This is a civil action brought by Relators, in the name of the State of Rhode Island, against Defendants pursuant to the State of Rhode Island Fraud False Claims Act, R.I. GEN. LAWS § 9-1.1-1 (2008), *et seq.*

652. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made or caused to be made, and may still be making or causing to be made, a false statement or misrepresentation of material fact on an application for any benefit or payment under the Rhode Island Medicaid program, in violation of R.I. GEN. LAWS § 9-1.1-1 (2008).

653. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made or caused to be made, and may still be making or causing to be made, a

false statement or representation of material fact for use in determining rights to a benefit or payment, in violation of R.I. GEN. LAWS § 9-1.1-1 (2008).

654. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally concealed or failed to disclose, and may still be concealing or failing to disclose, an event with an intent fraudulently to secure the benefit or payment either in a greater amount or quantity than is due or when no benefit or payment is authorized, in violation of R.I. GEN. LAWS § 9-1.1-1 (2008).

655. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly offered or paid, and may still be offering or paying, remuneration, directly or indirectly, overtly or covertly, in cash or in kind, in return for purchasing, ordering or arranging for, or recommending purchasing or ordering of, a good, supply or service for which payment was made, in whole or in part, under the Medicaid program, in violation of R.I. GEN. LAWS § 9-1.1-1 (2008).

656. The State of Rhode Island or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Warner Chilcott prescription drugs for recipients of Medicaid.

657. As a result of Defendants' actions, as set forth above, the State of Rhode Island or its political subdivisions has been, and may continue to be, severely damaged.

**COUNT XXIX**
**<u>(Violation of Tennessee Medicaid False Claims Act)</u>**

658. Relators incorporate herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

659. This is a civil action brought by Relators in the name of the State of Tennessee against Defendants under the Tennessee Medicaid False Claims Act, TENN. CODE ANN. § 71-5-183(a).

660. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the State of Tennessee a claim for payment under the Medicaid program knowing it was false or fraudulent, in violation of TENN. CODE ANN. § 71-5-182(a)(l)(A).

661. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, records or statements to get false or fraudulent claims under the Medicaid program paid for or approved by the State of Tennessee with knowledge that such records or statements were false, in violation of TENN. CODE ANN. § 71-5-182(a)(l)(B).

662. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the State of Tennessee, relative to the Medicaid program, with knowledge that such records or statements were false, in violation of TENN. CODE ANN. § 71-5-182(a)(1)(D).

663. The State of Tennessee, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Warner Chilcott prescription drugs for recipients of the Medicaid program.

664. As a result of Defendants' actions, as set forth above, the State of Tennessee has been, and may continue to be, severely damaged.

**COUNT XXX**
**(Violation of Texas Human Resources Code,**
**Medicaid Fraud Prevention Chapter)**

665. Relators incorporate herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

666. This is a civil action brought by Relators in the name of the State of Texas against Defendants under the State of Texas Human Resources Code, Medicaid Fraud Prevention Chapter, TEX. HUM. RES. CODE § 36.101(a).

667. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made or caused to be made, and may still be making or causing to be made, a false statement or misrepresentation of material fact on an application for a contract, benefit or payment under a Medicaid program, in violation of TEX. HUM. RES. CODE § 36.002(1).

668. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made or caused to be made, and may still be making or causing to be made, a false statement or misrepresentation of material fact that is intended to be used, and has been used, to determine a person's eligibility for a benefit or payment under the Medicaid program, in violation of TEX. HUM. RES. CODE § 36.002(2).

669. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, caused to be made, induced or sought to induce, and may still be making, causing to be made, inducing or seeking to induce, the making of a false statement or misrepresentation of material fact concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program in violation of TEX. HUM. RES. CODE § 36.002(4)(B).

670. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made a claim under the Medicaid program for a service or product that was inappropriate, in violation of TEX. HUM. RES. CODE § 36.002(7)(C),

671. The State of Texas, its political subdivisions or the Department, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Warner Chilcott prescription drugs for recipients of Medicaid.

672. As a result of Defendants' actions, as set forth above, the State of Texas, its political subdivisions or the Department has been, and may continue to be, severely damaged.

**COUNT XXXI**
**(Violation of Virginia Fraud Against Taxpayers Act)**

673. Relators incorporate herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

674. This is a civil action brought by Relators on behalf of the Commonwealth of Virginia against Defendants under the Commonwealth of Virginia Fraud Against Taxpayers Act, VA. CODE ANN. § 8.01-216.5, *et seq.*

675. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the Commonwealth, a false or fraudulent claim for payment or approval, in violation of VA. CODE ANN. § 8.01-216.3(A)(l).

676. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Commonwealth, in violation of VA. CODE ANN. § 8.01-216.3(A)(2).

677. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth, in violation of VA. CODE ANN. § 8.01-216.3(A)(7).

678. The Commonwealth of Virginia, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for Warner Chilcott prescription drugs for recipients of state funded health insurance programs.

679. As a result of Defendants' actions, as set forth above, the Commonwealth of Virginia, its political subdivisions or the Department has been, and may continue to be, severely damaged.

**COUNT XXXII**
**(Violation of Wisconsin False Claims for Medical Assistance Act)**

680. Relators incorporate herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

681. This is a civil action brought by Relators on behalf of the State of Wisconsin against Defendants under the State of Wisconsin False Claims for Medical Assistance, WIS. STAT. § 20.931 (2007), *et seq.*;

682. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to any officer, or employee, or agent of the state, a false or fraudulent claim for medical assistance, in violation of WIS. STAT. § 20.931(2)(a) (2007).

683. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, a false record or statement to obtain approval or payment of a false claim for medical assistance, in violation of WIS. STAT. § 20.931(2)(b).

684. The State of Wisconsin, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for Warner Chilcott prescription drugs for recipients of state-funded health insurance programs.

685. As a result of Defendants' actions, as set forth above, the State of Wisconsin, its political subdivisions or the Department has been, and may continue to be, severely damaged.

## PRAYER FOR RELIEF

WHEREFORE, Relators prays for judgment against Defendants as follows:

A. That Defendants be ordered to cease and desist from submitting any more false claims, or further violating 31 U.S.C. § 3729, et seq., CAL. CODE § 12650, et seq., COLO. REV. STAT § 25.5-4-304, et seq., 2009 CONN. PUB. ACTS NO. 09-5, et seq., DEL. CODE ANN. tit. 6, § 1201, et seq., D.C. CODE ANN. § 2-308.13, et seq., FLA. STAT. ANN. § 68.081, et seq., GA. CODE ANN. § 49-4-168, et seq., HAW. REV. STAT. § 661-21, et seq., 740 ILL. COMP. STAT. ANN. § 1751, et seq., IND. CODE ANN. § 5-11-5.5, et seq., LA. REV. STAT. § 437.1, et seq., M.D. CODE ANN. Ch. 4, § 2-601, *et seq*., MASS. LAWS ANN. Ch. 12, §5A, et seq., MICH. COMP. LAWS SERV. § 400.601, et seq., MINN. STAT. § 15C.01, et seq., MONT. CODE ANN. § 17-8-401, et seq., NEV. REV. STAT. ANN. § 357.010, et seq., N.H. REV. STAT. ANN. § 167:61-b, et seq., N.J. STAT ANN. § 265, et seq., N.M. STAT. ANN. § 27-14-1, et seq., N.Y. CLS ST. FIN. § 187, et seq., N.C. GEN. STAT. § 1-605, et. seq., OKLA. STAT. tit. 63, § 5053, et seq., R.I. GEN. LAWS § 9-1,1-1, et seq., TENN. CODE ANN. § 71-5-181, et seq., TEX. HUM. RES. CODE § 36.001, et seq., VA. CODE ANN. § 8.01-216.1, et seq., and WIS. STAT. § 20.931 (2007), et seq.

B. That judgment be entered in Relators' favor and against Defendants in the amount of each and every false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per claim as provided by 31 U.S.C. § 3729(a), to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the Scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

C. That Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and CAL. CODE § 12650, et seq., COLO. REV. STAT § 25.5-4-304, et seq., 2009 CONN. PUB. ACTS NO. 09-5 § 5 (e), DEL. CODE ANN. tit. 6, § 1201, et seq., D.C. CODE ANN. § 2-308.13, et seq., FLA. STAT. ANN. § 68.081, et seq., GA. CODE ANN. § 49-4-168, et seq., HAW. REV. STAT. § 661-21, et seq., 740 ILL. COMP. STAT. ANN. § 1751, et seq., IND. CODE ANN. § 5-11-5.5, et seq., LA. REV. STAT. § 437.1, et seq., M.D. CODE ANN. Ch. 4, § 2-605, MASS. LAWS ANN. Ch. 12, §5A, et seq., MICH. COMP. LAWS SERV. § 400.601, et seq., MINN. STAT. § 15C.01, et seq., MONT. CODE ANN. § 17-8-401, et seq., NEV. REV. STAT. ANN. § 357.010, et seq., N.H. REV. STAT. ANN. § 167:61-b, et seq., N.J. STAT ANN. § 265, et seq., N.M. STAT. ANN. § 27-14-1, et seq., N.Y. CLS ST. FIN. § 187, et seq., N.C. GEN. STAT. § 1-605, et. seq., OKLA. STAT. tit. 63, § 5053, et seq., R.I. GEN. LAWS § 9-1,1-1, et seq., TENN. CODE ANN. § 71-5-181, et seq., TEX. HUM. RES. CODE § 36.001, et seq., VA. CODE ANN. § 8.01-216.1, et seq., and WIS. STAT. § 20.931 (2007), et seq.

D. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of California or its political subdivisions multiplied as provided for in CAL. CODE § 12651(a), plus a civil penalty of no more than ten thousand dollars ($10,000) per claim as provided by CAL. CODE § 12651(a), to the extent such multiplied penalties shall fairly compensate the State of California or its political subdivisions for losses resulting from the Scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

E. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Colorado or its political subdivisions multiplied as provided for in COLO. REV. STAT. § 25.5-4-305, plus a civil penalty of not less than five

thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each act as provided by COLO. REV. STAT. § 25.5-4-30), to the extent such multiplied penalties shall fairly compensate the State of Colorado or its political subdivisions for losses resulting from the Scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

F. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the Government of the State of Connecticut multiplied as provided for in 2009 Conn. Pub. Acts No. 09-5 § 2(b), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each act in violation of the State of Connecticut False Claims Act, as provided by Conn. Pub. Acts No. 09-5 § 2(b), to the extent such multiplied penalties shall fairly compensate the Government of the State of Connecticut for losses resulting from the Scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

G. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the Government of the State of Delaware multiplied as provided for in DEL. CODE ANN. tit. 6, §1201(a), plus a civil penalty of not less than five thousand five-hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each act in violation of the State of Delaware False Claims and Reporting Act, as provided by DEL. CODE ANN. tit. 6, § 1201(a), to the extent such multiplied penalties shall fairly compensate the Government of the State of Delaware for losses resulting from the Scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

H. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the District of Columbia, multiplied as provided for in D.C. CODE

ANN. § 2-308.14(a), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each false claim, and the costs of this civil action brought to recover such penalty and damages, as provided by D.C. CODE ANN. § 2-308.14(a), to the extent such multiplied penalties shall fairly compensate the District of Columbia for losses resulting from the Scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

I. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Florida or its agencies multiplied as provided for in FLA. STAT. ANN. § 68.082, plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) as provided by FLA. STAT. ANN. § 68.082, to the extent such multiplied penalties shall fairly compensate the State of Florida or its agencies for losses resulting from the Scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

J. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Georgia or its political subdivisions multiplied as provided for in GA. CODE ANN. § 49-4-168, plus a civil penalty of not less than fifteen (15) percent or more than twenty-five (25) percent of the proceeds per claim as provided by GA. CODE ANN. § 49-4-168.2, to the extent such multiplied penalties shall fairly compensate the State of Georgia or its political subdivisions for losses resulting from the Scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

K. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Hawaii, multiplied as provided for in HAW. REV.

STAT. § 661-21(a), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) as provided by HAW. REV. STAT. § 661-21(a), to the extent such multiplied penalties shall fairly compensate the State of Hawaii for losses resulting from the Scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

L. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Illinois, multiplied as provided for in 740 ILL. COMP. STAT, ANN. 175/3(a), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000), and the costs of this civil action brought to recover such damages and penalty, as provided by 740 ILL. COMP. STAT. ANN. 175/3(a), to the extent such multiplied penalties shall fairly compensate the State of Illinois for losses resulting from the Scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

M. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Indiana, multiplied as provided for in IND. CODE ANN. § 5-11-5.5-2, plus a civil penalty of at least five thousand dollars ($5,000) as provided by IND. CODE ANN. § 5-11-5.5-2, to the extent such multiplied penalties shall fairly compensate the State of Indiana for losses resulting from the Scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

N. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by Louisiana's medical assistance programs, multiplied as provided for in LA. REV. STAT § 438.6(B)(2), plus a civil penalty of no more than ten thousand dollars ($10,000) per violation or an amount equal to three times the value of the illegal remuneration,

whichever is greater, as provided for by LA. REV. STAT § 438.6(B)(I), plus up to ten thousand dollars ($10,000) for each false or fraudulent claim, misrepresentation, illegal remuneration, or other prohibited act, as provided by LA. REV. STAT § 438.6(C)(l)(a), plus payment of interest on the amount of the civil fines imposed pursuant to Subsection B of § 438.6 at the maximum legal rate provided by La. Civil Code Art. 2924 from the date the damage occurred to the date of repayment, as provided by LA. REV. STAT. § 438.6(C)(l)(b), to the extent such multiplied fines and penalties shall fairly compensate the State of Louisiana's medical assistance programs for losses resulting from the Scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

O. That judgment be entered in Relators' favor and against Defendants for restitution to the State of Maryland or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in M.D. CODE ANN. Ch. 4, § 2-602(b), multiplied as provided for in M.D. CODE ANN. Ch. 4, § 2-602(b)(1)(ii), plus a civil penalty of not more than ten thousand dollars ($10,000) for each false claim, pursuant to M.D. CODE ANN. Ch. 4, § 2-602(b)(1)(i), to the extent such multiplied penalties shall fairly compensate the State of Maryland or its political subdivisions for losses resulting from the Scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

P. That judgment be entered in Relators' favor and against Defendants for restitution to the Commonwealth of Massachusetts or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in MASS. LAWS ANN. ch. 12, 5B, multiplied as provided for in MASS. LAWS ANN. ch. 12, § 5B, plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand

dollars ($10,000) for each false claim, pursuant to MASS. LAWS ANN, ch. 12, 5B, to the extent such multiplied penalties shall fairly compensate the Commonwealth of Massachusetts or its political subdivisions for losses resulting from the Scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

Q. That judgment be entered in Relators' favor and against Defendants for restitution to the State of Michigan or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in MICH. COMP. LAWS SERV. §§ 400.603-400.606, 400.610b, in order to fairly compensate the State of Michigan or its political subdivisions for losses resulting from the Scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

R. That judgment be entered in Relators' favor and against Defendants for restitution to the State of Minnesota or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in MINN. STAT. § 15C.02(a), multiplied as provided for in MINN. STAT. § 15C.02(a), plus a civil penalty of not less than five thousand five- hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each act, pursuant to MINN. STAT. § 15C.02(a), to the extent such multiplied penalties shall fairly compensate the State of Minnesota or its political subdivisions for losses resulting from the Scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

S. That judgment be entered in Relators' favor and against Defendants for restitution to the State of Montana or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in

MONT. CODE ANN. § 17-8-403(2), multiplied as provided for in MONT. CODE ANN. § 17-8-403(2), plus a civil penalty of up to ten thousand dollars ($10,000) for each false claim, pursuant to MONT. CODE ANN. § 17-8-403(2), to the extent such multiplied penalties shall fairly compensate the State of Montana or its political subdivisions for losses resulting from the Scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

T. That judgment be entered in Relators' favor and against Defendants for restitution to the State of Nevada for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in NEV. REV. STAT. ANN. 357.040, multiplied as provided for in NEV. REV. STAT. ANN. § 357.040(1), plus a civil penalty of not less than two thousand dollars ($2,000) or more than ten thousand dollars ($10,000) for each act, pursuant to NEV. REV. STAT. ANN. § 357.040, to the extent such multiplied penalties shall fairly compensate the State of Nevada for losses resulting from the Scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

U. That judgment be entered in Relators' favor and against Defendants for restitution to the State of New Hampshire or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.H. REV. STAT. ANN. § 167:6111, multiplied as provided for in N.H. REV. STAT. ANN. § 167:61II, plus a civil penalty of two thousand dollars ($2,000) for each false claim, pursuant to REV. STAT. ANN. § 167:61II, to the extent such multiplied penalties shall fairly compensate the State of New Hampshire or its political subdivisions for losses resulting from the Scheme

undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

V. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of New Jersey or its political subdivisions multiplied as provided for in N.J. STAT. ANN. § 265, plus a civil penalty of not less than fifteen (15) percent or more than twenty-five (25) percent per claim as provided by N.J. STAT. ANN. § 265, to the extent such multiplied penalties shall fairly compensate the State of New Jersey or its political subdivisions for losses resulting from the Scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

W. That judgment be entered in Relators' favor and against Defendants for restitution to the State of New Mexico or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.M. STAT. ANN. § 27-14-4, multiplied as provided for in N.M. STAT. ANN. § 27-14-4, to the extent such multiplied penalties shall fairly compensate the State of New Mexico or its political subdivisions for losses resulting from the Scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after fill discovery;

X. That judgment be entered in Relators' favor and against Defendants for restitution to the State of New York or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.Y. CLS St. Fin. § 189.1., multiplied as provided for in N.Y. CLS St. Fin. § 189.1., plus a civil penalty of not less than six thousand dollars ($6,000) or more than twelve thousand dollars ($12,000) for each false claim, pursuant to N.Y. CLS St. Fin. § 189.l., to the extent such multiplied penalties shall fairly compensate the State of New York or its political subdivisions

for losses resulting from the Scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

Y. That judgment be entered in Relators' favor and against Defendants for restitution to the State of North Carolina for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.C. GEN. STAT. § 1-605, multiplied as provided for in N.C. GEN. STAT. § 1-607(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) as provided by N.C. GEN. STAT. § 1-607(a), to the extent such multiplied penalties shall fairly compensate the State of North Carolina for losses resulting from the Scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

Z. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Oklahoma or its political subdivisions multiplied as provided for in OKLA. STAT. tit. 63, § 5053, plus a civil penalty of not less than fifteen (15) percent or more than twenty-five (25) percent per claim as provided by OKLA. STAT. tit. 63, § 5053.4, to the extent such multiplied penalties shall fairly compensate the State of Oklahoma or its political subdivisions for losses resulting from the Scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

AA. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Rhode Island or its political subdivisions multiplied as provided for in R.I. GEN. LAWS § 9-1,1-1, plus a civil penalty of not less than fifteen (15) percent or more than twenty-five (25) percent per claim as provided by R.I. GEN. LAWS § 9-1,1-4, to the extent such multiplied penalties shall fairly compensate the State of Rhode Island or

its political subdivisions for losses resulting from the Scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

BB. That judgment be entered in Relators' favor and against Defendants for restitution to the State of Tennessee for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in TENN. CODE ANN. § 71-5-182, multiplied as provided for in TENN. CODE ANN. § 71-5-182(a)(l), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) pursuant to TENN. CODE ANN. § 71-5-182(a)(l), to the extent such multiplied penalties shall fairly compensate the State of Tennessee for losses resulting from the Scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

CC. That judgment be entered in Relators' favor and against Defendants for restitution to the State of Texas for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in TEX. HUM. RES. CODE § 36.052(a)(l), multiplied as provided for in TEX. HUM. RES. CODE § 36.052(a)(4), the interest on the value of such payments or benefits at the prejudgment interest rate in effect on the day the payment or benefit was paid or received, for the period from the date the payment or benefit was paid or received to the date that restitution is made to the State of Texas, pursuant to TEX. HUM. RES. CODE § 36.052(a)(2), plus a civil penalty of not less than five thousand dollars ($5,000) or more than fifteen thousand dollars ($15,000) for each unlawful act committed that resulted in injury to an elderly or disabled person, and of not less than one thousand dollars ($1,000) or more than ten thousand dollars ($10,000) for each unlawful act committed that did not result in injury to an elderly or disabled person, pursuant to TEX. HUM. RES. CODE § 36.052(a)(3)(A) and (B), to

the extent such multiplied penalties shall fairly compensate the State of Texas for losses resulting from the Scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

DD. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the Commonwealth of Virginia, multiplied as provided for in VA. CODE ANN. § 8.01-216.3(A), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) as provided by VA. CODE ANN. § 8.01-216.3(A), to the extent such multiplied penalties shall fairly compensate the Commonwealth of Virginia for losses resulting from the Scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

EE. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Wisconsin or its political subdivisions multiplied as provided for in WIS. STAT. § 20.931(2), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) as provided by WIS. STAT. § 20.931(2), to the extent such multiplied penalties shall fairly compensate the State of Wisconsin or its political subdivisions for losses resulting from the Scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

FF. That Defendants be ordered to disgorge all sums by which they have been enriched unjustly by its wrongful conduct; and

GG. That judgment be granted for Relators against Defendants for all costs, including, but not limited to, court costs, reasonable expenses, expert fees and all attorneys' fees incurred by Relator in the prosecution of this suit; and

HH. That Relators be granted such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(a), plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: March 30, 2011

/s/ Paul F. Lynch

Paul F. Lynch
65 Franklin Street, Suite 500
Boston, MA 02110
Telephone: 617-426-1120
Facsimile: 617-348-2147

Of Counsel:

W. Scott Simmer
Thomas J. Poulin
BLANK ROME LLP
600 New Hampshire Avenue, NW
Washington, DC 20037
Telephone: 202-772-5800
Facsimile: 202-772-5858

Stephen A. Weiss
David R. Buchanan
Scott A. George
SEEGER WEISS LLP
One William Street
New York, NY 10004
Telephone: 212-584-0700
Facsimile: 212-584-0799

*Attorneys for Relators*