# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* LISA A. ALEXANDER and JAMES P. GOAN, RELATORS, and on behalf of the STATES of CALIFORNIA, *et al.*, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 11-cv-10545-RGS |
| v. | ) ) | |
| WARNER CHILCOTT PLC, WARNER CHILCOTT CORPORATION, WARNER CHILCOTT (US), LLC, and JOHN DOES #1-100, FICTITIOUS NAMES, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS RELATORS' THIRD AMENDED COMPLAINT

## TABLE OF CONTENTS

Page

ARGUMENT ................................................................................................................................. 2

I.     RELATORS HAVE NOT SHOWN THAT FALSE CLAIMS FOR PAYMENT
       WERE SUBMITTED TO EACH GOVERNMENT PROGRAM AS A RESULT
       OF EACH ALLEGED SCHEME. ..................................................................................... 2

II.    RELATORS HAVE NOT SHOWN THAT WC'S ALLEGED MISCONDUCT
       CAUSED THE SUBMISSION OF ANY ALLEGEDLY FALSE CLAIM. ...................... 6

III.   RELATORS HAVE NOT SHOWN THAT ANY MEDICAID CLAIMS WERE
       FALSE. .............................................................................................................................. 9

CONCLUSION ............................................................................................................................. 10

# TABLE OF AUTHORITIES

Page(s)

CASES

*Ashcroft v. Iqbal,*
    556 U.S. 662, 679 (2009)......................................................................................3

*Hayduk v. Lanna,*
    775 F.2d 441 (1st Cir. 1985)..............................................................................10

*Klein v. MHM Corr. Servs., Inc.,*
    No. 08-11814, 2010 WL 3245291 (D. Mass. Aug. 16, 2010) ................................10

*Michael A. Metnuck & Assocs., Inc. v. Lloyd's Underwriting Syndicate No. 1209,*
    No. 11-10118, 2013 WL 783050 (D. Mass. Feb. 28, 2013) .................................10

*New York v. Amgen Inc.,*
    652 F.3d 103 (1st Cir. 2011).................................................................................9

*In re Neurontin Mktg. & Sales Pracs. Litig.,*
    712 F.3d 21 (1st Cir. 2013)...................................................................................6

*United States ex rel. Banigan v. Organon USA Inc.,*
    883 F. Supp. 2d 277 (D. Mass. 2012) ..............................................................9-10

*United States ex rel. Carpenter v. Abbott Labs., Inc.,*
    723 F. Supp. 2d 395 (D. Mass. 2010) .........................................................6-7, 9-10

*United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.,*
    579 F.3d 13, 29 (1st Cir. 2009)...................................................... 1, 3-5, 10

*United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.,*
    719 F.3d 31, 38-39 (1st Cir. 2013)........................................................ 2, 4-6

*United States ex rel.Franklin v. Parke-Davis,*
    No. 96-11651, 2003 WL 22048255 (D. Mass. Aug. 22, 2003) .............................6

*United States ex rel. Karvelas v. Melrose-Wakefield Hosp.,*
    360 F.3d 220 (1st Cir. 2004)..................................................................................1

*United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.,*
    707 F.3d 451 (4th Cir. 2013) ...............................................................................4

*United States ex rel. Rost v. Pfizer, Inc.,*
    507 F.3d 720 (1st Cir. 2007).......................................................... 1, 3-4

**STATUTES & OTHER AUTHORITIES**

Federal Rule of Civil Procedure 9(b) ....................................................................................1, 4

Federal Rule of Civil Procedure 12(b)(6) ..................................................................................1

Federal Rule of Civil Procedure 12(h)(2) ..................................................................................5

Relators' opposition to Defendants' Motion to Dismiss, like the Third Amended Complaint itself, revels in allegations that WC acted inappropriately in promoting certain prescription drugs.  As WC noted in its opening brief, and as Relators repeat throughout their opposition, the TAC recites a host of details regarding these alleged violations of federal laws and regulations.  But in this case—a False Claims Act case, ***not*** a case brought by the United States under the Food, Drug, and Cosmetic Act, the Anti-Kickback Statute, or any other federal law or regulation—these details are insufficient to establish liability.

As the First Circuit has explained, "alleged violations of federal regulations are insufficient to support a claim under the FCA." *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 234 (1st Cir. 2004).  Indeed, "FCA liability does not attach to violations of federal law or regulations, such as marketing of drugs in violation of the FDCA, that are independent of any false claim." *United States ex rel. Rost v. Pfizer, Inc.*, 507 F.3d 720, 727 (1st Cir. 2007).  Rather, a relator must "sufficiently establish that false claims were submitted for government payment." *Rost*, 507 F.3d at 733.  To do this, a relator must provide "factual or statistical evidence to strengthen the inference of fraud beyond possibility." *Id.* (quoted in *United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 579 F.3d 13, 29 (1st Cir. 2009) ("*Duxbury I*")); *see also id.* at 732 n.9 (relator must "show" that defendant "cause[d] to be presented a false claim for payment" (alteration in original) (internal quotation and citation omitted)).  Because Relators' allegations here fall short of this standard, their claims must be dismissed under Federal Rules of Civil Procedure 12(b)(6) and 9(b).

Relators also rely heavily on what they incorrectly characterize as "613 specific false claims resulting from [WC's alleged] schemes."  Opp. 8.  In fact, the specific alleged claims listed in the TAC relate only to one of the three "schemes" at issue in this case (the alleged

payment of kickbacks to physicians), and according to the TAC, they were submitted exclusively to Medicaid agencies in six states over a twenty-month period.  These claims (the "Medicaid-kickback claims") **do not** include **any** claims (a) submitted to Medicare, (b) resulting from alleged off-label promotion or misbranding, (c) resulting from WC's alleged involvement in the prior authorization process, (d) submitted to Medicaid agencies in the remaining states referenced in the TAC, or (e) submitted during any other period of time.

Relators argue that the Court may infer from their allegations regarding these limited Medicaid-kickback claims that other allegedly false claims were submitted, in other states, to other programs or government agencies, as a result of other alleged misconduct, and during other periods of time.  But there is nothing in the TAC to support such an inference, nor does *Duxbury I*—on which Relators rely—suggest that such an inference would be permissible on the facts alleged here.  To the contrary, in a later decision in the *Duxbury* litigation, the First Circuit flatly rejected the proposition that a relator's "bald assertions" of the scope of a particular scheme obligate a court to conclude that the scheme is as broad as the relator contends.  *United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 719 F.3d 31, 39 (1st Cir. 2013) ("*Duxbury II*").

Finally, Relators attempt to shift the burden to WC to disprove that any claims submitted to state Medicaid agencies for off-label uses or as a result of alleged kickbacks were false.  But the case law is clear that Relators—not WC—bear the burden on this issue.  Because the TAC does not plausibly show that these claims were false, the associated causes of action fail.

## ARGUMENT

## I.      RELATORS HAVE NOT SHOWN THAT FALSE CLAIMS FOR PAYMENT WERE SUBMITTED TO EACH GOVERNMENT PROGRAM AS A RESULT OF EACH ALLEGED SCHEME.

Relators devote hundreds of paragraphs in the TAC to descriptions of WC's allegedly improper marketing practices.  Even assuming that these allegations are true, this plethora of

detail masks a central defect in their pleading: Relators have failed to show that false claims for reimbursement were submitted to each government program at issue as a result of each alleged fraudulent scheme. As the First Circuit has made clear, "FCA liability does not attach to violations of federal law or regulations, such as marketing of drugs in violation of the FDCA, that are independent of any false claim." *Rost*, 507 F.3d at 727. Indeed, a "complaint [may] amply describe[ ] illegal practices in which [a defendant] allegedly engaged. But those practices, while illegal, are not a sufficient basis for an FCA action [where] they do not involve claims for government reimbursement." *Id.* at 732. Nor may this Court simply assume that false claims must have been submitted. Instead, Relators must "sufficiently establish" the submission of claims, by providing "factual or statistical evidence to strengthen the inference of fraud beyond possibility." *Id.* at 733.[1]

In *Rost*, the relator described the supposedly improper marketing practices of the defendant and alleged that a significant percentage of sales for the drug at issue were for off-label uses. *Id.* at 726. Although the court noted that it was not "irrational to infer" that some of these prescriptions could have been written for federally-insured patients and submitted for reimbursement, the relator provided no "factual or statistical evidence to strengthen the inference of fraud beyond possibility." *Id.* at 732-33.[2] As a result, the complaint was subject to dismissal.

---

[1] Contrary to Relators' argument, *Duxbury I* did not alter this standard. Rather, as Relators admit, the language in *Duxbury I* on which Relators rely was quoted from *Rost*. *See* Opp. 8. Relators also are incorrect in asserting (Opp. 12) that bare allegations that do not "show" an entitlement to relief are nevertheless sufficient to satisfy Relators' pleading burden. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

[2] Relators suggest that the *Rost* court was influenced by a criminal information that alleged that many patients taking the drug at issue for off-label uses paid for it themselves or through private insurers. Opp. 10; *see* 507 F.3d at 732. There is no indication in the First Circuit's decision, however, that this information played any role in the court's analysis of the relator's complaint. (continued…)

The First Circuit relied on *Rost* in *Duxbury I*.  As in *Rost*, the relator in *Duxbury I* alleged that the defendant engaged in an improper marketing scheme designed to induce physicians to write prescriptions that would be submitted for reimbursement to Medicare.  579 F.3d at 19. Unlike in *Rost*, however, the *Duxbury* relator "set[] forth allegations of kickbacks provided by [the defendant] that resulted in the submission of false claims" by eight specific healthcare providers.  *Id.* at 30.  The relator's allegations as to these eight facilities included details concerning the alleged kickbacks that they received, as well as "the dates and amounts of the false claims filed by [the facilities] with the Medicare program." *Id.*  Although a "close call," the court found that these allegations were sufficient to satisfy Rule 9(b).[3]  *Id.*  Notably, as the First Circuit later explained in *Duxbury II*, the provider-specific allegations "were the only allegations that distinguished Duxbury's claims from the ones that [the First Circuit] found to be deficient under Rule 9(b) in *Rost*."  *Duxbury II*, 719 F.3d at 38.[4]

*Rost* and *Duxbury I* confirm that it is not enough for a relator to describe a scheme in which false claims could have been submitted for reimbursement; rather, a relator must allege facts sufficient to show that it was "beyond possibility" that false claims were submitted to the government.  *See Rost*, 507 F.3d at 733; *Duxbury I*, 579 F.3d at 29.

---

To the contrary, the court found that the complaint was deficient because its allegations "[did] not sufficiently establish that false claims were submitted for government payment."  *Id.* at 733.

[3] The court in *Duxbury I* "decline[d] to draft a litigation manual full of scenarios of what allegations would be sufficient for purposes of Rule 9(b)" and "limit[ed] [its] holding to the facts."  *Id.* at 32 (internal quotation and citation omitted).

[4] Contrary to Relators' argument, *United States ex rel. Nathan v. Takeda Pharmaceuticals North America, Inc.*, 707 F.3d 451 (4th Cir. 2013), is entirely consistent with *Rost* and *Duxbury I*.  Like the First Circuit in those two cases, the Fourth Circuit in *Nathan* required "some indicia of reliability . . . to support the allegation that an actual false claim was presented to the government."  *Id.* at 457 (internal quotation and citation omitted).  The court did not—as Relators assert (Opp. 10)—"expressly disagree" with *Duxbury I*.  *See Nathan*, 707 F.3d at 457 (citing *Duxbury I* as case in which "specific allegations of the defendant's fraudulent conduct necessarily led to the plausible inference that false claims were presented to the government").

Here, Relators have not met this standard.  Relators allege that WC conducted three distinct fraudulent schemes:  (1) payment of kickbacks to healthcare providers; (2) improper promotion of products by use of off-label statements or unsubstantiated statements of superiority; and (3) involvement in the prior authorization process.  With respect to the latter two alleged schemes, Relators have not identified a single allegedly false claim that supposedly was submitted to the government, nor have they otherwise shown that such claims actually were submitted.  And even with respect to the alleged kickback scheme, Relators have only pointed to allegedly false claims submitted to Medicaid agencies in six states over a twenty-month period (the "Medicaid-kickback claims").[5]

Relators suggest that the Court may infer from the Medicaid-kickback claims that claims related to the two other schemes were submitted in the same six states and that claims related to all three schemes were submitted to Medicare and to other government programs, in other states, and during other time periods.  Opp. 12.  But Relators have alleged no facts that would support such an inference.  Nor does *Duxbury I*, on which Relators again rely, support their position. That case considered a single scheme involving a single government program, as opposed to the three distinct schemes and multiple government programs at issue here.  Moreover, as the First Circuit made clear in *Duxbury II*, a court is not obligated to accept "bald assertions" as to the

---

[5] Relators incorrectly suggest that WC has "concede[d]" that it "knew" that its alleged practices would result in the submission of false claims, that its alleged conduct violated the Anti-Kickback Statute, and that claims for off-label prescriptions submitted to Medicare were false. *See* Opp. 9, 11, 14 n.6, 23.  WC has made no such concessions but has focused its arguments on the allegations made in the TAC, as it is required to do at this stage.  WC reserves the right to contest each of these points later in these proceedings should some or all of Relators' claims survive this motion to dismiss.  *See* Fed. R. Civ. P. 12(h)(2).

breadth of an alleged scheme that are unsupported by factual allegations.  *See* 719 F.3d at 39.

Relators' proffered inference is simply untenable on the facts alleged here.[6]

## II.   RELATORS HAVE NOT SHOWN THAT WC'S ALLEGED MISCONDUCT CAUSED THE SUBMISSION OF ANY ALLEGEDLY FALSE CLAIM.

In addition to failing to show that false claims were submitted to the government,

Relators have not adequately alleged that WC caused the submission of any such claim.

Causation requires a showing that the defendant's alleged conduct was a "substantial factor" in

the submission of a claim for reimbursement.  *United States ex rel. Franklin v. Parke-Davis*, No.

96-11651, 2003 WL 22048255, at *4 (D. Mass. Aug. 22, 2003).

This Court considered the "substantial factor" test in *United States ex rel. Carpenter v.*

*Abbott Laboratories, Inc.*, 723 F. Supp. 2d 395 (D. Mass. 2010).  *Carpenter*, like the instant

action, involved allegations that a pharmaceutical company had provided kickbacks to healthcare

providers and promoted a product for off-label use.  *Id.* at 398-99.  The defendant argued that the

relator failed to allege that the defendant's conduct was a substantial factor in the submission of

any false claim for reimbursement.  The relator had identified, *inter alia*, reimbursement claims

allegedly submitted to Medicare and Medicaid for prescriptions written for off-label use, surveys

in which healthcare providers stated that they had been persuaded to write prescriptions for an

off-label purpose, and the mischaracterization of medical evidence in marketing the drug.  *Id.* at

405-07.  This Court found that the allegations, although "less than overwhelming, when

mustered as a whole" minimally satisfied the substantial factor test.  *Id.* at 407.

---

[6] Relators' reliance on *In re Neurontin Marketing & Sales Practices Litigation*, 712 F.3d 21 (1st Cir. 2013), likewise is unavailing.  *Neurontin* concerned an alleged scheme to increase revenue from a private insurer, rather than the government, and there was no dispute that the insurer paid for off-label prescriptions.  *See id.* at 39.  Here, by contrast, Relators have not adequately alleged that any purportedly off-label prescription for a federally-insured patient was submitted to the government for payment.

Relators' allegations here are thinner than the "gruel" in *Carpenter*. *See id.* Once again, Relators rely on various details concerning WC's alleged marketing schemes to mask the TAC's core deficiency: its failure to show that WC's conduct caused the submission of false claims to government programs. Relators allege, for instance, that healthcare providers received speaker fees and other inducements, that the WC sales force was involved in the prior authorization process, and that the Company promoted its drugs for off-label uses and with unsubstantiated statements of superiority. Relators have failed to show, however, that any such conduct caused even a single healthcare provider to write a prescription for a federally-insured patient, let alone that any such prescription was submitted for reimbursement.

With respect to the kickback allegations, Relators have failed to allege that any inducements supposedly paid to healthcare providers caused the submission of false claims to the government.[7] Even with respect to the Medicaid-kickback claims listed in the TAC, Relators have not shown a sufficient causal connection between a healthcare provider's receipt of speaker fees or other alleged inducements and his or her decision to prescribe a particular drug to a particular federally-insured patient at a particular time. Although Relators claim that the physicians who prescribed the Medicaid-kickback claims did so "[a]s a result of kickbacks," *see, e.g.*, TAC ¶ 232, they assert no facts to support this conclusory allegation.[8]

Likewise, Relators have not shown that any involvement by the WC sales force in the prior authorization process was a significant factor in the submission of a false claim for

---

[7] Indeed, Relators have suggested that healthcare providers may have written prescriptions for WC products before receiving alleged inducements. *See, e.g.*, TAC ¶ 231 ("Dr. Fedonenko . . . prescribed a significant quantity of Actonel before she started serving as a speaker . . . .").

[8] Relators allege that a significant number of prescriptions for one WC product—Atelvia—were written by speakers. *See* TAC ¶¶ 237-38. However, Relators have not shown that any of these prescriptions were written for federally-insured patients who sought reimbursement from government programs.

reimbursement.  Relators describe the need for prior authorizations for certain WC drugs and

assert that WC personnel were involved in the prior authorization process, *see, e.g.*, TAC ¶¶ 157,

271-72, 604, but they do not show that this involvement led to the submission of any false

claims.  Relators do not allege, for example, that prior authorization requests were made more

frequently or by different healthcare providers following sales representatives' alleged

involvement.  Nor do they show that sales representatives provided false language to use on any

particular prior authorization request or that such requests were granted more frequently as a

result of WC's alleged involvement.[9]  Relators also do not identify a single instance in which a

sales representative's input resulted in the submission of a claim to the government.[10]

Relators also fail to show that any off-label statements or allegedly unsubstantiated

claims of superiority were a substantial factor in inducing the submission of a false claim for

payment.  Relators allege that the WC sales force was trained to promote WC products for off-

label uses and to make unsubstantiated claims that WC drugs were superior to competitor

products, *see id.* ¶¶ 294-300, 315-23, 326, 333-36, 399-403, 521, 551, but they do not show that

such training was actually used by sales representatives in the field.[11]  Relators also have not

shown how any statements concerning the superiority of WC's products could have rendered any

_____

[9] Relators' argument that the sales force used similar explanations on multiple prior authorization requests (Opp. 18) does not suggest that these explanations were false as to any federally-insured patients whose prescriptions ultimately were submitted for reimbursement.

[10] Relators allege that WC's prior authorization scheme "targeted" federally-insured patients, *see* TAC ¶ 280, and that some prior authorization requests for such patients were approved, *see id.* ¶¶ 283, 291.  They do not show, however, that any of these approved prescriptions were ever submitted for reimbursement.

[11] Relators assert that managers made unsubstantiated claims regarding WC drugs' superiority and that WC personnel promoted products to specialists who may not typically have written prescriptions for on-label uses of such products.  *See* Opp. 19.  Relators have not shown, however, that any such promotions led healthcare providers to write prescriptions for federally-insured patients or that any such prescriptions were submitted for reimbursement.

resulting claims for payment ineligible for reimbursement, especially when healthcare providers prescribed the drugs for on-label uses.  Relators assert that this conduct constituted "misbranding" under the FDCA, Opp. 3, but they have not shown how the alleged conduct supposedly made the claims ineligible for payment under the Medicare or Medicaid statutes. Nor have Relators shown that any alleged promotional statements were a substantial factor in the submission of these or other claims for reimbursement.[12]  Unlike in *Carpenter*, Relators point to no survey data or other evidence to suggest that action on the part of the Company's sales force caused healthcare providers to write off-label prescriptions.[13]

## III.   RELATORS HAVE NOT SHOWN THAT ANY MEDICAID CLAIMS WERE FALSE.

Relators have not shown that any claims submitted to state Medicaid agencies were false. To make this showing, Relators must allege facts sufficient to show that a particular state statute or regulation restricts reimbursement of claims to prescriptions written for on-label uses, *see United States ex rel. Banigan v. Organon USA Inc.*, 883 F. Supp. 2d 277, 295 (D. Mass. 2012), or to prescriptions that comply with the Anti-Kickback Statute, *see New York v. Amgen Inc.*, 652 F.3d 103, 111 (1st Cir. 2011).[14]  Relators attempt to shift the burden and suggest that WC must

---

[12] In arguing that supposedly unsubstantiated claims of superiority are material to the government's reimbursement decisions, Relators rely on several settlement agreements between the government and other companies in unrelated matters.  *See* Decl. of Scott Simmer; Opp. 21-22.  The Court should strike these documents because they are irrelevant to Relators' allegations against WC.  They also are of no help to Relators, as Relators do not contend that the companies who entered into the agreements admitted the allegations asserted therein, which were instead "expressly denie[d]."  *See, e.g.,* Decl. of Scott Simmer, Ex. 1, 3-5 (GSK) & Ex. 3, 5-6 (Pfizer).

[13] Contrary to Relators' assertion (Opp. 15 n.7), the allegation that this Court rejected as a "guesstimate" in *Carpenter* was the relator's "observation[ ]," set forth in paragraph 173 of his amended complaint, that 66% of the prescriptions at issue were for off-label uses.  *See* 723 F. Supp. 2d at 406.  The Court did not reach the same conclusion with respect to the survey evidence cited in paragraph 176 of the amended complaint.  *See id.*

[14] Prior to March 2010, violations of the Anti-Kickback Statute did not lead inevitably to the submission of false claims.  *See* WC Mem. 24.

demonstrate that the states involved in this case do, in fact, reimburse claims for off-label prescriptions or prescriptions resulting from kickbacks.  *See* Opp. 24-25.  But Relators cite no authority—and WC is aware of none—suggesting that the burden of pleading and proof on this issue may be shifted to the defendant.[15]  To the contrary, as the court explained in *Banigan*, Relators must allege "that any State denies Medicaid coverage" for the prescriptions at issue. *See* 883 F. Supp. 2d at 295.  Relators have not met this burden.[16]

## CONCLUSION

For the reasons set forth above and in their motion to dismiss, WC requests that the TAC be dismissed in its entirety.  Because Relators have had multiple opportunities to plead their claims—including after WC identified the deficiencies of those claims in great detail—the dismissal of this action should be with prejudice.  *See Hayduk v. Lanna*, 775 F.2d 441, 445 (1st Cir. 1985); *Carpenter*, 723 F. Supp. 2d at 411.

Respectfully submitted,

November 1, 2013

/s/ Ronald G. Dove, Jr.
Geoffrey E. Hobart (BBO# 547499)
Matthew J. O'Connor (BBO #631259)
Ronald G. Dove Jr. (*pro hac vice*)
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC  20004
Tel.: (202) 662-5685

---

[15] Relators also incorrectly suggest that WC must provide an "innocent explanation" as to why the alleged facts do not suggest fraud.  Opp. 11.  To the contrary, Relators bear the burden of showing that it was "beyond possibility" that false claims were submitted for reimbursement. *Duxbury I*, 759 F.3d at 29.

[16] In an implicit concession of this point, Relators have attempted to augment their allegations by filing a declaration containing hundreds of pages of exhibits.  *See* Decl. of Scott Simmer; Opp. 20-21 & n.9; *id.* 25.  These materials should be stricken because the Court cannot consider them in ruling on WC's motion.  *See Michael A. Metnuck & Assocs., Inc. v. Lloyd's Underwriting Syndicate No. 1209*, No. 11-10118, 2013 WL 783050, at *6 (D. Mass. Feb. 28, 2013); *Klein v. MHM Corr. Servs., Inc.*, No. 08-11814, 2010 WL 3245291, at *2 (D. Mass. Aug. 16, 2010).

Fax: (202) 778-5685
rdove@cov.com

*Attorneys for Warner Chilcott Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2013, a true and correct copy of the foregoing

document was served electronically on all registered counsel of record via ECF and is available

for viewing and downloading from the ECF system.

/s/ Ronald G. Dove, Jr.
Ronald G. Dove, Jr. (*admitted pro hac vice*)
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, D.C.  20004
Tel.: (202) 662-5685
Fax: (202) 778-5685
rdove@cov.com